**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JASON WALTERS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-cv-01840-K |
| | § | |
| EXEL, INC. D/B/A DHL SUPPLY CHAIN, | § | |
| | § | |
| *Defendant.* | § | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

*/s/ Annie Lau*
Annie Lau
Texas Bar No. 24057723
FISHER & PHILLIPS LLP
500 N. Akard Street, Suite 3550
Dallas, Texas 75201
Telephone: (214) 220-9100
Facsimile: (214) 220-9122
*alau@fisherphillips.com*

**COUNSEL FOR DEFENDANT**
**EXEL INC. d/b/a DHL SUPPLY CHAIN**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    SUMMARY OF ARGUMENT ............................................................................... 1

II.   STATEMENT OF MATERIAL FACTS ............................................................. 2

    A.   Walters was an Operations Supervisor, with the Primary Responsibility of Managing Others ............................................................................................ 2

    B.   Walters Engaged in a Workplace Altercation and Threatened Another Employee in Violation of Defendant's Employee Handbook and Workplace Safety Rules ............ 3

    C.   Walters was Terminated Due to Improper Physical Contact and Threatening Another Employee in Violation of Defendant's Employee Handbook and Workplace Safety Rules ................................................................................. 8

    D.   Plaintiff Properly Received COBRA Notification ...................................... 10

III.  ARGUMENT AND AUTHORITIES ................................................................. 12

    A.   Legal Standard for Summary Judgment ..................................................... 12

    B.   Defendant Is Entitled to Summary Judgment Dismissal of Plaintiff's FLSA Claim ......................................................................................................... 13

        1.   Standard for Executive Employee Exemption under the FLSA. ............ 13

        2.   Plaintiff's Role as Operations Supervisor Was Exempt under the FLSA. ............. 14

    C.   Summary Judgment is Proper on Plaintiff's Claim for Age Discrimination ................. 15

        1.   Legal Standards for ADEA Claims .......................................................... 15

        2.   Plaintiff's Age Discrimination Claim Lacks Merit and Must Be Dismissed .......... 17

    D.   Defendant Is Entitled to Summary Judgment on Plaintiff's COBRA Claim ................ 21

        1.   Plaintiff's COBRA claim fails as a matter of law ..................................... 21

        2.   Defendant should be awarded its attorneys' fees in connection with Plaintiff's COBRA claim. .......................................................................... 23

    E.   Alternatively, Defendant Is Entitled to Summary Judgment Regarding Certain of Plaintiff's Damages Claims. .......................................................... 24

IV.   CONCLUSION .................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Cedar Hill Indep. Sch. Dist.*,
No. 3:13-CV-2598-D, 2014 WL 66488 (N.D. Tex. Jan. 8, 2014)............................................25

*Amezquita v. Beneficial Texas*,
264 F. App'x 379 (5th Cir. 2008) .......................................................................................18

*Bennett v. Total Minatome Corp.*,
138 F.3d 1053 (5th Cir.1998) ..............................................................................................15

*Bienkowski v. American Airlines, Inc.*,
851 F.2d 1503 (5th Cir. 1988) .......................................................................................17, 18

*Bodenheimer v. PPG Industries, Inc.*,
5 F.3d 955 (5th Cir. 1993) ....................................................................................................19

*Brock-Chapman v. Nat'l Care Network, L.L.C.*,
No. 3:10-CV-454-B, 2013 WL 169177 (N.D. Tex. Jan. 16, 2013) ......................................15

*Brown v. CSC Logic, Inc.*,
82 F.3d 651 (5th Cir. 1996) ..................................................................................................19

*Brunnemann v. Terra Int'l, Inc.*,
975 F.2d 175 (5th Cir. 1992) ................................................................................................26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................................12, 13

*Dean v. American Sec. Ins. Co.*,
559 F.2d 1036 (5th Cir. 1977) ..............................................................................................26

*Degruise v. Sprint Corp.*,
279 F.3d 333 (5th Cir. 2003) ................................................................................................21

*Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*,
738 F.3d 703 (5th Cir. 2013) ................................................................................................12

*Dotson v. U.S.*,
87 F.3d 682 (5th Cir. 1996) ..................................................................................................27

*Fields v. J.C. Penney Co., Inc.*,
968 F.2d 533 (5th Cir. 1992) ................................................................................................16

*Gibbs v. Gibbs*,
210 F.3d 491 (5th Cir. 2000) ................................................................................................23

*Good v. Ask Jeeves, Inc.*,
    No. 3:02-CV-1946-L, 2004 WL 2203248 (N.D. Tex. Sept. 30, 2004)...................................21

*Hardy v. SDM Hosp., LLC*,
    No. 20-CV-3157-S-BK, 2022 WL 272718 (N.D. Tex. Jan. 10, 2022)...................................25

*Henderson v. Fenwick Protective Inc.*,
    No. 3:14-CV-505-M-BN, 2015 WL 9582755 (N.D. Tex. Nov. 23, 2015)...........................25

*Kanida v. Gulf Coast Medical Personnel LP*,
    363 F.3d 568 (5th Cir. 2004) ......................................................................................16

*Krisher v. Xerox Corp.*,
    102 F. Supp. 2d 715 (N.D. Tex. 1999) .........................................................................21

*Lawrence v. Jackson Mack Sales, Inc.*,
    837 F. Supp. 771 (S.D.Miss. 1992), aff'd 42 F.3d 642 (5th Cir. 1994)...................................22

*Lester v. Advanced Environmental Recycling Technologies, Inc.*,
    248 F. App'x 492 (5th Cir. 2007) .................................................................................26

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) (*en banc*) (*per curiam*)............................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................................13

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)...........................................15, 16

*Meadaa v. K.A.P. Enter., LLC*,
    756 F.3d 875 (5th Cir. 2014) ......................................................................................12

*Moore v. Eli Lilly Co.*,
    990 F.2d 812 (5th Cir.), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126
    L.Ed.2d 419 (1993)....................................................................................................19

*Myers v. King's Daughters Clinic*,
    912 F.Supp. 233 (W.D. Tex. 1996), aff'd 96 F.3d 1445 (5th Cir. 1996)..........................21, 22

*O'Connor v. Consol. Coin Caterer's Corp.*,
    517 U.S. 308 (1996)...................................................................................................17

*Okoye v. University of Texas Houston Health Science Cntr.*,
    245 F.3d 507 (5th Cir.2001) .......................................................................................16

*Onyebuchi v. Volt Mgmt. Corp.*,
    No. 4:04-CV-576-A, 2005 WL 1981393 (N.D. Tex. Mar. 31, 2005)...................................26

*Patrick v. Ridge*,
    394 F.3d 311 (5th Cir. 2004) ...........................................................................19

*Ragas v. Tenn. Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ...........................................................................12

*Rogers v. Hartford Life and Accident Ins. Co.*,
    167 F.3d 933 (5th Cir. 1999) ...........................................................................26

*Russell v. McKinney Hosp. Venture*,
    235 F.3d 219 (5th Cir. 2000) ......................................................................16, 17

*Sands v. Wal-Mart Stores, Inc.*,
    No. 4:06 CV 239 A, 2007 WL 1589438 (N.D. Tex. Jun. 1, 2007)........................16

*Schimek v. MCI, Inc.*,
    No. CIV.A.3:05-CV-0045-P, 2006 WL 2252034 (N.D. Tex. Aug. 7, 2006) ........................22

*Smith v. Berry*,
    165 F.3d 390 (5th Cir. 1999) ...........................................................................26

*Squyres v. Heico Companies, L.L.C.*,
    782 F.3d 224 (5th Cir. 2015) ...........................................................................20

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) .....................................17

*Starnes v. Wallace*,
    849 F.3d 627 (5th Cir. 2017) ...........................................................................25

*Stidom v. JP Morgan Chase Bank, N.A.*,
    No. 3:21-CV-1389-N, 2022 WL 17834904 (N.D. Tex. Dec. 21, 2022)................................17

*Thorson v. Aviall Servs., Inc.*,
    No. 3:15-CV-0571-D, 2018 WL 1426971 (N.D. Tex. Mar. 22, 2018)....................................22

*Topalian v. Ehrman*,
    954 F.2d 1125 (5th Cir.), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121
    L.Ed.2d 46 (1992) ...........................................................................................22

*Turman v. Greenville Indep. Sch. Dist.*,
    No. 3:03-CV-1786-M, 2004 WL 350683 (N.D. Tex. Jan. 27, 2004) ....................................26

*Waggoner v. City of Garland*,
    987 F.2d 1160 (5th Cir. 1993) ..........................................................................20

**Statutes**

29 U.S.C. §§ 206-207 ..........................................................................................13

29 U.S.C. §§ 1001 et seq...........................................................................................23

29 U.S.C. § 1132(c) ............................................................................................26, 27

29 U.S.C. § 1132(c)(3)........................................................................................26, 27

29 U.S.C. § 1132(g)(1) .............................................................................................23

29 U.S.C. § 1161 et seq....................................................................................2, 21, 23

29 U.S.C. § 1166(a)(2), (4)(c)...................................................................................21

**Other Authorities**

29 C.F.R. § 541 et seq...............................................................................................13

29 C.F.R. § 541.1(f) ..................................................................................................14

29 C.F.R. § 541.100(a)..............................................................................................14

29 C.F.R. § 541.100(a)(1) .........................................................................................14

29 C.F.R. § 2575.502c–3 ..........................................................................................27

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Exel Inc. d/b/a DHL Supply Chain ("**Defendant**" or "**Exel**"), pursuant to Federal Rule of Civil Procedure 56, together with Local Rules 7.1, 7.2, 56.3, and 56.5, files this Brief in Support of its Motion for Summary Judgment.

## I.     SUMMARY OF ARGUMENT

Defendant is entitled to summary judgment on all claims by Plaintiff Jason Walters ("Plaintiff") in the instant action, for several reasons. The evidence conclusively proves Plaintiff's position with Exel as an Operations Supervisor qualified for the minimum wage and overtime exemption under the Fair Labor Standards Act ("**FLSA**") applicable to executive, administrative, and professional employees. There is no genuine dispute as to any material fact regarding Plaintiff's proper classification as an exempt employee, and Defendant is therefore entitled to judgment as a matter of law on Plaintiff's FLSA claim.

Moreover, Plaintiff cannot establish a *prima facie* case for age discrimination under the Age Discrimination in Employment Act of 1967 ("**ADEA**") because he has no evidence that he was replaced by someone sufficiently younger or otherwise discharged because of his age. Even if Plaintiff could establish a *prima facie* case for age discrimination, any inference of discrimination is destroyed because Exel has proffered legitimate, non-discriminatory reasons for Plaintiff's termination, namely, Plaintiff grabbing a co-worker's jacket and threatening bodily harm to her, in violation of Exel's neutral workplace policies. Plaintiff also has no evidence that Exel's proffered reasons are false, nor does he have any evidence to substantiate any claim that age discrimination is the "real reason" for his separation. Accordingly, Plaintiff's ADEA claim fails as a matter of law.

The evidence also establishes that Exel's benefits plan administrator sent Plaintiff a COBRA Qualifying Event Notice on March 22, 2022—well within the deadline to do so following

his separation from employment on March 16, 2022. Defendant is therefore entitled to summary judgment dismissal of Plaintiff's claim under 29 U.S.C. § 1161 et seq.

Accordingly, Defendant should be granted summary judgment on all claims brought by Plaintiff.

## II.     STATEMENT OF MATERIAL FACTS

### A.     <u>Walters was an Operations Supervisor, with the Primary Responsibility of Managing Others</u>

At all times relevant hereto, Plaintiff was employed by Exel as an Operations Supervisor on an FLSA-exempt, salaried basis. (Complaint ¶¶ 20, 25; APP 014, Lines 7-11; APP 023, Lines 17-25; APP 024, Lines 1-11; APP 037, Lines 3-11). Plaintiff was initially paid a salary of $43,000 per year, which was increased over time but never decreased. (APP 014, Lines 7-8; APP 023, Lines 17-20).

Exel's job description for the Operations Supervisor role states 70 percent of that position involves "Associate Interaction," including conducting one-on-one coaching and performance reviews, directing Associates' daily activities, and managing turnover of hourly staff. (APP 189-191). Process improvement and planning were also responsibilities of the Operations Supervisors, as were conducting interviews and enforcing Exel's company policies. (*Id.)* Operations Supervisors, in fact, conduct interviews for all hourly employees, and the decision to hire or not hire each hourly applicant is made exclusively by the Operations Supervisors. (APP 076, Lines 11-25; APP 077, Lines 1-12; APP 088, Lines 21-25; APP 089, Lines 1-17). Plaintiff performed all of those tasks, including making the decision to hire several Associates on behalf of Exel. (APP 137, Lines 21-25; APP 138, Lines 1-25; APP 139, Lines 1-13; APP 088, Lines 11-24; APP 100, Lines 12-25; APP 101, Lines 1-23).

By Plaintiff's own account, he admits that as an Operations Supervisor for Exel, he

"supervised a 45-member team," "manage[d] labor and expenses[,]" delegated work to staff and set their priorities, set employees' schedules, and "[r]ecruited, interviewed[,] and selected employees to fill vacant roles[.]" (*See* APP 062-063 (Plaintiff's resumé); *see also* APP 041, Lines 9-21 (Plaintiff verifying the accuracy of his resumé); *see, e.g.,* APP 049, Line 25; APP 050, Lines 1-11 (Plaintiff testifying he would redirect employees throughout the day to ensure timely delivery of loads)). He also recommended a subordinate employee for promotion, which Exel granted. (APP 047, Lines 22-25; APP 048, Lines 1-5). Plaintiff also avers he trained employees, monitored employee compliance with company policies, and coached employees who he identified as having performance problems. (APP 062-063). Plaintiff claims he would monitor employee safety and productivity and, if someone was having an issue, he would discuss with them how to improve and, if those efforts were unsuccessful, would issue them disciplinary actions. (APP 038, Lines 10-20; APP 039, Lines 14-19; APP 044, Line 25; APP 045, Lines 1-9; APP 051, Lines 6-15; APP 054, Lines 14-20). Moreover, Plaintiff claims his supervisor, Operations Manager Eartis Shaw ("**Shaw**"), selected him to "rewrite and modernize" the procedural manuals for Exel's Forney, Texas warehouse, which he did based upon his knowledge and experience. (APP 042, Lines 7-25; APP 043, Lines 1-17). When Exel relocated its operations from Terrell to Forney, Texas, Plaintiff testified he was in charge of shutting down and setting up Exel's operations at those facilities. (APP 043, Lines 18-25). On a daily basis, Plaintiff used his skills and experience to determine how to best address problems that had been reported to him by the prior shift's Operations Supervisor and to set the warehouse's priorities for the day. (APP 008, Lines 16-25; APP 009, Lines 1-25; APP 010, Lines 1-25; APP 011, Lines 1-25; APP 012, Lines 1-5; APP 053, Lines 13-23).

**B.    Walters Engaged in a Workplace Altercation and Threatened Another Employee in Violation of Defendant's Employee Handbook and Workplace Safety Rules**

On the morning of March 10, 2022, DeNeill Evaite Hooper ("**Hooper**") met with Shaw

and reported an altercation that occurred earlier that day with Plaintiff. (APP 140, Lines 08-16; APP 168; APP 153, Lines 22-25; APP 154, Lines 1-12; APP 157, Lines 23-25; APP 158, Lines 1-5). Hooper reported that she had reported to a pre-shift meeting that day four minutes late, which was in accordance with an agreement she and Shaw previously made to account for her daycare needs. Plaintiff had a separate one-on-one meeting with Hooper after the pre-shift meetings concluded, and Hooper reported that during that conversation, Plaintiff grabbed her jacket and pulled her in closer to him and, while leaning in, told Hooper to "<u>calm down before he puts me in a chokehold</u>." (APP 155, Lines 24-25; APP 156, Lines 1-17; APP 027, Lines 21-25; APP 028, Lines 1-10).

Shaw excused Hooper from the remainder of her shift and reported the incident to Human Resources Representative Mickey Moza ("**Moza**"). (APP 141, Lines 19-25; APP 142, Line 1; APP 174, Lines 5-18).

Later that same morning, two of Hooper's co-workers—Shaquel Thomas and Tenisha Thomas—called Hooper and reported to her that Plaintiff admitted to both of them that he had told Hooper to "calm down before he puts [her] in a chokehold." (APP 163, Lines 7-25; APP 164, Lines 1-5). Hooper prepared a written statement and provided it to Shaw that day. (APP 153, Lines 22-25; APP 154, Lines 1-11; *see also* APP 168-169 (the statement identified by Hooper in her deposition); *see also* APP 123, Lines 21-25; APP 124, Lines 1-25). In her statement, Hooper reiterates Plaintiff "pulled [her] coat and told [her] to 'calm down before he puts [her] in a choke hold.'" (APP 168). Hooper also noted Shaquel Thomas (neé Wells) and Tenisha Thomas reported to Hooper that Plaintiff had repeated to them what he had said to Hooper. (*Id.*; *see also* APP 159, Lines 1-4 (Hooper testifying she knew Shaquel by her maiden name, Wells, but that she may go by Thomas now)). Hooper reiterated, "This is not a joking matter to me and if [Walters] thinks it

is, it's not. You can't say things like that or put your hands on someone's person." (APP 169).

Also, on the morning of the incident at issue, Shaw asked Plaintiff to come into his office and discuss Hooper's complaint. (APP 141, Lines 14-21). During their conversation, Plaintiff admitted to grabbing Hooper's jacket but claimed it was in reference to her allegedly not wearing proper "safety colors." (APP 142, Lines 2-15). Plaintiff provided a handwritten statement to Shaw that morning, explaining his version of what had transpired, and Shaw suspended Plaintiff pending the outcome of Exel's investigation into Hooper's complaint. (APP 142, Lines 23-25; APP 143, Lines 1-11; *see also* APP 206-209 (Plaintiff's handwritten statement)). That handwritten statement, however, made no mention of grabbing Hooper's jacket or threatening to choke her. (*See* APP 206-209). Accordingly, Moza directed Shaw to obtain a second statement from Plaintiff expressly addressing Hooper's specific claims, which he did. (APP 127, Lines 12-17; APP 135, Lines 1-3; APP 144, Lines 1-3; *see also* APP 210-211 (Shaw's request for Plaintiff to address Hooper's allegations of pulling her jacket and threatening to choke her, and Plaintiff's second written statement in response)). Plaintiff admitted in his second statement to "touching" Hooper's jacket, but he denied threatening to choke her. (APP 210).

Shaw also spoke to Shaquel and Tenisha Thomas and asked them to each complete a statement regarding what they knew of the incident, which they did (although they both refused to sign their respective statement because they purportedly did not want to be involved). (APP 130, Lines 23-25; APP 131, Lines 1-7; APP 143, Lines 13-19; *see also* APP 194-195 (Written statements of Shaquel Thomas and Tenisha Thomas)). Both Thomases confirmed Plaintiff told them he said to Hooper that "he was gonna put her in a choke [hold]" and that they believed he was not serious about the threat, but admitted they did not know how he said it to Hooper because they did not witness the exchange firsthand. (*Id.*)

Exel also obtained a copy of the security video covering the date, time, and place of the altercation. (APP 125, Lines 19-24; APP 072, Lines 11-18; APP 162, Lines 4-10). Hooper confirmed that video captured the incident at issue. (APP 160, Lines 18-21; APP 161, Lines 5-10; *see also* APP 059-061 (screen shot from the security video wherein Hooper identifies herself)). The security video, which has no audio, shows Plaintiff talking to Hooper for approximately 30 seconds, when he then points his finger in her face, steps closer to her, and grabs her jacket before leaning down to continue speaking to her in what appears to be mere inches from Hooper's face. (APP 212).

Exel maintains policies in its Employee Handbook regarding, *inter alia*, appropriate workplace conduct. Rule 510.3A, "General Work and Safety Rules," explicitly explains Exel "will not tolerate associate behavior that is offensive or harmful to the health, safety or morale of other associates, or to the interests of the organization or its customers." (APP 197). Violations of the General Work and Safety Rules are divided into two categories: Class One and Class Two, with Class Two rule violations being considered "gross misconduct" and grounds for immediate termination from employment. (APP 197-198). Pursuant to Rule 510.3B, "General Work Rules," included among Class Two rule violations are "[t]hreatening or inflicting bodily harm on a co-worker, supervisor, manager or customer." (APP 199-200). Exel also maintains a Workplace Violence Prevention policy that states, in relevant part, "Threats, threatening behavior, or acts of violence against associates… by anyone on Company property… other locations associated with the workplace will not be tolerated. Violations of this policy will lead to disciplinary action up to and including termination of employment." (APP 201-202). Included as an example of prohibited workplace violence are:

- **Actual or threatened physical contact** (e.g. fights, pushing, intimidation)
- **Direct, indirect or veiled threats**

• **Verbal threats, including, abusive, intimidating or harassing behavior**….

(*Id.*) There is no exception in with the General Work and Safety Rules or the Workplace Violence Prevention policy that permits or excuses threats of violence intended as a joke. (*See* APP 197-198; APP 199-200; APP 201-202).

Plaintiff, as an almost 11-year employee of Exel, was very familiar with Exel's work rules and prohibition against threats. (APP 029, Lines 24-25; APP 030, Lines 1-3; APP 035, Lines 16-18; see also id. at APP 046, Lines 4-9 (Walters testifying he was responsible for ensuring compliance with Exel's policies and manuals)). In fact, Plaintiff had previously been warned regarding Exel's "no touching" policy after a "pushing" incident with another co-worker approximately 18 months prior. (APP 102, Lines 6-25; APP 103, Lines 1-11 (Dobbins authenticating Exhibit K as his personal notes from the investigation of the August 27, 2020 incident between Walters and Lorenzo Perez); APP 117 ("Note to File" for Walters's personnel file); see also APP 086, Lines 23-25; APP 087, Lines 1-17 (Tammy Williams testifying regarding the prior incident)). Plaintiff did not deny that he had "directed" or "pushed" the supervisor at issue, but the supervisor reported he did not perceive any ill-intent and that he had "tripped" while Plaintiff was physically "directing" him. (APP 102, Lines 18-25; APP 103, Lines 1-7; APP 104, Lines 8-23; APP 106, Lines 10-25; APP 107, Lines 1-8). At the conclusion of Exel's investigation of that incident, then-General Manager John Dobbins met with Plaintiff and discussed that his behavior "was ill advised and under zero circumstances should happen again" and that, had the results of the investigation been different, his employment could have been terminated for having "[placed his] hands on another individual." (APP 097, Lines 17-22; APP 105, Lines 17-25; APP 106, Lines 1-25, APP 107, Lines 1-8; APP 117). Dobbins warned Plaintiff, "[This serves as your one and only warning that issues similar to this will be met with the above[-]mentioned outcomes should it happen again." (APP 117).

### C. Walters was Terminated Due to Improper Physical Contact and Threatening Another Employee in Violation of Defendant's Employee Handbook and Workplace Safety Rules

Based upon the statements of Plaintiff, Hooper, Tenisha Thomas, and Shaquel Thomas, and the security video of the incident, Exel concluded Plaintiff had committed a Class 2 work rule violations (i.e. actual or threatened physical contact; direct, indirect or veiled threats; verbal threats, etc.) and, as a result, made the decision to terminate Walters's employment. (APP 182, Lines 2-10; APP 098, Line 25; APP 099, Lines 1-23; APP 075, Lines 3-20). Although Elliott and Shaw assisted to compile evidence in connection with the investigation, the ultimate decision-makers in Plaintiff's termination were Moza, Dobbins, Director of Human Resources Antonio Juarez ("**Juarez**"), and Senior Director of Human Resources Meredith Singletary ("**Singletary**") (APP 068, Lines 16-25; APP 069, Lines 1-7; APP 069, Lines 16-20; APP 070, Lines 3-8; APP 171, Lines 4-14; APP 122, Lines 11-17; APP 174, Lines 3-24; APP 099, Lines 11-23; *see also* APP 132, Lines 18-24; APP 134, Lines 6-16 (Shaw stating that he gathered evidence as requested by Moza and informed Elliott of what evidence he gathered, "And then I had nothing else to do with [the termination decision]" though he did agree with the ultimate decision)). On March 16, 2022, Shaw met with Plaintiff via telephone call and informed him that his employment was being terminated effective immediately due to his Class 2 work rule violations—specifically, for grabbing an Associate's clothing and pulling her closer and telling the Associate "to calm down before being put in [a] choke hold." (APP 128, Lines 3-25; APP 129, Lines 22-25; APP 130, Lines 1-10; APP 196).

Plaintiff stated in his deposition the only other employee he is aware of having also touched another employee was BP[1]—an employee eight years younger than Plaintiff who, according to

---

[1] Employee initials used to protect non-party privacy.

Plaintiff, head-butted and slapped him on one occasion. (APP 017, Lines 1-2; APP 040, Lines 8-20). Plaintiff claims Defendant took no action against BP for the alleged incident, but Plaintiff did not claim that he or anyone else ever reported it. (APP 040, Lines 21-22). Dobbins, Shaw, and Elliott all testified no such incident was ever reported to them. (APP 110, Lines 1-8; APP 145, Lines 18-25; APP 078, Lines 7-14).

Dobbins, on the other hand, testified that another employee named JA was immediately suspended and, following an internal investigation of the matter, terminated from employment for having touched another employee. (APP 108, Lines 19-25; APP 109, Lines 1-8). Specifically, JA and another employee had engaged in a verbal altercation, during which witnesses viewed JA physically push the co-worker. (APP 203-205). JA's employment was terminated for his violation of the company's Workplace Violence policy. (*See id.*). At the time, JA was 44 years old. (APP 186, ¶ 7).

Although Plaintiff claims a former co-worker advised him that he (Walters) had been replaced by a newly hired, much younger individual named JO, that alleged statement was untrue. (APP 015, Lines 1-10; APP 073, Lines 9-17; APP 126, Lines 5-6). Rather, Exel moved BP, an Operations Supervisor then on the night shift, to fill Plaintiff's role following his termination. (APP 073, Lines 9-17; APP 074, Lines 6-18; APP 126, Lines 5-9; APP 015, Line 25; APP 016, Lines 1-6). At the relevant time, BP was age 41, and Plaintiff was 49. (APP 186, ¶¶ 8-9).

When asked why Plaintiff believed his termination was related to his age, Plaintiff explained his belief was exclusively based upon his understanding that "they brought in a brand new recruit to take [his] place." (APP 021, Lines 6-13). Plaintiff further testified:

> Q. Are you saying that you believe they terminated you in order to bring in this college recruit?
> A. I would not presume to know why --
> Q. Okay. So you don't know.

A. -- they did. I don't know.
Q. So if you weren't replaced by a college recruit but by somebody else, would that make a difference?
A. If only in perception.
Q. What's that mean?
A. I -- I won't ever know the truth. I wasn't there to find out the details. I was dismissed. So I can only assume.

*Id.* at APP 021, Lines 14-25.

Plaintiff also testified that Shaw referred to him as "Paw Paw" and "Old Man." (APP 019, Lines 12-21; APP 022, Lines 13-15). However, Plaintiff also admits Shaw gave him raises during the three to four years Shaw served as his supervisor, and also gave him good performance reviews. (APP 019, Lines 22-25; APP 020, Lines 1-7). Shaw, who did not participate in the termination decision, testified he viewed Plaintiff as a friend, and any decision made by him regarding Plaintiff would likely have been biased based upon that friendship. (APP 133, Lines 14-19; APP 136, Lines 1-10).

### D.    <u>Plaintiff Properly Received COBRA Notification</u>

Exel processes benefits terminations first at the site level, with the local management team submitting a termination into a system which notifies Exel's third-party benefits administrator of the change within one to two weeks. (APP 178, Lines 21-25; APP 179, Lines 1-2; APP 179, Lines 14-17). The benefits administrator then processes the termination and issues the COBRA notification by mail to the terminated employee. (*Id.* at APP 179, Lines 4-11). Exel's Human Resources representatives, including Moza, do not have access to employees' benefits information and thus cannot provide any information regarding their benefits. (*Id.* at APP 179, Lines 20-25; *accord id.* at APP 180, Lines 5-10 (Moza testifying "employees think that HR, [and Moza] as local HR, can process their benefits for them, their enrollment, make changes, et cetera, when I have zero connection with any of that. That's all done by that third-party administrator")). Instead, employees are to contact Exel's benefits hotline with all benefits-related questions, which hotline

directs to the third-party administrator. (*Id.* at APP 181, Lines 14-17).

Following his termination call with Shaw, Plaintiff called and spoke to Moza later that morning and sent him texts on March 21 and 22, 2022. (APP 175, Lines 16-23; APP 176, Lines 24-25; APP 177, Lines 1-17). Plaintiff wanted to know when his health benefits would end and wanted a letter from Exel stating as much so Plaintiff and his child "could be put on my wife's insurance. They required a letter from the company." (APP 018, Lines 5-7). On March 22, 2022, Moza explained to Walters the COBRA notification process and told Plaintiff the local management team advised they had processed the termination on March 21 and that he could therefore follow up with the benefits team (*i.e.*, the third-party benefits administrator) in one to two weeks. (APP 114).

On March 22, 2022, Exel's benefits administrator sent Plaintiff the required COBRA information regarding the continuation of his health care coverage and other health care options. (*See* APP 216-224 (COBRA notice mailed to Plaintiff); *see also* APP 225 (administrator's records showing the notice was printed at 4:57 pm on March 22, 2022); APP 214, ¶¶ 7, 9). The address the notice was mailed to was 142 County Road 2437, Mineola, Texas, 75773—the same address where Plaintiff had lived for approximately 12 years as of the date of his deposition. (*See* APP 216; APP 007, Lines 15-19; APP 214, ¶ 7).

Plaintiff texted Moza again on the afternoon of March 28, 2022, upset that Moza could not answer his benefits questions and alleging Moza had told him his benefits ended on March 21 but that "the info[rmation] sent to [Walters's] pharmacy says the benefits term[inat]ed on the 16th[.]" (APP 115). Moza did not respond. (*Id.*). Later that afternoon, Plaintiff called Exel's benefits administrator regarding his benefits, which the administrator immediately marked the issue as "resolved." (*See* APP 225, ¶ 9 (records of administrator's activities regarding Walters's qualifying

event case).

Plaintiff claims he "has no recollection of receiving notice of the continuation of COBRA rights and has not received notice except by and through his attorney; however, based on the statement of the Human Resource Manager, Mickey Moza, they were not provided on March 16. 2022." (Complaint ¶ 65; *accord* APP 032, Lines 14-20 (Plaintiff testifying, "I did not receive any COBRA rights or any heads up that I needed to be looking for them. Didn't know what they were, what they entailed")). Plaintiff's position is that he should have been provided notice of when his benefits would end, and how he could continue them, during "the exit interview, which did not happen." (APP 033, Lines 19-22; *accord id.* at APP 034, Lines 4-9 (Plaintiff stating "it was explained to [him]" that employees receive their COBRA notice during their exit interview, though he's never personally attended an exit interview)).

## III.    ARGUMENT AND AUTHORITIES

### A.    <u>Legal Standard for Summary Judgment</u>

Summary judgment is appropriate when the record shows there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *see also, Meadaa v. K.A.P. Enter., LLC*, 756 F.3d 875, 880 (5th Cir. 2014) (a dispute is *genuine* only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

After the moving party demonstrates that there are no genuine issues of material fact for jury trial, the nonmoving party *must* come forward with *specific* facts that establish there are. *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (quoting *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000)). For Plaintiff to do so, he must go beyond his pleadings and present specific facts establishing that genuine fact issues

remain for trial notwithstanding the movant's showing to the contrary. *Celotex*, 477 U.S. at 324. The standard also requires more than some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment for a defendant is mandatory when the plaintiff fails to meet his summary judgment burdens. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (*en banc*) (*per curiam*).

> **B.      Defendant Is Entitled to Summary Judgment Dismissal of Plaintiff's FLSA Claim**

>> *1.      Standard for Executive Employee Exemption under the FLSA.*

The FLSA generally requires that all covered, nonexempt workers are entitled to a minimum wage of $7.25 per hour and, for all time worked in excess of 40 hours per workweek, compensation at a rate of time and one-half the employee's regular rate of pay. 29 U.S.C. §§ 206-207. However, Section 13(a)(1) of the FLSA, as defined by applicable regulations, provides an exemption from the Act's minimum wage and overtime requirements for employees employed as bona fide executive, administrative, professional, and outside sales employees. 29 C.F.R. § 541 et seq. To qualify for the executive employee exemption, all of the following tests must be met:

1. The employee must be compensated on a salary basis (as defined in the Regulations) at a rate not less than $684 per week;

2. The employee's primary duty must be managing the enterprise, or managing a customarily recognized department or subdivision of the enterprise;

3. The employee must customarily and regularly direct the work of at least two or more other employees; and

4. The employee must have the authority to hire or fire other employees, or the employee's suggestions and recommendations as to the hiring, firing, advancement,

promotion, or any other change of status of other employees must be given particular weight.

29 C.F.R. § 541.100(a). The applicable regulations include as management duties under the second element of this category of exemption: interviewing, selecting, and training of employees; setting and adjusting the rates of pay and hours of work; directing other employees' work; maintaining other employees' production records for use in supervision or control; appraising other employees' productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling employee complaints and grievances and disciplining employees when necessary; planning the employee work; determining the techniques to be used; apportioning the work among the workers; determining the types of materials, supplies, machinery, or tools to be used or merchandise to be bought, stocked, and sold; and providing for the safety of the workers and their property. 29 C.F.R. § 541.1(f).

>     2.    *Plaintiff's Role as Operations Supervisor Was Exempt under the FLSA.*

Plaintiff's role as an Operations Supervisor—as defined both by the applicable job description and Plaintiff's own description of his duties—clearly qualify for the FLSA's executive employee exception from minimum wage and overtime requirements.

First, Plaintiff admits he was at all times paid on a salary basis, and that he was compensated at a rate of at least $43,000 per year, which equates to $826.92 per week. (APP 014, Lines 7-8; APP 023, Lines 17-20). This is well above the FLSA's minimum salary requirement of $684 per week. 29 C.F.R. § 541.100(a)(1).

Second, Plaintiff's primary duty was the management of Exel's enterprise. Plaintiff interviewed, selected, and trained employees, and recommended employees for promotion. (*See* APP 062-063 (Plaintiff's resumé); *see also* APP 041, Lines 9-21 (Plaintiff verifying the accuracy of his resumé); *accord* APP 137, Lines 21-25; APP 138, Lines 1-25; APP 139, Lines 1-13; APP

088, Lines 11-24; APP 100, Lines 16-25; APP 101, Lines 1-23; APP 189; *see also* APP 047, Lines 22-25; APP 048, Lines 1-5 (Plaintiff discussing a subordinate who, upon his recommendation, was promoted to a night-shift Operations Supervisor role)). He set Associates' schedules, delegated work to staff, set their priorities, and planned their work. (APP 062; APP 049, Line 25; APP 050, Lines 1-11 (Plaintiff testifying he would redirect employees throughout the day to ensure timely delivery of loads)). He reviewed productivity reports and apprised employees' productivity and efficiency. (APP 038, Lines 10-20; APP 039, Lines 14-19; APP 044, Line 25; APP 045, Lines 1-9; APP 051, Lines 6-15; APP 054, Lines 14-20). Plaintiff also monitored for employee safety and issued employee discipline for safety violations. (APP 013, Lines 7-9; APP 026, Lines 15-16; APP 031, Lines 10-20; APP 036, Lines 23-24; APP 038, Lines 10-20).

Third, Plaintiff customarily and regularly supervised two or more other employees. In fact, he testified that during his shift as an Operations Supervisor, he supervised a team of approximately 45 employees. (APP 052, Lines 4-18).

Finally, Plaintiff not only had the ability to hire and fire employees, he executed that authority on numerous occasions. (APP 025, Lines 12-16; APP 137, Lines 21-25; APP 138, Lines 1-25; APP 139, Lines 1-13; APP 088, Lines 11-24; APP 100, Lines 16-25; APP 101, Lines 1-23).

Because Plaintiff's position as an Operations Supervisor qualified for the FLSA's executive employee exemption, Defendant is entitled to summary judgment dismissal of his FLSA claims.

### C.     Summary Judgment is Proper on Plaintiff's Claim for Age Discrimination

####         *1.     Legal Standards for ADEA Claims.*

Courts apply the *McDonnell Douglas* burden shifting framework to analyze discrimination claims under the ADEA. *Brock-Chapman v. Nat'l Care Network, L.L.C.*, No. 3:10-CV-454-B, 2013 WL 169177, at *3 (N.D. Tex. Jan. 16, 2013); *see also Bennett v. Total Minatome Corp.*, 138

F.3d 1053, 1060 (5th Cir.1998) (applying the *McDonnell Douglas* framework to age discrimination claims under the ADEA). The *McDonnell Douglas* framework is applicable at the summary judgment stage of litigation. *Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 574-75 (5th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In order to survive summary judgment, the plaintiff must raise a genuine issue of material fact by satisfying the *McDonnell Douglas* framework. *Okoye v. University of Texas Houston Health Science Cntr.*, 245 F.3d 507, 512 (5th Cir.2001).

Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To prove a *prima facie* case of age discrimination under the ADEA, the plaintiff must present evidence to show that: (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and either (4)(a) he was replaced by someone outside the protected class, or (b) he was replaced by someone younger, or (c) he was otherwise discharged because of his age." *Fields v. J.C. Penney Co., Inc.*, 968 F.2d 533, 536 (5th Cir. 1992). The fourth element "requires [Plaintiff] to provide evidence adequate to create an inference that he was fired based upon his on age." *Sands v. Wal-Mart Stores, Inc.*, No. 4:06 CV 239 A, 2007 WL 1589438, at *3 (N.D. Tex. Jun. 1, 2007) (citing *O'Connor v. Consol. Coin Caterer's Corp.*, 517 U.S. 308, 312 (1996)).

If the plaintiff is able to establish a *prima facie* case, the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for its decision. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1817, 36 L.Ed.2d 668 (1973)). "This burden on the employer is only one of production, not persuasion, involving no credibility assessments." *Id.* If the employer carries its

burden, the inference of discrimination created by the plaintiff's *prima facie* case "drops out of the picture and the fact finder must decide the ultimate question: whether the plaintiff has proven intentional discrimination." *Id.* (internal quotations and citations omitted). In order to rebut a defendant's showing of legitimate, nondiscriminatory reasons for its actions, "[i]t is not enough… to *dis* believe the employer." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Instead, "the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* "To succeed on his age discrimination claim, [a plaintiff] must prove 'that age was the "but-for" cause of the challenged adverse employment action.'" *Stidom v. JP Morgan Chase Bank, N.A.*, No. 3:21-CV-1389-N, 2022 WL 17834904, at *3 (N.D. Tex. Dec. 21, 2022) (quoting *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 180 (2009)).

### 2. Plaintiff's Age Discrimination Claim Lacks Merit and Must Be Dismissed.

#### a) Plaintiff Cannot Establish a *Prima Facie* Case of Age Discrimination.

As the Fifth Circuit has noted:

> The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age. … [T]he *prima facie* case requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . .. In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger.

*O'Connor v. Consol. Coin Caterers*, 517 U.S. 308, 312 (1996) (internal quotation and citation omitted); *see also Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir. 1988) ("Bienkowski contends that to establish his *prima facie* case he need only show that he was replaced by someone younger than himself, if even by a mite. The law is not so simplistic. . .. *Burdine* has been reasonably interpreted to require a plaintiff to show that he was replaced by a worker sufficiently younger in the context of his employment to permit an inference of age discrimination. . .. In the present case, Bienkowski is five years older than his replacement and the

replacement was the same age, 54, as the average American security department worker. . ..
Although this fact does not legally preclude the possibility of discrimination against Bienkowski,
. . . it is a close question whether he established a *prima facie* case.").

Here, Plaintiff, then age 49, was replaced by another existing worker who was age 41,
someone also within the class of individuals protected under the ADEA. (APP 186, ¶¶ 8-9).
Notably, including Plaintiff, there were at least nine Operations Supervisors over the age 40 at the
time, <u>six of whom were age 50 or older</u>. (APP 187, ¶ 10). Thus, Plaintiff does not have evidence
that he was replaced by a worker *sufficiently younger in the context of his employment* to establish
the fourth required element of his *prima facie* case of age discrimination. *See Bienkowski*, 851 F.2d
at 1506. Moreover, as Plaintiff has admitted, his claim of age discrimination is based on nothing
but pure speculation. *See* APP 021, Lines 14-25.

Because Plaintiff cannot establish a *prima facie* case of discrimination under the ADEA,
Defendant should be granted summary judgment in its favor on such claim.

> b) <u>Plaintiff Cannot Rebut Defendant's Non-Discriminatory Business Reasons</u>
>    <u>for Its Actions.</u>

Even if Plaintiff could establish a *prima facie* case, Exel has met its burden to produce a
legitimate business justification for Plaintiff's termination: Plaintiff's violations of Exel's General
Work Rules and its Workplace Violence Prevention policy, constitute a Class Two work rule
violation—a terminable offense. Though Plaintiff disputes whether he did, in fact, threaten to
choke Hooper, such dispute is immaterial. "[E]ven an employer's incorrect belief in the underlying
facts—or an improper decision based on those facts—can constitute a legitimate, non-
discriminatory reason for termination." *Amezquita v. Beneficial Texas*, 264 F. App'x 379, 386 (5th
Cir. 2008) (citing *Bryant v. Compass Group USA Inc*., 413 F.3d 471, 478 (5th Cir. 2005);
*Mayberry v. Vought Aircraft Co*., 55 F.3d 1086, 1091 (5th Cir. 1995)). Plaintiff admits to

"touching" Hooper's jacket (as confirmed in video evidence)—which by itself constitutes a terminable Class Two rule violation—and, even if he didn't threatened Hooper as alleged, Defendant still reasonably believed he did based on the three witness statements it was provided to the contrary.

Once the employer meets its burden of production, "[t]o avoid dismissal on the employer's motion for summary judgment, the employee must show that the employer's putative legitimate, nondiscriminatory reason was not its real reason, but was merely a pretext for discrimination." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (citations omitted). To survive summary judgment, Plaintiff must set forth probative evidence demonstrating that Defendant's stated reasons for its decision to terminate him from his employment was impermissible age discrimination. *Brown v. CSC Logic, Inc*., 82 F.3d 651, 654 (5th Cir. 1996); *Bodenheimer v. PPG Industries, Inc*., 5 F.3d 955, 957-58 (5th Cir. 1993). This requires him to demonstrate "discrete facts" showing a causal nexus between his age and Defendant's adverse employment decision. *Moore v. Eli Lilly Co*., 990 F.2d 812, 817 n. 24 (5th Cir.), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993) (in ADEA cases, "prevalent flaw" in losing plaintiffs' evidence is the absence of proof of nexus between the adverse employment decision and the employer's allegedly discriminatory acts).

Here, Plaintiff is without evidence even remotely suggesting that these non-discriminatory reasons are false or not credible, let alone that the real reason for Defendant's decision was his age. In fact, Plaintiff admits he "touched" Hooper's jacket, and he was aware of Exel's Work Rules, himself being tasked with enforcing those rules and having terminated other employees for Class Two work rule violations. (APP 029, Lines 24-25; APP 030, Lines 1-3; APP 035, Lines 16-18; APP 046, Lines 4-9). Walters had also recently been admonished for touching a co-worker and

explicitly warned that any future instance of placing his hands on another would result in termination. (APP 117).

In support of his age discrimination claim, Plaintiff relies exclusively upon his speculative belief that he was replaced by "a brand-new college recruit" much younger than he, rather than a "seasoned supervisor." (APP 021, Lines 6-13). Yet, this belief was mistaken; Plaintiff was, indeed, replaced by a seasoned Operations Supervisor who, at the time he replaced Plaintiff, had been working on the night shift for over nine years. (APP 073, Lines 9-17; APP 074, Lines 6-18; APP 126, Lines 5-9; APP 015, Line 25; APP 016, Lines 1-6; *see also* APP 186, ¶ 9 (showing BP's original hire date to be November 26, 2012)). Moreover, although Plaintiff alleges Shaw referred to him as "Paw Paw" and "Old Man," Shaw gave him raises and good performance reviews, and was not involved in the ultimate decision to terminate Plaintiff's employment.  (APP 019, Lines 12-21; APP 019, Lines 22-25; APP 020, Lines 1-7; APP 022, Lines 13-15). Rather, the ultimate decision-makers were Moza, Dobbins, Juarez, and Singletary—none of whom Plaintiff even *alleges*, much less has proof by a preponderance of the evidence, harbored a discriminatory animus toward him based upon his age. (APP 068, Lines 16-25; APP 069, Lines 1-7; APP 069, Lines 16-20; APP 070, Lines 3-8; APP 071, Lines 4-14; APP 122, Lines 11-17; APP 174, Lines 3-24; APP 099, Lines 11-23; *see also* APP 132, Lines 18-24; APP 134, Lines 6-16 (Shaw stating that he gathered evidence as requested by Moza and informed Elliott of what that evidence was, "And then I had nothing else to do with [the termination decision]")). Moreover, remarks such as calling someone "old man" have been found by the Fifth Circuit to be insufficient, on its own, to establish a discriminatory animus. *See, e.g.*, *Squyres v. Heico Companies, L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015) ("old guy" and "old man" insufficient to show discriminatory animus); *Waggoner v. City of Garland*, 987 F.2d 1160, 1163 (5th Cir. 1993) (supervisor referring to plaintiff as "old fart"

held to be insufficient to establish discrimination); *see also Good v. Ask Jeeves, Inc.*, No. 3:02-CV-1946-L, 2004 WL 2203248, at *6 (N.D. Tex. Sept. 30, 2004) ("Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment") (citing *Scales v. Slater*, 181 F.3d 703, 712 (5th Cir. 1999)).

Because Plaintiff has no evidence to rebut Defendant's legitimate, non-discriminatory reasons for terminating his employment, his ADEA claim fails as a matter of law.

**D.      Defendant Is Entitled to Summary Judgment on Plaintiff's COBRA Claim.**

*1.      Plaintiff's COBRA claim fails as a matter of law.*

Like his claims under the FLSA and ADEA, Plaintiff's COBRA claims are also subject to summary judgment dismissal because he had no evidence Defendant failed to comply with the requirements of 29 U.S.C § 1161 et seq.

Under COBRA's provisions, an employer has 30 days in which to notify an ERISA-qualified plan administrator of any qualifying event, such as a covered employee's termination, and the administrator, in turn, has 14 days in which to notify the employee of his rights under ERISA as a plan beneficiary. 29 U.S.C. § 1166(a)(2), (4)(c). As this Court has observed:

> In an action for benefits under COBRA, the administrator bears the burden of proving that adequate notice was given. While the statute itself does not provide guidance with respect to the manner in which notice is to be provided, courts interpreting this issue have held that a "good faith attempt" to comply with the notice requirement is sufficient.

*Krisher v. Xerox Corp.*, 102 F. Supp. 2d 715, 721 (N.D. Tex. 1999) (collecting cases). In the Fifth Circuit, "the law requires only that the employer make a good faith attempt to comply with COBRA's notification provision." *Degruise v. Sprint Corp.*, 279 F.3d 333, 337 (5th Cir. 2003); *see also Myers v. King's Daughters Clinic*, 912 F.Supp. 233, 236 (W.D. Tex. 1996), aff'd 96 F.3d 1445 (5th Cir. 1996). "While the statute itself does not specify what exactly will qualify as notice,

numerous courts have held that mailing COBRA notification to an employee's last known address satisfies the notification provision." *Schimek v. MCI, Inc.*, No. CIV.A.3:05-CV-0045-P, 2006 WL 2252034, at *13 (N.D. Tex. Aug. 7, 2006) (collecting cases); *Myers*, 912 F. Supp. At 236; *Lawrence v. Jackson Mack Sales, Inc.*, 837 F. Supp. 771, 782 (S.D.Miss. 1992), aff'd 42 F.3d 642 (5th Cir. 1994). Moreover, "§1166 does not require proof that the notices required by that section be received." *Lawrence*, 837 F. Supp. at 783; *accord Thorson v. Aviall Servs., Inc.*, No. 3:15-CV-0571-D, 2018 WL 1426971, at *12 (N.D. Tex. Mar. 22, 2018) (holding "employers are not 'required to ensure that plan participants actually receive [COBRA] notice'; they are merely obliged to act in good faith and to use means 'reasonably calculated' to reach plan participants" (quoting *Degruise*, 279 F.3d at 336)).

Here, the evidence conclusively establishes Exel's benefits administrator mailed a notice of COBRA rights on March 22, 2022, to Plaintiff at his last known address, which was and is his correct mailing address. *See* APP 007, Lines 15-19. Clearly, then, Defendant notified its administrator of Plaintiff's March 16, 2022 termination well within the 30-day deadline to do so, and the administrator unquestionably sent Plaintiff the required notice within 14 days thereafter, as required by COBRA. The summary judgment evidence presented by Defendant establishes its good faith attempt to provide Plaintiff with COBRA notice. Plaintiff's counterargument is predicated solely on his allegation that the COBRA notice was never *received*. As a result, he has failed to adduce any evidence showing there is a genuine issue for trial. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir.), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

Because Plaintiff has not raised a genuine issue for trial, Defendant is entitled to summary judgment on Plaintiff's COBRA claim.

2.    *Defendant should be awarded its attorneys' fees in connection with Plaintiff's COBRA claim.*

Pursuant to 29 U.S.C. § 1132(g)(1), the court has discretion to award reasonable attorneys' fees and costs to *either party* in an action under COBRA brought by a plan participant under 29 U.S.C. §§ 1001 et seq. Plaintiff avers his COBRA claims arise from Defendant's alleged violation of 29 U.S.C. §§ 1161 et seq., therefore allowing Defendant to recover its reasonable attorneys' fees and costs. *See* Complaint ¶¶ 8, 60, 67, 68.

Defendant need not be the prevailing party in order to recover its attorneys' fees and costs incurred with Plaintiff's COBRA claim. *Gibbs v. Gibbs*, 210 F.3d 491, 503 (5th Cir. 2000) (holding "a party need not prevail in order to be eligible for an award of attorneys' fees under § 1132(g)(1) of ERISA"). In considering whether to award attorneys' fees under § 1132(g)(1), courts consider the following five factors:

> (1) the degree of the opposing parties' culpability or bad faith;
> (2) the ability of the opposing parties to satisfy an award of attorneys' fees;
> (3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances;
> (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
> (5) the relative merits of the parties' position.

*Id.* at 504 (citing *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1458 (5th Cir. 1995)).

Defendant at all times acted swiftly and in good faith and provided the required COBRA notice within a week of Plaintiff's termination—thus well within the 45-day deadline to do so; Plaintiff, however, had received the COBRA notice and proceeded with his COBRA claim on the contention that he doesn't recall receiving it, which as explained *supra* makes no legal difference. He knew the notice was timely sent, and he pursued this claim in bad faith. The first and fifth factors therefore weigh in favor of awarding Defendant its attorneys' fees and costs. Notably, on August 26, 2022, Andrew Etter, Exel's Associate General Counsel, explicitly notified and

provided Plaintiff's counsel a copy of the March 22, 2022 COBRA notice that was sent to Plaintiff. (APP 226, ¶ 3; APP 229-239; APP 240-241). Despite the clear evidence provided, Plaintiff nevertheless pursued this baseless claim.

An award of attorneys' fees is also warranted under the circumstances to dissuade other employees from pursuing similar baseless claims. *See, e.g.*, Complaint ¶ 17 (Plaintiff alluding other employees may join or assert similar claims, stating, "Plaintiff *at this time* is not making any claims on a representative basis, only for himself. That being said other employees in the same position as Plaintiff were treated and paid the same as Plaintiff…").

With respect to the fourth factor, Plaintiff filed suit solely to benefit himself and not any other ERISA plan participant. Although Defendant lacks sufficient knowledge to opine regarding whether Plaintiff has the ability to satisfy an award of attorneys' fees, his financial situation should not be used to shield him from responsibility for forcing Defendant to incur costs to defend against a claim brought in bad faith that was, at the outset, not supported by the law or the facts known to Plaintiff pre-suit.

In light of the assessment factors weighing in favor of Defendant and the totality of the circumstances of this case, Defendant should be awarded its attorneys' fees and costs incurred in connection with Plaintiff's COBRA claim.

    **E.**    **Alternatively, Defendant Is Entitled to Summary Judgment Regarding Certain of Plaintiff's Damages Claims.**

To the extent any of Plaintiff's claims are not dismissed by summary judgement, Defendant is entitled to summary judgment regarding Plaintiff's claims for compensatory damages because such damages are not available under the FLSA, ADEA, or COBRA. Defendant is also entitled to summary judgment regarding Plaintiff's claim for punitive damages under the FLSA and ADEA, as punitive damages are also not available under those statutes.

Plaintiff's claims all arise under the FLSA, 29 U.S.C. § 201 et seq.; the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq. ("ADEA"); and COBRA. Complaint ¶¶ 1-2, 5. In connection with those claims, Plaintiff seeks to recover *inter alia* punitive and compensatory damages. *Id.* at ¶ 4. Plaintiff also seeks an award of prejudgment interest. *Id.* at ¶¶ 67, 68. These categories of damages, however, are not available in connection with the claims asserted.

A plaintiff cannot recover non-pecuniary losses or punitive damages under the FLSA except in cases alleging retaliation. *Starnes v. Wallace*, 849 F.3d 627, 636 (5th Cir. 2017) (citing *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062, 1066 (5th Cir. 2016) (deciding "the FLSA's broad authorization of 'legal and equitable relief' encompasses compensation for emotional injuries suffered by an employee *on account of employer retaliation*") (emphasis added)); *accord Adams v. Cedar Hill Indep. Sch. Dist.*, No. 3:13-CV-2598-D, 2014 WL 66488, at *7 (N.D. Tex. Jan. 8, 2014) (holding punitive damages are not available under the FLSA to a plaintiff who asserts claims only for unpaid regular and overtime wages). Here, Plaintiff has not alleged any retaliation whatsoever, therefore he is not entitled to compensatory or punitive damages in connection with his FLSA claim. Additionally, "prejudgment interest is not available for FLSA claims… that seek compensation for unpaid overtime wages and liquidated damages." *Henderson v. Fenwick Protective Inc*., No. 3:14-CV-505-M-BN, 2015 WL 9582755, at *7 (N.D. Tex. Nov. 23, 2015), report and recommendation adopted, No. 3:14-CV-505-M, 2015 WL 9582147 (N.D. Tex. Dec. 28, 2015) (citing 29 U.S.C. § 216; *Knowlton v. Greenwood Indep. Sch. Dist.*, 957 F.2d 1172, 1183 (5th Cir. 1992)); *accord Hardy v. SDM Hosp., LLC,* No. 20-CV-3157-S-BK, 2022 WL 272718, at *6 (N.D. Tex. Jan. 10, 2022), report and recommendation adopted, No. 3:20-CV-3157-S-BK, 2022 WL 271751 (N.D. Tex. Jan. 28, 2022)) ("Prejudgment interest is not available for FLSA claims that seek compensation for unpaid overtime wages and liquidated damages"). Because Plaintiff is

only seeking compensation for allegedly unpaid overtime—not retaliation—in connection with his FLSA claim, he is also not entitled to prejudgment interest.

Likewise, "[a] plaintiff suing under the ADEA may recover only pecuniary losses such as wages and fringe benefits." *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992); *accord Turman v. Greenville Indep. Sch. Dist.*, No. 3:03-CV-1786-M, 2004 WL 350683, at *6 (N.D. Tex. Jan. 27, 2004) (holding punitive damages are not available under the ADEA, noting "ADEA remedies are supposed to be compensatory, not punitive") (quoting *Hansard v. Pepsi–Cola Metro. Bottling Co.*, Inc., 865 F.2d 1461, 1469 (5th Cir. 1989)). The Fifth Circuit has made clear that "[u]nlike Title VII, the ADEA does not provide for punitive damages" and, moreover, "damages for mental pain and suffering… are not available… [under the ADEA] alone." *Smith v. Berry*, 165 F.3d 390, 395 (5th Cir. 1999); *see also Dean v. American Sec. Ins. Co.*, 559 F.2d 1036 (5th Cir. 1977) (definitively holding punitive damages are not recoverable in a private action brought under ADEA).

The Fifth Circuit has also held compensatory and punitive damages are not available in addition to the civil remedy provisions of ERISA under Section 1132(c). *Lester v. Advanced Environmental Recycling Technologies, Inc.*, 248 F. App'x 492, 497 (5th Cir. 2007) (holding compensatory and punitive damages for defendant's delay in paying Plan benefits are not available under civil remedy provisions of ERISA); *accord Rogers v. Hartford Life and Accident Ins. Co.*, 167 F.3d 933, 944 (5th Cir. 1999) (holding "compensatory damages… are not recoverable under ERISA"); *see also Onyebuchi v. Volt Mgmt. Corp.*, No. 4:04-CV-576-A, 2005 WL 1981393, at *3 (N.D. Tex. Mar. 31, 2005) ("the sole remedy for the failure to provide the required COBRA notices is provided by 29 U.S.C. § 1132(c)") (citing *Lopez v. Premium Auto Acceptance Corp.*, 389 F.3d 504, 509 & n.9 (5th Cir. 2004)); *see also* 29 U.S.C. § 1132(c)(3) (providing an employer who fails

to comply with COBRA's notice requirements "may in the court's discretion be liable to such participant… in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems proper"); 29 C.F.R. § 2575.502c–3 (increasing the maximum available award under § 1132(c) from $100 to $110 per day); *see also Dotson v. U.S.*, 87 F.3d 682, 691 (5th Cir. 1996) (noting "ERISA does not permit recovery of compensatory or punitive damages…").

Because Plaintiff seeks remedies that are not available under applicable law, Defendant is entitled to summary judgment on Plaintiff's claims for: (i) compensatory and punitive damages and prejudgment interest in connection with his FLSA claim; (ii) compensatory and punitive damages in connection with his ADEA claim; (iii) compensatory damages in connection with his COBRA claim; and (iv) punitive damages in connection with his COBRA claim, to the extent such claim exceeds the maximum potential award provided in 29 U.S.C. § 1132(c)(3) and 29 C.F.R. § 2575.502c–3.

## IV.    CONCLUSION

Defendant Exel Inc. d/b/a DHL Supply Chain is entitled to summary judgment on Plaintiff's claims because there is no evidence to support his causes of action under the FLSA, the ADEA, or COBRA. Defendant respectfully requests this Court grant its Motion for Summary Judgment, grant summary judgment in favor of Defendant on all claims, and grant Defendant all such other and further relief, in law and in equity, to which it may justly be entitled.

Respectfully submitted,

/s/ Annie Lau
Annie Lau
Texas Bar No. 24057723
FISHER & PHILLIPS LLP
500 N. Akard Street, Suite 3550
Dallas, Texas 75201
Telephone: (214) 220-9100
Facsimile: (214) 220-9122
alau@fisherphillips.com

**COUNSEL FOR DEFENDANT
EXEL INC. d/b/a DHL SUPPLY CHAIN**

## CERTIFICATE OF SERVICE

On the 16th day of February, 2024, I filed the foregoing document with the Clerk of Court for the United States District Court, Northern District of Texas, using the Court's Electronic Case Filing system. I hereby certify that I have served the document on all counsel of record by a manner authorized by FED. R. CIV. P. 5 (b)(2).

Bob Whitehurst
5380 Old Bullard Road, Suite 600, #363
Tyler, TX 75703
whitehurstlawfirm@yahoo.com

Donald E. Uloth
LAW OFFICE OF DONALD E. ULOTH
18208 Preston Road, Suite D-9 #261
Dallas, TX 75252
don.uloth@uloth.pro

/s/ Annie Lau
Annie Lau