**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JASON WALTERS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:22-cv-01840-K** |
| | § | |
| **EXEL, INC. D/B/A DHL SUPPLY CHAIN,** | § | |
| | § | |
| *Defendant.* | § | |

**APPENDIX IN SUPPORT OF DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**<u>APP</u>**

1. Excerpts from Transcript of Jason Walters Deposition, April 11, 2023 ................. 001-058

     <u>Exhibit 10</u> – Screen Shot from Security Video ................................................ 059-061

     <u>Exhibit 13</u> – Jason Walters' Resume ............................................................. 062-063

2. Excerpts from Transcript of Adam Elliott Deposition, April 13, 2023 ................. 064-081

3. Excerpts from Transcript of Tammy Williams Deposition, April 13, 2023 ............ 082-091

4. Excerpts from Transcript of John Dobbins Deposition, June 27, 2023 ................. 092-112

     <u>Exhibit I</u> – Text Messages ............................................................................. 113-116

     <u>Exhibit K</u> – Note to File 08-20 (EXEL_001591) .................................... 117

5. Excerpts from Transcript of Eartis Shaw Deposition, April 13, 2023 .................... 118-148

6. Excerpts from Transcript of DeNeill Hooper, April 13, 2023 ............................... 149-167

     <u>Exhibit 2</u> – Statement of DeNeill Hooper (EXEL_00114-00115) .................... 168-169

7. Excerpts from Transcript of Mickey Moza Deposition, June 27, 2023 ................. 170-184

8. Declaration of Antonio Juarez, HR Director, Exel, Inc., d/b/a DHL Supply Chain, February 15, 2024 ................................................................................................ 185-212

9. Declaration of Bruce Gillis, Head of Compliance, Businessolver.com, Inc., February 15, 2024 ................................................................................................ 213-225

10.    Declaration of Andrew Etter, Associate General Counsel, Exel, Inc. d/b/a DHL
       Supply Chain, February 16, 2024 .......................................................................... 226-241

Respectfully submitted,

/s/ Annie Lau
Annie Lau
Texas Bar No. 24057723
FISHER & PHILLIPS LLP
500 N. Akard Street, Suite 3550
Dallas, Texas 75201
Telephone: (214) 220-9100
Facsimile: (214) 220-9122
alau@fisherphillips.com

**COUNSEL FOR DEFENDANT
EXEL INC. d/b/a DHL SUPPLY CHAIN**

## <u>CERTIFICATE OF SERVICE</u>

On the 16th day of February, 2024, I filed the foregoing document with the Clerk of Court for the
United States District Court, Northern District of Texas, using the Court's Electronic Case Filing
system. I hereby certify that I have served the document on all counsel of record by a manner
authorized by FED. R. CIV. P. 5 (b)(2).

Bob Whitehurst
5380 Old Bullard Road, Suite 600, #363
Tyler, TX 75703
whitehurstlawfirm@yahoo.com

Donald E. Uloth
LAW OFFICE OF DONALD E. ULOTH
18208 Preston Road, Suite D-9 #261
Dallas, TX 75252
don.uloth@uloth.pro

/s/ Annie Lau
Annie Lau

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION
3    JASON WALTERS,              )
          Plaintiff,            )
4                                )
                                 )
5    VS.                         )     CIVIL ACTION NO:
                                 )     3:22-cv-01840-C
6    EXEL,INC D/B/A DHL SUPPLY   )
     CHAIN,                      )
7         Defendant.             )
8
9
10
              -----------------------------------
11                      ORAL DEPOSITION OF
12                        JASON WALTERS
13                       APRIL 11, 2023
              -----------------------------------
14
15
16
17              ORAL DEPOSITION OF JASON WALTERS, produced as
18    a witness at the instance of the Defendant, and duly
19    sworn, was taken in the above-styled and -numbered cause
20    on April 11, 2023, from 9:31 a.m. to 3:56 p.m., before
21    Melanie Seifert, CSR in and for the State of Texas,
22    reported by machine shorthand, at the Mineola Civic
23    Center, 1150 North Newsom Street, Mineola, Texas,
24    pursuant to the Federal Rules of Civil Procedure and the
25    provisions stated on the record or attached hereto.
```

Page 1

1                    A P P E A R A N C E S

2

     FOR THE PLAINTIFF:

3

     Bob Whitehurst
4    WHITEHURST & WHITEHURST
     5380 Old Bullard Road, Suite 363
5    Tyler, Texas 75703
     Phone:  (903) 593-5588
6    E-mail: whitehurstlawfirm@yahoo.com

7

     FOR THE DEFENDANT:

8

     Arthur V. Lambert
9    FISHER & PHILLIPS, LLP
     500 North Akard Street, Suite 3550
10   Dallas, Texas 75201
     Phone:  (214) 220-9100
11   E-mail: alambert@fisherphillips.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                      Page 2

```
 1                          INDEX

 2                                              PAGE

 3   Appearances.....................................2

 4   Agreements......................................6

 5   Exhibit Index...................................4

 6   JASON WALTERS

 7   Examination by Mr. Lambert......................6

 8   Signature and Changes.........................210

 9   Reporter's Certificate........................212

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                           Page  3
```

```
 1                        EXHIBITS
 2      EXHIBIT NAME  DESCRIPTION                      PAGE
 3      Exhibit 1       Application For Employment.......11
 4      Exhibit 2       Plaintiff's Additional Disclosure
                        Pursuant To The Civil Justice
 5                      Expense And Delay Reduction
                        Plan............................19
 6
        Exhibit 3       Exel Letter 6/8/2011
 7                      Exel 000012.....................34
 8      Exhibit 4       Charge of Discrimination........36
 9      Exhibit 5       Plaintiff's Second Amended
                        Original Complaint..............86
10
        Exhibit 6       Statement By DeNeill Hooper
11                      Exel 00114-00115...............122
12      Exhibit 7       Complainant/Witness Statement
                        Form-Exel 00116................127
13
        Exhibit 8       Complainant/Witness Statement
14                      Form-Exel 00117................128
15      Exhibit 9       Corrective Action Form Exempt
                        Level Associates-Exel 00120.....133
16
        Exhibit 10      Video Photos...................136
17
        Exhibit 11      Plaintiff's Response And Objections
18                      To Defendant's First Set Of
                        Interrogatories................140
19
        Exhibit 12      Plaintiff's Response And Objections
20                      To Defendant's Second Set Of
                        Interrogatories................152
21
        Exhibit 13      Jason Walters' Resume..........162
22
        Exhibit 14      Corrective Action Notice
23                      Exel 00196-00198...............182
24      Exhibit 15      Attendance Corrective Action Notice
                        Exel 00276-00360...............187
25


                                       Page 4
```

1                      EXHIBITS CONTINUED

2     EXHIBIT NAME   DESCRIPTION                    PAGE

3     Exhibit 16     Tammy Williams' Text Messages...198

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 5

APP 005

```
 1                    P R O C E E D I N G S

 2                    THE REPORTER:  Today is April 11th, 2023.

 3      The time is 9:31 a.m.  This is the deposition of Jason

 4      Walters, in the matter of Jason Walters versus Exel,

 5      Inc. d/b/a DHL Supply Chain, Civil Action No.

 6      3:22-cv-01840-C.  We are located at the Mineola Civic

 7      Center, 1150 N. Newsom Street, Mineola, Texas.

 8                    Would counsel state your appearances and

 9      any agreements for the record.

10                    MR. WHITEHURST:  This is Bob Whitehurst,

11      for the plaintiff, Mr. Jason Walters.  I'd like you to

12      send it to read -- to read and sign the deposition.

13                    MR. LAMBERT:  Okay.  Art Lambert, for the

14      defendant.

15                    (Witness sworn.)

16                         JASON WALTERS,

17      having been first duly sworn, testified as follows:

18                         EXAMINATION

19      BY MR. LAMBERT:

20          Q.  Mr. Walters, good morning.

21          A.  Good morning.

22          Q.  How are you doing today?

23          A.  Very well, sir.

24          Q.  Great.  Have you ever had a deposition taken

25      before?
```

Veritext Legal Solutions
800-336-4000

APP 006

```
1                    MR. WHITEHURST:  I don't have them.  I told
2     Theresa --
3                    MR. LAMBERT:  Deanna.
4                    MR. WHITEHURST:  Yeah.  There's thousands
5     of pages.
6                    MR. LAMBERT:  Okay.
7                    MR. WHITEHURST:  I don't have them.
8               How many have you got today?
9                    THE WITNESS:  All of them.
10                   MR. LAMBERT:  Okay.  We'll see what we have
11    to do with that.
12                   MR. WHITEHURST:  Okay.
13                   THE WITNESS:  It's just -- just expenses
14    for my son's insurance payouts.  Summaries.
15         Q.  (BY MR. LAMBERT)  Okay.  Where do you currently
16    live?
17         A.  I live at 142 County Road 2437, Mineola, Texas.
18         Q.  How long have you lived there?
19         A.  Oh, we've been there approximately 12 years.
20         Q.  Do you live with anyone else?
21         A.  I live with my wife of 27 years and my son.
22         Q.  Okay.  How old is your son?
23         A.  He's 16.
24         Q.  What's your highest level of education?
25         A.  Some college.  First year of college.
```

Page 10

1        Q.   And operations manager, we're talking about

2   Eartis Shaw?

3        A.   Yes.

4        Q.   And with you, we're talking about the

5   operation -- you had operations supervisor, right?

6        A.   Yes, sir.

7        Q.   What do you mean -- what's set up shifts?

8        A.   We'd show up; look at the pass-down for

9   information of orders that were to be fulfilled.  Any

10  kind of special equipment or prioritization would be set

11  up and ready to go for the associates when they started

12  at 0600.

13       Q.   The associates are the people that do the bulk

14  of the work; the manual labor?

15       A.   Yes, sir.

16       Q.   What's pass-down?

17       A.   Pass-down is information from a prior shift to

18  the oncoming shift.

19       Q.   Like, what kind of information?

20       A.   Attendance, how many units were pulled and

21  loaded, shipped, any kind of special situations that

22  would need to be addressed in order to make things more

23  smooth on the next shift.  It was just kind of a

24  heads-up for the next shift.

25       Q.   For the next shift.  For the next shift?

Page 21

```
 1          A.   The next shift.  Yes, sir.
 2          Q.   So what would you do in response to receiving
 3     that information of pass-down?
 4          A.   I would prepare whatever it took to get the job
 5     done for the next shift.
 6          Q.   Like, what kind of things would you have to
 7     prepare?
 8          A.   We'd have to get equipment put into the doorway
 9     so that they could be loaded, make sure that we had the
10     proper equipment on hand, operational equipment,
11     condition of forklifts, are they charged and ready to go
12     for the shift, any kind of damages that we see that were
13     not reported prior to the -- me getting there, condition
14     of the dock, condition of the aisles where we would be
15     working.  All those -- all those things.
16          Q.   You had mentioned special equipment.  What type
17     of special equipment would you use?
18          A.   Forklifts, clamp trucks, 18-wheelers, trailers.
19          Q.   So explain to me what happened --
20          A.   Golf carts.
21          Q.   So you kind of got in at five o'clock and you
22     were setting up shifts, right?  What does that entail?
23     Other -- you looked at the pass-down.  You checked out
24     what sort of special equipment and you prioritized --
25     prioritized what?
```

Page 22

1          A.   The due date or the time that a order was due

2     out by.

3          Q.   So would you assign personnel for equipment

4     based on what the priorities were necessary?

5          A.   That is correct.

6          Q.   I'm just trying to get an idea from your day to

7     day.

8          A.   Sure.

9          Q.   So you would come in; get this pass-down from

10    the prior supervisor.  Hopefully a complete one, right?

11         A.   Right.

12         Q.   And from that, you're trying to determine,

13    okay, I got this needs to go out.  This needs to go out.

14    This needs to go out.  This needs to go out.  Just

15    approximate, right?

16         A.   That's correct.

17         Q.   I need this to get this out.  I need this to

18    get that out.  I need this to get that out.  I need this

19    to get that out.

20         A.   Right.

21         Q.   In order to get this out, maybe I'm going to

22    need -- well, you may -- you know, maybe I need the

23    forklifts here because I need to make sure the loading

24    bay is clear --

25         A.   Right.

Page 23

```
 1          Q.   -- so I can get that or whatever.  You're
 2     making decisions like that to kind of -- setting up how
 3     you're going to --
 4          A.   That's correct.
 5          Q.   This -- or sometimes this is the highest
 6     priority.  Everything's got to go --
 7          A.   Right.
 8          Q.   -- to this.  All resources go to that, right?
 9          A.   Right.
10          Q.   That would be what you're looking at, as
11     opposed to -- this is kind of what lawyers do.  This is
12     my day, as I look at my day, and I say this has to go
13     out at nine o'clock; everybody stop; this is what we're
14     doing versus these have to go out today --
15          A.   Right.
16          Q.   -- and, you know, my secretary has nothing.
17     I've got to do this, then --
18          A.   Stop what you're doing and make it happen.
19          Q.   And other times I know I just need to do this
20     earlier because this is more work-intensive, that type
21     of thing; is that fair?
22          A.   Yes.
23               MR. LAMBERT:  Bob, was that a fair
24     assessment of what you do every day?
25               MR. WHITEHURST:  Some.  Whatever jumps up
```

Page 24

```
 1    and bites me.

 2              MR. LAMBERT:  Yeah.

 3        Q.  (BY MR. LAMBERT)  Just like yours.  Sometimes

 4    you think you have an easy day and all of a sudden you

 5    don't.

 6        A.  It can change very rapidly.

 7        Q.  Yeah.  Okay.  So the associates -- and, again,

 8    that's what DHL -- that's what Exel calls the workers,

 9    right?

10        A.  That's correct.

11        Q.  That's just the lingo we're talking about,

12    right?

13        A.  Right.

14        Q.  Ten hours a day.

15              Plaintiff and others in this position.  Do

16    you mean other operation supervisors work 12 hours a

17    day?

18        A.  Yes.

19        Q.  Or more depending on the workload.  So

20    sometimes you work more than 12 hours a day?

21        A.  That's correct.

22        Q.  How many other operation supervisors were

23    there?

24        A.  In March, there would have been four day shift

25    and four night shift plus any college recruits that they
```

Page 25

1    measured on productivity.

2         Q.  What did the person on the floor do?

3         A.  Made sure everything was running properly, that

4    people were working instead of loafing.  It wasn't

5    anything unusual, like forklift parked for an hour, you

6    know, why is -- why is this happening?

7              Our main -- our main goal was to maintain

8    safety for the associates so that they were not injured

9    in any way.

10        Q.  Had you had safety training anywhere along the

11   line?

12        A.  Yes.

13        Q.  Where did you get safety training?

14        A.  Through -- through DHL.  Exel.

15        Q.  What type of safety training?

16        A.  Forklift safety training, basic -- basic

17   training on what your expectation is, dress code, steel

18   -toed shoes.

19        Q.  Appropriate -- yeah.

20        A.  Yes.  Appropriate personal protective

21   equipment, reflective and high vis colors, steel-toed

22   shoes.

23        Q.  Were you certified in any way on safety?

24        A.  I don't recall getting a certificate.

25        Q.  Do you know if those are certified classes?

```
1          Q.  Right.

2          A.  -- just didn't change their name.

3          Q.  Yeah.  See, I talked over you.  I'm sorry.

4               And is that your signature on the second

5     page?

6          A.  Yes.

7          Q.  And that was your starting salary was 43 grand?

8          A.  Yes, sir.

9          Q.  And did you receive raises while you were at

10    the company?

11         A.  Yes.

12         Q.  The fourth paragraph down, it says your new

13    your position qualifies you as a member of Bonus Group

14    E, with a maximum payout of ten percent.

15               Do you see where reading?

16         A.  Yes.

17         Q.  Included in this offer packet is a copy of the

18    Management Incentive Plan.  What was that?

19         A.  It was based on performance for the site and

20    individual performance.

21         Q.  Did you ever receive bonus through the

22    Management Incentive Plan?

23         A.  I believe that that lasted about two years, and

24    then they did away with it.

25         Q.  Okay.  During those two years, did you receive
```

Page 35

```
1            Q.   Who is Andres Miranda?

2            A.   He is the -- one of the other day shift

3       supervisors.

4            Q.   And when -- when did you talk to Mr. Miranda?

5            A.   Sometime after -- maybe a month after March.

6       So April, maybe.  I couldn't be for sure on that, of

7       course.

8            Q.   And he told you John Oloh took -- took over

9       your position?

10           A.   Yes.

11           Q.   What else did you talk about with Mr. Miranda?

12           A.   I think the only other thing we talked about

13      was the passing of my -- I call -- I always called him

14      my mirror.  Bill Huhner.  He was another supervisor on

15      my shift and --  he and I were on the same shift

16      together, and he died suddenly.

17           Q.   When did that happen?  After you left?

18           A.   Yes.

19           Q.   So very shortly after you left?

20           A.   Very shortly.  Yes, sir.

21           Q.   Do you know how old Mr. Huhner was, about?

22           A.   Late 50s.  58, maybe.

23           Q.   How old is Mr. Miranda?

24           A.   Late 30s.

25           Q.   You had mentioned B█████ P█████.  Who is
```

Page 40

```
1    B██████  P████████?
2         A.  He was a supervisor that was on nights.  And
3    then they asked him to come to days, I believe, after I
4    was gone.
5         Q.  Come to days as what?
6         A.  As operations supervisor still.
7         Q.  To work alongside Mr. Oloh?
8         A.  Yes.  To train him up.
9         Q.  Do you know if Mr. P██████ is still there?
10        A.  He is.
11        Q.  How do you know that?
12        A.  I should say the last I checked.
13        Q.  When's the last you checked?
14        A.  Maybe three or four months ago.
15        Q.  How did you check?
16        A.  I guess by text message.
17        Q.  You texted Mr. P██████?
18        A.  Yeah.
19        Q.  Within the last three or four months?
20        A.  Yeah.
21        Q.  And what did you text him about?
22        A.  I think I was asking about what his -- what
23   Johnny's name was.  I didn't know his last name at the
24   time.
25        Q.  And do you still have those text messages?
```

Page 41

```
1          Q.  Do you know how old Mr. Phillips is?

2          A.  Mid to late 30s.

3          Q.  Who is Joel Zamora?

4          A.  Joel Zamora was an inventory supervisor.  And

5    just prior to that, I believe they started training him

6    for a night shift supervisor, as a backup or something

7    to that effect.

8          Q.  Do you know Enrique Lopez?

9          A.  Yes.  Okay.  Enrique was the new guy.  I don't

10   know what they were training him for.  My understanding

11   was he was a relative of the inventory manager's, Jose

12   Luis Gonzales.

13         Q.  What's an inventory manager or inventory

14   supervisor -- or is there a difference between an

15   inventory supervisor and inventory manager?

16         A.  The same kind of difference between an

17   operation manager and operations supervisor.

18         Q.  Okay.

19         A.  One rank above.

20         Q.  So is Enrique Lopez a supervisor or a manager?

21         A.  I don't know what he is.

22         Q.  Okay.

23         A.  He was -- he was new.  I think he could settle

24   in anywhere.

25         Q.  What about Diana Brock.  Do you know Diana
```

Page 43

```
1          A.  I did not receive any COBRA --

2          Q.  No.

3          A.  -- notices.

4          Q.  Not COBRA.  Your need for COBRA notice?

5          A.  I needed to know when my benefits ended so that

6     we could be put on my wife's insurance.  They required a

7     letter from the company.

8          Q.  Did you ever get that letter from the company?

9          A.  I did not.

10         Q.  How did you get on your wife's insurance

11    without a letter?

12         A.  She had to speak with somebody and -- with her

13    company, and they somehow got it squared away after the

14    fact.  I hadn't -- I hadn't heard when the benefits

15    ended.  I couldn't get a letter of when the benefits

16    ended, and that's what they wanted.

17         Q.  Did your wife pay for you to be on her

18    insurance?

19         A.  Yes.

20         Q.  Do you know how much?

21         A.  No, sir, I do not.

22         Q.  You don't know how much additional your wife

23    pays for you to be on the insurance?

24         A.  No.

25         Q.  How about your son.  Does she pay additional
```

Page 48

1    Q.  Okay.  What do you tell people -- when you

2  worked there, what did you tell people you did?  What

3  did you tell people your job was?

4    A.  Supervisor of operations.

5    Q.  So your job consisted primarily of handling

6  tires for warehousing and transportation of Goodyear

7  products.  That's what the company did at that facility,

8  right?

9    A.  Yes, sir.  At that facility, yes, sir.

10    Q.  Okay.  "I was misclassified as an exempt

11  employee and was making approximately $26.44 per hour.

12  I was often referred to as Papa by my coworkers."

13              Who referred to you as Papa?

14    A.  It was actually Paw Paw.  P-a-w P-a-w would be

15  correct.  Paw Paw.

16    Q.  Okay.  Paw Paw by your coworkers.  Who referred

17  to you as that?

18    A.  Eartis, mainly.  He thought that was funny.

19    Q.  That -- that was your supervisor?

20    A.  That was my manager, yes.  Operations manager,

21  Eartis Shaw.

22    Q.  How long had he been your -- your operations

23  manager, about?

24    A.  Three or four years.  He was in inventory

25  before he was operations manager so...

                                          Page 54

1       Q.   Had you received raises at all during that

2    period of time?

3       A.   Yes.

4       Q.   Did he give you performance reviews?

5       A.   Yes.

6       Q.   Did you get good performance reviews?

7       A.   Yes.

8       Q.   Did he treat you differently than other

9    operation supervisors or other employees?

10       A.   Well, I'm the only one he called Paw Paw.

11       Q.   Other than that?

12       A.   And -- other than that, no.

13       Q.   Do you know if you got lower raises than other

14    people?

15       A.   No.

16       Q.   Did you get assigned different shifts or more

17    shifts than other people?

18       A.   Sometimes, yes.

19       Q.   And sometimes not, right?

20       A.   Sometimes the same; sometimes more.  Just

21    depending on what the job required.

22       Q.   Do you think that was because of your age?

23       A.   I would say age and tenure.

24       Q.   Your experience level?

25       A.   Yes.

Page 55

1    manager, the OM1, which would be Eartis Shaw.  The night

2    shift supervisors are generally the least experienced.

3         Q.  Okay.

4         A.  Sorry, I was distracted.  What -- where were --

5    where were we?

6         Q.  We were asking -- I was asking why you thought

7    your age had anything to do with termination at the

8    company.

9         A.  Well, they didn't bring -- they didn't bring in

10   seasoned supervisors.  They brought in a brand-new

11   college recruit to take my place.

12        Q.  Okay.  Other than that?

13        A.  That's all.

14        Q.  Are you saying that you believe they terminated

15   you in order to bring in this college recruit?

16        A.  I would not presume to know why --

17        Q.  Okay.  So you don't know.

18        A.  -- they did.  I don't know.

19        Q.  So if you weren't replaced by a college recruit

20   but by somebody else, would that make a difference?

21        A.  If only in perception.

22        Q.  What's that mean?

23        A.  I -- I won't ever know the truth.  I wasn't

24   there to find out the details.  I was dismissed.  So I

25   can only assume.

                                            Page 57

```
 1              MR. WHITEHURST:  I need to take a
 2    five-minute break.
 3              MR. LAMBERT:  That would be great.  I was
 4    just -- I was actually going to ask if you wanted to do
 5    that.
 6              THE REPORTER:  Off the record at 10:55.
 7              (Recess, 10:55-11:05 a.m.)
 8              THE REPORTER:  Back on the record at 11:05.
 9         Q.  (BY MR. LAMBERT)  Okay.  We are still on
10    Exhibit Number 4.  About how many times would Mr. Shaw
11    call you Paw Paw?  Daily?
12         A.  Daily.
13         Q.  About -- it says on this "Old Man."  Did he
14    call you Old Man?
15         A.  Old Man.  Old Man.  Paw Paw.
16         Q.  And, again, was Mr. Shaw your age?  Older than
17    you?  Younger than you?
18         A.  Slightly younger.
19         Q.  How about Mr. Huhner?
20         A.  He was a little old than I am, yeah.
21         Q.  And did Mr. Shaw call him Paw Paw or Old Man?
22         A.  Yes.
23         Q.  Did he call anybody else Paw Paw or Old Man?
24         A.  No.  Not to my knowledge, I should say.
25         Q.  That's -- as far as you know, yeah.
```

Page 58

```
 1          A.   Yes.

 2          Q.   So at that point you --

 3          A.   That was the schedule was 12-hour shifts.

 4          Q.   That's what I'm saying, yeah.  Your normal

 5     shift --

 6          A.   Right.

 7          Q.   -- was 12 hours?

 8          A.   Right.

 9          Q.   Just like before, it was 12 hours times four.

10     Now Thursday, Friday -- now it's 12 times three?  So

11     they cut you down a day?

12          A.   (Witness nodding head.)

13          Q.   Did your pay stay the same?

14          A.   They didn't cut the pay.

15          Q.   That's what I meant.

16          A.   No.

17          Q.   They didn't reduce your pay.  Your salary

18     stayed the same throughout that period of time and you

19     might have gotten a raise, things like that?

20          A.   Right.  Everything --

21          Q.   They didn't reduce --

22          A.   -- everything was across the board with

23     everybody when there was changes.  There was never

24     individual changes.

25          Q.   Right.  They didn't reduce your pay when they
```

Page 64

1    reduced the hours?

2        A.  They didn't reduce the hours.  They reduced the

3    required shifts.

4        Q.  Okay.  I can -- I understand that.  Believe me.

5    I feel your pain on that.  They didn't reduce --

6        A.  Yes.

7        Q.  -- the pay -- your pay because you were working

8    a different shift schedule.  Fair enough?

9        A.  Uh-huh.

10       Q.  Okay.  Yes?

11       A.  Yes.

12       Q.  I do that to my kids.  It drives them crazy.

13   But it's a habit.

14       A.  Right.

15       Q.  Okay.  And you still were -- still had to work

16   Sundays --

17       A.  Yes.

18       Q.  -- right?  When requested?

19       A.  Yes, sir.  And any other shift that needed to

20   be covered.

21       Q.  Okay.  And did you feel like you had to work

22   more of those or less of those?

23               We had talked about that before.  Because

24   of your tenure, you were relied on more heavily; is that

25   fair?

Page 65

1    A.  Operations manager.

2    Q.  Did you have input into that?

3    A.  Yes.  If there was some kind of issue that I

4  would report or whatever, I --

5    Q.  What kind of issue would you report?

6    A.  Like behavioral issues or lack of productivity,

7  blatant lack of proper --

8    Q.  Person not cutting the mustard?

9    A.  Right.  Instead of finding out months later,

10  you alert immediately and hopefully change that to being

11  productive rather than being nonproductive.

12    Q.  Did you interview employees or prospective

13  employees?

14    A.  Sometimes.

15    Q.  Did you provide input on that?

16    A.  Yes.

17    Q.  Did you write up employees?

18    A.  Yes.

19    Q.  They had a system, right, of -- I forget what

20  it's called.  A number of checks --

21    A.  Right.

22    Q.  -- that you had to go through, like one, two,

23  three and four?

24    A.  Uh-huh.

25    Q.  Yes?

Page 93

```
 1          A.  But yes.

 2          Q.  I have.

 3               "Plaintiff did not represent the company in

 4     the handling of complaints or in resolving grievances."

 5               What does that mean?  Paragraph 38 I'm

 6     looking at.

 7          A.  If there was an issue, it would go to the

 8     operations manager and the GM, and then onto corporate

 9     HR.

10          Q.  What kind of issue?

11          A.  Any kind of grievances.  If it wasn't handled

12     in-house, then it would escalate up to HR.

13          Q.  I mean, you didn't handle anything on the

14     floor?

15          A.  Yes.  I would call people out for unsafe

16     practices and tell them why.

17          Q.  Not interacting appropriately with other --

18     other employees?

19          A.  Yes.  If there was arguments or something like

20     that.

21          Q.  Not uncommon, right?

22          A.  Not uncommon when you get people together.

23          Q.  And Ms. Hooper, that was a complaint, right?

24     And you handled that on your own?  Certainly an issue?

25          A.  Well, no, I didn't.  She -- she left, went up
```

```
1    terminated?

2         A.   Yes.

3         Q.   What did Bill have to say?

4         A.   In his words?

5         Q.   Uh-huh.

6         A.   That's bullshit.

7         Q.   Okay.  Was that a phone call or in person?

8         A.   That was a phone call.

9         Q.   Did he tell you why you were terminated?

10        A.   No.

11        Q.   Then what was bullshit?

12        A.   That I was terminated, in that -- at all,

13   having to do with anything.

14        Q.   I mean, if he didn't know why you were

15   terminated, how did he know it was not appropriate?

16        A.   I don't know -- I don't know what he knew.

17        Q.   Did he --

18        A.   But he -- he -- his opinion was it was

19   bullshit.

20        Q.   And he didn't tell you -- or you didn't discuss

21   the reasons for your termination?

22        A.   I didn't know them at the time.

23        Q.   He didn't discuss what he considered to be the

24   reasons for your termination?

25        A.   No.
```

Veritext Legal Solutions
800-336-4000

APP 027

1     Q.  And didn't tell you why he thought it was not

2  appropriate?

3     A.  The fact that I was not told what was going on

4  or kept in the loop at all --

5     Q.  Did he --

6     A.  -- that's -- that's what he was referring to.

7     Q.  Did he send you anything else other than this

8  screenshot?

9     A.  That's all that I can recall that he sent.

10    Q.  How did he send to you?  By e-mail?

11    A.  I think so.  I'm not certain on that.  It was

12  either by text or by e-mail.

13    Q.  And if you could -- if I could have a copy of

14  that e-mail or text, please.

15    A.  Okay.

16    Q.  So that's somebody from DHL or Exel that you

17  talked to after your termination, right?

18    A.  Yes.

19    Q.  That's somebody we haven't talked about prior

20  to this?

21    A.  Bill Huhner?

22    Q.  We haven't talked about you talking to Bill

23  Huhner prior to this, right?

24    A.  No.  Guess not.

25    Q.  Okay.  So who else did you talk to that we

                                          Page 110

1    in an office.

2         Q.  So you've seen a video that was produced in

3    this case?

4         A.  Yes.

5         Q.  You say, "Plaintiff is the only person in the

6    video that can be recognized."

7                   So that is you in the video?

8         A.  Yes.

9         Q.  And Paragraph 55, "The corrective action form

10   dated March 16th, 2022, which was first seen by

11   Plaintiff on January 17th, 2023, states in part, quote,

12   'termination for violating work rule number two class

13   two rules gross conduct,' closed quote."

14                  See where I'm reading?

15        A.  I do.  Yes.

16        Q.  What's class two mean?

17        A.  I don't have that information in front of me.

18        Q.  You don't recall what class two meant?  You

19   don't recall if there are two levels of discipline,

20   class one for possible violations, class one and class

21   two?

22        A.  It's not something I used every day.  That was

23   used by operations management and the general manager.

24        Q.  And you worked there for how long?

25        A.  Almost 11 years.

Page 115

1        Q.  You knew the rules of conduct that the company

2    worked by, correct?

3        A.  Yes.

4        Q.  And 56 is:  "Based on the directive of Mr. Adam

5    Elliott on March 4th, 2022, Plaintiff, Eartis Shaw, or

6    Adam Elliott should have terminated, slash, disciplined

7    Ms. Hooper for being late again."

8             That's per that procedure we had talked

9    about earlier, right?

10       A.  Yes.

11       Q.  Do you know whether Ms. Hooper was disciplined?

12       A.  I -- I do not.  I was not party to that at all.

13       Q.  The e-mail states no grace period, right?  And

14   that's Exhibit A were talking about?

15       A.  Yes.

16       Q.  And Plaintiff did not terminate/discipline

17   Ms. Hooper because did not have the authority to

18   terminate an employee.

19             We talked about that, right?

20       A.  Yes.

21       Q.  But you did have the ability to discipline

22   Ms. Hooper, right?

23       A.  I can call her out for it, yes, and let her

24   know, you know, where -- where she stands, if she has a

25   question on what her points are, attendance bucket,

Page 116

1    things like that.

2        Q.  Have you written people up in the past for

3    being late, unduly, a number of times?

4        A.  Yes, if told by the -- the people that keep the

5    points, the clock-in points, which is the operations

6    manager or the -- and/or the payroll person.

7        Q.  So they'd tell you that this person has too

8    many late points and you'd have to write her up, right?

9        A.  Yes.

10       Q.  But you've written people up other things, too,

11   right?  Safety violations?

12       A.  Yes, sir.

13       Q.  You aren't being told be somebody who's

14   upstairs to write somebody up for a safety violation,

15   correct?

16       A.  Right.  It goes to them after I write it up for

17   their approval.

18       Q.  Right.  Because you're the person who would

19   witness safety, right?

20       A.  Right.

21       Q.  Or procedural issues on the floor?

22       A.  Yes.

23       Q.  People fighting with each other, right?

24       A.  Yes.

25       Q.  People not doing their job correctly, right?

                                          Page 117

1   did not have an intention to go on COBRA of the company?

2        A.  I'm sorry.  Could you repeat that?

3        Q.  Yeah, that was poorly worded.  Strike it.

4             Paragraph 65 says, "Plaintiff has no

5   recollection of receiving notice of the continuation of

6   COBRA rights and has not received notice except by and

7   through his attorney."

8             Is it possible you received your notice of

9   COBRA rights?

10       A.  No.

11       Q.  How do you know?

12       A.  Because I didn't even know what they were.

13  Nobody mentioned them to me.  Nobody sent them to me.

14       Q.  Okay.  Says you have no recollection of

15  receiving notice of the continuation of COBRA rights?

16       A.  Right.

17       Q.  Is that an accurate statement?

18       A.   I did not receive any COBRA rights or any heads

19  up that I needed to be looking for them.  Didn't know

20  what they were, what they entailed.

21       Q.  Okay.  And based on the statement of human

22  resource manager, Mickey Moza, they were not provided on

23  March 16, 2002.

24             What statement is that; do you know?

25       A.  Are you on 65?

APP 032

1      Q.  Yeah.  You had said based on the statement of

2    human resource manager, Mickey Moza, they were not

3    provided on March 16th, 2022.

4              What statement is that?

5      A.  March 16th is when I was terminated.  Yes.

6      Q.  Well, what statement did Mickey Moza make?

7      A.  He did not make a statement.  I did not -- I

8    was not invited to come in.  I was terminated over the

9    phone by Eartis Shaw and Adam Elliott.

10     Q.  Okay.  So as we sit here today, you're not

11   aware of any statement by Mickey Moza regarding whether

12   or not your COBRA benefits were provided to you on March

13   20 -- on March 16th?

14     A.  That was what number 64 states.  Why could they

15   not be -- my questions be answered when I clearly asked

16   when they would end and I was referred to somebody else

17   and I was bounced back and forth and never given an

18   answer.

19     Q.  Okay.  Do you know when -- what date or time

20   period the COBRA notice is supposed to be received?

21     A.  My understanding is that they would provide it

22   at the exit interview, which did not happen.

23     Q.  Okay.

24     A.  I did not have an exit interview.

25     Q.  Does everyone at the company get an exit

1    interview?

2         A.  It's been my experience that everybody gets an

3    exit interview.

4         Q.  Have you ever been present at an exit

5    interview?

6         A.  I have not.

7         Q.  Do you know whether at the exit interview a

8    COBRA notice is provided to somebody?

9         A.  It was -- that was when it was explained to me.

10        Q.  When you left your prior employer, did they

11   give you a COBRA notice when you left?

12        A.  I do not recollect at that time.  That was 11

13   years prior to that or 12 years prior to that.

14        Q.  Okay.  Have you ever seen somebody provided a

15   COBRA notice at the time they were terminated?

16        A.  I've never been there for a termination.

17        Q.  Ever in your career?

18        A.  No.

19        Q.  Paragraph 66, you say, "Due to the lapse in

20   coverage, Plaintiff and his wife could not obtain a very

21   expensive and necessary drug that Gunner needed."

22             Do you see where I'm reading?

23        A.  Yes.

24        Q.  How did you pay for the drug?

25        A.  Are you asking me how did we --

                                            Page 121

1    performance regarding class two work rule number two

2    gross misconduct, quote, "threatening associate," closed

3    quote, has been deemed unacceptable and therefore we're

4    terminating your employment effective immediately.

5              And you're saying that Eartis didn't tell

6    you anything about this?

7        A.  That's correct.

8        Q.  But at some point he told you that there were

9    statements made, right?

10       A.  Yes.

11       Q.  Did he tell you what the statements were about?

12       A.  No.

13       Q.  He just said two people made statements about

14   you and didn't say what?

15       A.  Right.

16       Q.  And you understand that threatening an

17   associate is something that's inappropriate, right?

18       A.  Yes.

19       Q.  It says, "grabbed associate's clothing and

20   pulled closer to body."

21             Do you see where it says that?

22       A.  I do see that.

23       Q.  You did grab an associate's clothing, right?

24       A.  I did not.

25       Q.  You did not grab an associate's clothing?

                                        Page 134

```
1          A.   I did not grab anything.   I touched her jacket

2     saying that it was not proper PP&E.

3          Q.   You didn't pull that jacket away from her body?

4          A.   And I did not pull.

5          Q.   Okay.   Did you pull that clothing away from her

6     body?

7          A.   Not that I know of.   I mean, all I did was

8     touch the cloth and say that you know that this is not

9     proper PP&E.

10         Q.   You did see the video, right?

11         A.   Yes.   Which you can't see her in the video.

12         Q.   But do you have any reason to believe that's

13    not her in the video?

14         A.   I don't know why it's off -- off screen like it

15    is.   It's turned an odd -- odd manner.   But she's the

16    only one I talked to, so I would -- I can only assume

17    that it was her.

18         Q.   You don't have any reason to believe it was not

19    her?

20         A.   I would just be guessing otherwise.

21         Q.   Well, are -- is there anybody else that you may

22    have engaged on that day that way?

23         A.   I engage people all day long every day about

24    work rule violations.   Safety issues.   Concerns.

25                   (Exhibit 10 marked.)
```

Page 135

```
 1    have an exempt position, right?
 2                  You can go back to that.  It's Exhibit 3.
 3                  No, actually it doesn't say.  You're being
 4    paid a starting annual salary on a bi-weekly basis,
 5    right?
 6         A.  That's what it says.  Yes, sir.
 7                  I don't want to see anything about salary
 8    exempt or -- I wouldn't even know what that means.
 9         Q.  Okay.  And you were paid salary every two
10    weeks, right?
11         A.  Every two weeks was the salary payroll.
12         Q.  You also say in the answer to Interrogatory No.
13    3, "After Plaintiff was terminated, the other employees
14    avoided Plaintiff."
15                  What makes you say that?
16         A.  Wouldn't answer a call or a message or...
17         Q.  And you talked to Eartis more than once, right?
18         A.  When he called to let me know that Bill had
19    passed away, yes.
20         Q.  And you talked to Bill, right?
21         A.  Yes.  I talked to him a couple of times that --
22    that I can recall.
23         Q.  And so -- okay.  We've only talked about one
24    time so far.  What was the second time about?
25         A.  That's a good question.  I don't -- I don't
```

Page 145

1      Q.  It says -- if I'm reading -- "operation

2   supervisors are told of issues that have to be addressed

3   as they become an issue."

4           Do you see where I'm reading?

5      A.  Are we in the fourth paragraph?

6      Q.  The fourth paragraph, yeah.

7      A.  Okay.  Okay.  Yes.  Middle ways, "operations

8   supervisors told of issues have to be addressed as they

9   become an issue."  Uh-huh.

10      Q.  Then they're told -- but there are issues that

11   you actually address on your own, right?  On your own

12   recognizances.  Safety issues, things like that?

13      A.  Yes.

14      Q.  People goofing off?

15      A.  Yes.  Productivity or lack thereof.

16      Q.  Machinery that's broken down or not functioning

17   properly, things like that, right?

18      A.  Yes.

19      Q.  Accidents at the workplace, right?

20      A.  Yes.

21      Q.  What happens when somebody has an accident at

22   the workplace?

23      A.  There is a statement taken from the associate

24   as to what happened.  This is assuming no injury.  If

25   they were injured, of course, they would be taken

Page 148

1   was John Dobbins and Eartis Shaw that was --

2       Q.  Okay.  That's who did the undermining?

3       A.  -- giving -- that was giving her permission to

4   be late.

5       Q.  Okay.  So who was being undermined?

6       A.  That would be me.

7       Q.  Ah.  So who is the "they" are dismissed or

8   undermined by upper management other than you?

9       A.  When I say "they," I'm saying supervisors in

10  general --

11      Q.  Okay.

12      A.  -- as they, if you're referring to this

13  paragraph here.

14      Q.  Okay.  And you say, "Often operations

15  supervisors are put in bad situations to enforce rules."

16  That -- did you consider it was the responsibility of

17  operations supervisors to enforce rules?

18      A.  To enforce company policies, yes, sir, and

19  rules that are there for safety reasons.

20      Q.  Well, and other rules, too, right?

21      A.  And other rules, too.

22      Q.  Then you've got -- okay.  Skipping to the next

23  paragraph down.  Almost the last line, it says, "That

24  would be a total of 60 hours, but we're paid for 40

25  hours."

Page 150

```
 1        treated more favorable than you under similar
 2        circumstances.
 3                  Do you understand what that question means?
 4            A.  I'm reading, but I just -- it doesn't make a
 5        lot of sense to me.
 6            Q.  Okay.
 7            A.  I apologize.
 8            Q.  Well, let me ask you this.  Do you know of
 9        anybody else at the company who was accused of touching
10        another employee's clothing -- any other supervisor or
11        manager who was accused of touching somebody else's
12        clothing who -- do you know of anybody else who was
13        accused of that?
14            A.  Yes.
15            Q.  Who?
16            A.  B████ P███████.
17            Q.  What was B████ P██████ accused of?
18            A.  Well, there were witnesses, too, and he
19        head-butted me and slapped my glasses off in front of
20        subordinates.
21            Q.  And what happened to Mr. P██████?
22            A.  Nothing.
23            Q.  What was Mr. P██████' position at the time?
24            A.  Operations supervisor.
25            Q.  Anybody else?
```

Page 155

1    benefits?

2         A.  No, sir.

3         Q.  How much did you receive when you got them,

4    about?

5         A.  I apologize.  I don't remember the number.

6         Q.  Okay.

7         A.  It ended up being about six months' worth.

8              (Exhibit 13 marked.)

9         Q.  (BY MR. LAMBERT)   I'll show you what is marked

10   as Exhibit 13.  Is this the resume we were just talking

11   about in response to Interrogatory No. 18?

12        A.  Uh-huh.

13        Q.  Yes?

14        A.  Yes.

15        Q.  Thank you.

16              This -- who prepared this resume?

17        A.  I did.

18        Q.  Is this a true and correct copy of your resume?

19        A.  Yes.

20        Q.  It's accurate?

21        A.  Yes.

22        Q.  And you sent this to the people that you said

23   you sent resumes to, in Interrogatory No. 18, right?

24   You sent this to prospective employers?

25        A.  Right.

Page 162

```
1          A.   Okay.
2          Q.   Doing all the things in helping promote the
3     onboard talent of our team.   Is that true?   Do you
4     consider that true?
5          A.   Absolutely.   To me, that means hiring and
6     promoting the people that you have that have done a job.
7          Q.   Then, you see where you say, "I was selected to
8     author the procedural manuals currently used at the new
9     warehouse in Forney."   Is that true?
10         A.   Yes.
11         Q.   What warehouse is that?
12         A.   The Goodyear warehouse in Forney.
13         Q.   Where you worked for DHL?
14         A.   Yes.
15         Q.   What procedural manuals?
16         A.   Operations.
17         Q.   And you authored them?
18         A.   Yes.
19         Q.   How did you get to -- how did they choose
20    you -- or who chose you?
21         A.   I don't know how high up it went, but I was
22    chosen by the operations manager to rewrite and
23    modernize the manuals.
24         Q.   And who was the operation manager at the time?
25         A.   That would be Eartis Shaw.
```

Page 165

1           Q.   What did that entail, writing the procedural
2      manuals?
3           A.   Making sure that the steps and the information
4      included were accurate as to our specific operation.
5           Q.   When you're getting, parens, transition from
6      Terrell, what does that mean?
7           A.   That was at the time when we were transitioning
8      from our Terrell warehouse to the new warehouse at
9      Forney.
10          Q.   Were there already procedural manuals in place
11     or did you make them from scratch?
12          A.   There were ones in place.
13          Q.   So you just revised and...
14          A.   Yes.
15          Q.   Based on your experience and knowledge in the
16     area?
17          A.   Yes.
18          Q.   When you say you were tasked with settings up
19     the new operation in Forney, that's from the move from
20     Terrell, right?
21          A.   Yes, sir.
22          Q.   And that's correct?
23          A.   Yes.
24          Q.   Who gave you that task?
25          A.   That would be the GM and the OM.

                                              Page 166

1          Q.  The GM at the time would have been John

2     Dobbins?

3          A.  Yes.

4          Q.  And the OM was Eartis?

5          A.  Yes, sir.

6          Q.  Then, you shut down operations in Terrell.

7     What did that entail?

8          A.  That was disposing of items that we weren't

9     going to need in the new warehouse, breaking down and

10    sending over empty rack as we emptied the product.  The

11    product that we did have we would load them up on trucks

12    and then take them over and then restock them into the

13    Forney warehouse.

14         Q.  Okay.  And down in "Experience," it's got

15    operations supervisor.  That's while you were at DHL,

16    right?

17         A.  Yes.

18         Q.  June '11 to March 2022?

19         A.  Yes.

20         Q.  What do you say when a prospective employer

21    asks why you're no longer at your company?

22         A.  Well, they haven't asked me.

23         Q.  Okay.

24         A.  Haven't had one ask me yet.

25         Q.  Oh, okay.  First bullet point says, "trained,

                                        Page 167

```
 1    mentored and motivated employees to maximize team

 2    productivity," right?

 3        A.  Yes.

 4        Q.  How do you do that?  How do "you" do that?

 5        A.  Making sure that my trainer or trainers are

 6    doing their job properly, teaching them safe practices,

 7    encourage them to be safe and get up to the goal of

 8    productivity.

 9        Q.  How do you make sure your trainers do their job

10    properly?

11        A.  Go around and check them every once when

12    they're working with the -- their new people, training

13    them, asking how it's going, is there anything I can do

14    to help.

15        Q.  If you see they're not doing it properly, do

16    you advise them?

17        A.  What was that again?

18        Q.  If you see that the trainers aren't doing what

19    you think is the proper method, would you -- do you

20    advise them on how to do that or mentor them?

21        A.  Yes.

22        Q.  And next bullet point, you disseminate safety

23    information.  Do you give safety classes to the

24    associates?

25        A.  I do not.
```

Page 168

1      Q.  Okay.  You just make sure they comply, like we

2   talked about, right?

3      A.  Yes.

4      Q.  Monitor employee compliance, right, with

5   regulatory and organizational policies.

6              How do you know the regulatory policies?

7      A.  By the operations manuals, and the processes

8   are specifically called out to tell how to accomplish it

9   from start to finish.

10     Q.  In the training you receive, right?

11     A.  Yes.

12     Q.  That we talked about before?

13     A.  Yes.

14     Q.  Then, you say you developed initiates for

15  process improvement and review and assessed ongoing

16  operations.  What does that mean?

17     A.  That's if we see a better way of doing

18  something, we bring it up and we try to always improve

19  as we go.  And if we need to change the process to make

20  it more productive, then that's what we do, as long as

21  doesn't compromise safety.

22     Q.  We or you?

23     A.  It -- it includes me.  Includes everybody.

24  We're a whole team.

25     Q.  All the operations supervisors?

Page 169

1    the operational folks, right?

2        A.  Yes.

3        Q.  You built and developed employee talent; is

4    that true?

5        A.  It's true.

6        Q.  How do you build and develop employee talent?

7        A.  Keep building them up, make them better.

8        Q.  How do you make them better?

9        A.  Make them more efficient, make them -- it's

10   repetitional, a lot of things, as they -- as they go

11   along and there's a natural repetition and you're going

12   to get better at it.

13       Q.  You teach them better ways to do things?

14       A.  Absolutely.

15       Q.  So you correct them if they're not doing it

16   properly?

17       A.  Yes.

18       Q.  It says resulting in advancement within the

19   company.  How so?

20       A.  Promote from within instead of hire from

21   without.

22       Q.  Who came off of your team that was promoted

23   from within?

24       A.  One of my inventory guys is the OM2 at night.

25       Q.  Who is that?

Page 171

```
 1          A.   Jason Smith.

 2          Q.   He used to work for you?

 3          A.   Yes.

 4          Q.   Did you recommend him to be promoted?

 5          A.   Yes.

 6          Q.   How does that work?

 7          A.   Word of mouth.  You know, if they make an

 8     application, somebody says what do you think -- you

 9     know, what do you think about this?  You know, encourage

10     that absolutely they'll do a great job.

11          Q.   Next bullet point, you met productivity goals

12     by adhering to operating standards and managing labor

13     and expenses.  That's true, right?

14          A.   Yes.

15          Q.   How do you manage labor and expenses?

16          A.   Managing the labor is the expense for us, our

17     particular site, making sure that they're performing at

18     their best.  That way we get the best return for -- for

19     the money that's being spent.

20          Q.   How do you manage labor and what's that mean?

21          A.   Making sure they're being productive for the

22     time that they are on the clock.  In our particular

23     instance, it's moving tires out.

24          Q.   As you flip the page, next bullet point is you

25     execute and optimize operational responsibilities to
```

Page 172

1    they're picked to the drop-off point, that's less travel

2    time, which is less wasted time.

3        Q.  Okay.  You say -- the next bullet point, you

4    trained team members on best practices and protocols.

5    How did you do that?

6        A.  Well, that's making sure everybody's pulling

7    the right direction, making sure that the team is doing

8    what they're supposed to be doing and making sure

9    they're doing what they're supposed to be doing.

10       Q.  What do you do to train?

11       A.  What do we do to train?  Teach them how

12   to drive --

13       Q.  What do you do to train?

14       A.  Well, the first thing I do is know how to do

15   everything that they do.  So I know how to drive the

16   forklifts and operate the forklifts and -- as well as

17   knowing the paperwork part of it and the planning in the

18   areas of the warehouse where -- like I said, where it

19   needs to be dropped, close by that certain area that

20   they're being pulled from.

21       Q.  And is that the same when you identify areas of

22   deficiency and perform root cause analysis to solve

23   problems?

24       A.  Right.

25       Q.  Can you think of any problems that you did do

                                              Page 174

APP 049

```
1    that to?

2         A.  If we have a failure, like a failure of getting

3    a load out on time --

4         Q.  Uh-huh.

5         A.  -- and we didn't rearrange the labor to make

6    this one happen but we got the one that's not due for

7    another four hours, you know, that one got done four

8    hours ahead of schedule while this one was late.  We

9    should have shifted.  That's the best practice is to

10   make sure you shift your labor to the one that's going

11   to be late.

12        Q.  That's what we had talked about before kind of,

13   right?  You sometimes --

14        A.  Uh-huh.

15        Q.  -- all hands on deck needs to be done, and

16   other times you need to figure out --

17        A.  Right.  It could slip by you if you're not

18   paying attention.

19        Q.  And you're the person who was making those

20   calls at the beginning, right?

21        A.  Uh-huh.

22        Q.  Based on the handover or whatever it's called?

23        A.  Pass-down.

24        Q.  Thank you.

25        A.  That's what I call it.  That's what we've
```

Page 175

APP 050

```
1    always called it.
2         Q.  Okay.
3         A.  The new guys started to call it something
4    different but...
5         Q.  That's why I bumped my head.
6              Okay.  You say you built strong -- strong
7    operational teams to meet process and production
8    demands.  What do you do to build a team?
9         A.  The best thing to do is make sure you retain
10   your associates and ensure that they're doing what
11   they're supposed to be doing.  They're not getting in
12   trouble.  They're not being lazy.  They're not being
13   unsafe.  They're certainly not getting injured.
14              And the more you retain them, the better
15   your product -- productivity is going to be.  They're
16   going to be experienced.  They're going to know at the
17   drop of a hat what to do.  You give it to them, they run
18   with it instead of having to babysit them.
19        Q.  Would it be accurate to say you can't treat all
20   your associates -- you can't handle all your associates
21   the same way?
22        A.  No.
23        Q.  Different people have to be handled different
24   ways?
25        A.  Sure.
```

Page 176

1          Q.  And you use your years' experience in dealing

2     with these people to do that, right?

3          A.  Yes.

4          Q.  Next bullet, you trained, assisted and

5     supervised 45-member team resulting in improved

6     efficiency.

7                You supervised 45 people at DHL?

8          A.  The numbers fluctuate, but up to -- up to 45,

9     yeah.

10          Q.  And you were responsible for training 45 people

11     or whatever that -- whatever your team was at that time?

12          A.  Well, they never -- you never trained all at

13     one time, but --

14          Q.  Yeah.

15          A.  -- train up.

16          Q.  But you were responsible for seeing that they

17     were trained properly?

18          A.  Yes.

19          Q.  And if not, you would assist them, right?

20          A.  That's correct.

21          Q.  And you were responsible for making sure that

22     their efficiency was where it should be, right?

23          A.  That's correct.

24          Q.  Which including the next bullet, you delegated

25     properly, set -- setting priorities and goals for every

Page 177

APP 052

1    shift and your team.

2         A.  Yes.

3         Q.  Is that fair?

4         A.  Yes.

5         Q.  I'm trying to -- I'm sorry.  I'm trying to --

6    we talked about mentoring, right?  That's the same thing

7    we had talked about before.  Supplying knowledge of

8    various company programs?

9         A.  Uh-huh.

10        Q.  And help people fit in and know the right

11   protocols?

12        A.  Yes.

13        Q.  Okay.  And we talked about the next bullet

14   point, where you help figure out how to cover priority

15   tasks, right?

16        A.  Yes.

17        Q.  That's that pass-down where you then --

18        A.  Uh-huh.

19        Q.  -- determine how best to handle the problems

20   that you've been given by the night shift?

21        A.  Yes.

22        Q.  Is that a fair statement?

23        A.  Yes, sir.

24        Q.  Research and prepared reports required by

25   management for governmental agencies.

                                           Page 178

APP 053

1    their destinations, the loads may have shifted and could

2    possibly fall out and create a dangerous condition.  So

3    that's the kind of things that we --

4         Q.  And you were --

5         A.  -- watched for, tried to resolve.

6         Q.  You were the interface between DHL and the

7    trucking company for that type of thing?

8         A.  Yes.  And we ran it up the flagpole, too, with

9    upper management as well.  Kept them abreast of the

10   situations.

11        Q.  Because it's important to keep vendors happy,

12   right?

13        A.  Absolutely.

14        Q.  You reviewed reports on employee attendance,

15   productivity and effectiveness.  Those are the reports

16   that you had talked about that get kicked out; is that

17   right?  The productivity and attendance reports?

18        A.  It's not so much as a report as it is

19   individual -- as it becomes an issue.  It's not a report

20   you print out every single day for every single person.

21   It's just the people that have an issue so that you

22   would --

23        Q.  So there's, like, a process or a program that

24   shows that somebody's having a productivity issue?

25        A.  Right.

Page 180

```
1                    CHANGES AND SIGNATURE
2      WITNESS NAME:  JASON WALTERS
3      DATE:  APRIL 11, 2023
4      PAGE LINE      CHANGE           REASON
5       54    9        Yes          MORE DETAIL
6           My job was to do what my
7      managers gave to me. Rules were given
8      to me and I was to make sure everyone
9      followed those rules. My job was in the
10     warehouse when it was cold, I was cold
11     when it was hot, I was hot. Hydration
12     and heat stroke were a large concern.
13     I didn't ask anything of the associates
14     that I couldn't or wouldn't do. I was
15     trained on all the equipment + used it
16     when needed. I loaded + unloaded
17     tires by hand. I had no authority
18     to hire or fire associates. That was
19     up to the managers.
20
21
22
23
24
25
                                        Page 210
```

APP 055

1          I, JASON WALTERS, have read the foregoing

   deposition and hereby affix my signature that same is

2  true and correct, except as noted above.

3

4

                              _Jason K. Walters_

5                                 JASON WALTERS

6

7  THE STATE OF _Texas_ )

8  COUNTY OF _Wood_ )

9

10      Before me, _Margret Quintana_, on this day

11  personally appeared JASON WALTERS, known to me (or

12  proved to me under oath or through

13  _Driver's License_ ) (description of identity

14  card or other document) to be the person whose name is

15  subscribed to the foregoing instrument and acknowledged

16  to me that they executed the same for the purposes and

17  consideration therein expressed.

18      Given under my hand and seal of office this

19  _13_ day of _May, 2023_ , _____.

20

21  ┌────────────────────┐

22  │ MARGRET QUINTANA   │   _Margret Quintana_
   │ Notary Public, State of Texas │
   │ My Commission Expires │
   │ September 01, 2024 │   NOTARY PUBLIC IN AND FOR
   │ NOTARY ID 1209093-4 │
   └────────────────────┘   THE STATE OF _Texas_

23                          COMMISSION EXPIRES: _9-1-24_

24

25      Job No. TX5787736

                                      Page 211

APP 056

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3    JASON WALTERS,              )
           Plaintiff,            )
 4                               )
                                 )
 5    VS.                        )      CIVIL ACTION NO:
                                 )      3:22-cv-01840-C
 6    EXEL,INC D/B/A DHL SUPPLY   )
      CHAIN,                     )
 7         Defendant.            )
 8
                     REPORTER'S CERTIFICATION
 9               DEPOSITION OF JASON WALTERS
                      APRIL 11, 2023
10
11         I, Melanie Seifert, Certified Shorthand Reporter in
      and for the State of Texas, hereby certify to the
12    following:
13         That the witness, JASON WALTERS, was duly sworn by
      the officer and that the transcript of the oral
14    deposition is a true record of the testimony given by
      the witness;
15
16         I further certify that pursuant to FRCP Rule 30(F)
      (1) that the signature of the deponent:
17
18         __X__ was requested by the deponent or a party
      before the completion of the deposition and returned
19    within 30 days from date of receipt of the transcript.
      If returned, the attached Changes and Signature Page
20    contains any changes and the reasons therefor:
21
22         ____ was not requested by the deponent or a party
      before the completion of the deposition.
23
24         I further certify that I am neither counsel for,
      related to, nor employed by any of the parties or
      attorneys in the action in which this proceeding was
25    taken, and further that I am not financially or
```

Page 212

1    otherwise interested in the outcome of the action.

2          Further,I am not a relative or employee of any
     attorney of record in this cause, nor do I have a

3    financial interest in the action.

4          Certified to by me this 25th day of April, 2023.

5

6                          *Melanie Seifert*

7                          MELANIE SEIFERT, CSR 7234
                           Expires October 31, 2024

8                          Script Deposition Services, LLC.
                           Firm Registration No. 11972

9                          P.O. Box 60
                           China Spring, Texas 76633

10                         (903) 470-0098

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  213







# JASON WALTERS

903-283-0404 ◇ m249sawgunr@yahoo.com ◇ Mineola, TX 75773

## SUMMARY

Results-focused logistics professional with strength in teamwork. Proactive leader with strengths in communication and collaboration. Proficient in leveraging assets and maintaining a positive attitude to get the job done, efficiently and safely...all while maintaining situational awareness so as to acknowledge and promote the on board talent of our team. Adept at managing concurrent objectives to promote efficiency and influence positive outcomes. I was selected to author the procedural manuals currently used at the new warehouse in Forney (transition from Terrell). I was tasked with setting up the new operation in Forney before we started moving all product to the new warehouse and then also sent back to shut down operations in Terrell and see that all product was sent over and correctly notated. I coordinated with our drivers and dispatched them to make that happen safely and efficiently.

## SKILLS

- Friendly, Positive Attitude
- Good Work Ethic
- Reliable & Trustworthy
- People Skills
- Organizational Skills
- Critical Thinking
- Customer Service
- Active Listening
- Planning & Organizing
- Problem Resolution
- Supervision & Leadership

- Relationship Building
- Team Building
- Team Management
- Conflict Resolution
- Training & Development
- Basic Math
- Data Management
- PPE Use
- First Aid/CPR
- Maintenance & Repair



EXHIBIT
Walters
13
4/11/23

## EXPERIENCE

### Operations Supervisor

DHL Supply Chain | Forney, TX | Jun 2011-Mar 2022

- Trained, mentored and motivated employees to maximize team productivity.
- Disseminated safety information and monitored employee compliance with regulatory and organizational policies.
- Developed initiatives for process improvement and reviewed and assessed ongoing operations.
- Drove standardized best practices and leveraged support functions to optimize operational performance while meeting goals.
- Built and developed employee talent to drive engagement, resulting in advancement within company.
- Met productivity goals by adhering to operating standards and managing labor and expenses.

- Executed and optimized operational responsibilities to promote seamless delivery of services.
- Implemented process innovations to improve overall performance and reduce labor costs.
- Reduced process lags and trained team members on best practices and protocols.
- Identified areas of deficiency and performed root-cause analysis to solve problems.
- Built strong operational teams to meet process and production demands.
- Trained, assisted and supervised 45-member team, resulting in improved efficiency.
- Delegated work to staff, setting priorities and goals.
- Provided leadership, insight and mentoring to newly hired employees to supply knowledge of various company programs.
- Developed work schedules according to budgets and workloads, covering priority tasks.
- Participated in subordinates' tasks to facilitate productivity or help overcome difficulties.
- Recruited, interviewed and selected employees to fill vacant roles.
- Researched and prepared reports required by management or governmental agencies.
- Guided employees in handling difficult or complex problems.
- Consulted with managers to resolve problems relating to employee performance, office equipment and work schedules.
- Resolved customer complaints or answered customers' questions.
- Recommended solutions related to staffing issues and proposed procedural changes to managers.
- Reviewed reports on employee attendance, productivity and effectiveness to evaluate performance.
- Coordinated with other supervisors, combining group efforts to achieve goals.
- Discussed job performance problems with employees, identifying causes and issues to find solutions.
- Reviewed employees' work to check adherence to quality standards and proper procedures.
- Trained employees on best practices and protocols while managing teams to maintain optimal productivity.
- Interpreted and explained work procedures and policies to brief staff.
- Implemented departmental policies and standards in conjunction with management to streamline internal processes.

**EDUCATION AND TRAINING**

Texas A&M University | College Station, TX
*Honor graduate at Mineola High School.
*Recipient of the Sul Ross Scholarship to Texas A&M University.
*Continuing education through work for specific skills needed to maintain efficiency.
*United States Marine Corps Reserve 1991-1995

**ADDITIONAL INFORMATION**

Having a working knowledge of machinery and equipment, on and off-road has always been important. That basic knowledge in order to maintain operational/road worthy equipment has proven time and time again to be a worthwhile endeavor.

ADAM ELLIOTT - 4/13/2023

1

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION
3   JASON WALTERS            )
                             )
4   vs.                      )    CIVIL ACTION
                             )    3:22-cv-01840-C
5                            )    JURY REQUESTED
    EXEL, INC. D/B/A          )
6   DHL SUPPLY CHAIN          )
7
8
9
                    ORAL DEPOSITION OF
10                     ADAM ELLIOTT
                  THURSDAY, APRIL 13, 2023
11                 9:53 A.M. - 11:09 A.M.
12
13
14
15        ORAL DEPOSITION OF ADAM ELLIOTT, produced as a
16   witness at the instance of the Plaintiff, and duly
17   sworn, was taken in the above-styled and -numbered
18   cause on the 13th day of April, 2023, from 9:53 a.m.
19   to 11:09 a.m., before Maribel Torres, Certified
20   Shorthand Reporter in and for the State of Texas,
21   reported by computerized stenotype machine at the law
22   offices of Fisher Phillips, LLP, 500 North Akard
23   Street, Suite 3550, Dallas, Texas, pursuant to the
24   Federal Rules of Civil Procedure and the agreements
25   herein after set for, if any.  Signature reserved.

ADAM ELLIOTT - 4/13/2023

2

```
 1    APPEARANCES
 2
      REPRESENTING THE PLAINTIFF:
 3    BOB WHITEHURST, ESQ.
      WHITEHURST & WHITEHURST, ESQ.
 4    5380 OLD BULLARD ROAD
      SUITE 600, #363
 5    TYLER, TEXAS 75703
      TELEPHONE: (903)593-5588
 6    EMAIL: whitehurstlawfirm@yahoo.com
 7
      REPRESENTING THE PLAINTIFF:
 8    THEANNA BEZNEY, ESQ.
      FISHER PHILLIPS, LLP
 9    500 NORTH AKARD STREET
      SUITE 3550
10    DALLAS, TEXAS 75201
      TELEPHONE: (214)220-8325
11    EMAIL: tbezney@fisherphillips.com
12
      ALSO PRESENT:
13    MR. JASON WALTERS, PLAINTIFF
14
15
16
17
18
19
20
21
22
23
24
25
```

ADAM ELLIOTT - 4/13/2023

3

1                          I N D E X
2
         Appearances...........................        2
3    WITNESS:  ADAM ELLIOTT
         Examination by Mr. Whitehurst........     4, 67
4        Examination by Ms. Bezney............       63
         Acknowledgment.......................       70
5        Court Reporter's Certificate.........       72
6
                       PLAINTIFF'S EXHIBITS
7
8    NO.       DESCRIPTION                          PAGE
9
     1    3/4/2022 Email from Adam Elliott          15
10        to Forney Supervisors
     2    Statement "To whom it may concern,"       56
11        Investigation Summary Form,
          Complainant/Witness Statement Form,
12        Complainant/Witness Statement Form,
          Corrective Action Form, Organizational
13        Chart - Goodyear Forney
          EXEL_00114, 00115, 00112, 00113,
14        00116 through 00119, 00111 (in order
          provided to reporter)
15
16                     DEFENDANT'S EXHIBIT
17
     1    Xerox Photos                              65
18
19
20
21
22
23
24
25

ADAM ELLIOTT - 4/13/2023

4

1                    P R O C E E D I N G S
2              THURSDAY, APRIL 13, 2023 - 9:53 A.M.
3                   (REPORTER'S NOTE:  Names not spelled on
4                   the record may be spelled phonetically.
5                   Quotation marks may be used with
6                   indirect, inexact quotes.)
7                   THE COURT REPORTER:  This is the oral
8    deposition of Adam Elliott, taken at Fisher Phillips
9    in Dallas, Texas, on April 13th, 2023.  The time is
10   9:53 a.m.  My name is Maribel Torres with Leigh &
11   Associates.
12                  Counsel, could you please state your
13   appearances for the record before I swear in the
14   witness.
15                  MR. WHITEHURST:  Bob Whitehurst for the
16   plaintiff, Jason Walters.
17                  MS. BEZNEY:  Theanna Bezney from Fisher
18   Phillips for defendant, Exel.
19                       ADAM ELLIOTT,
20   having been duly administered the oath, testified as
21   follows:
22                       EXAMINATION
23   BY MR. WHITEHURST:
24        Q.   Could you state your name for the record,
25   please, sir?

1          A.    Adam Elliott.

2          Q.    Okay.  And how are you employed, sir?  Who

3     do you work for now?

4          A.    I work for DHL Supply Chain.

5          Q.    And how long have you worked for them?

6          A.    Approximately 15 months --

7          Q.    Okay.

8          A.    -- with DHL Supply Chain.

9          Q.    Okay.  Have you worked any other places for

10    DHL?

11         A.    I worked with DHL Express.

12         Q.    And where is that?  Is that in Texas?

13    Somewhere else?

14         A.    Mostly in Texas but also Louisiana.

15         Q.    Okay.

16               Were you involved in the termination of

17    Jason Walters?

18         A.    Yes.

19         Q.    How so?

20         A.    I am the general manager, so helped compile

21    the evidence for the case.

22         Q.    Okay.  Anyone else besides yourself work

23    with you doing that?

24         A.    Eartis Shaw.

25         Q.    Anybody else?

ADAM ELLIOTT - 4/13/2023

6

| 1 | A. | In regards to...? |
| 2 | Q. | Termination of Mr. Walters. |
| 3 | A. | In making the decision? |
| 4 | Q. | Yes. |
| 5 | A. | Yes. |
| 6 | Q. | Who was that? |
| 7 | A. | John Dobbins -- |
| 8 | Q. | Is John Dobbins still with DHL? |
| 9 | A. | Yes. |
| 10 | Q. | Okay.  And where is he located at? |
| 11 | A. | He's located in Forney, Texas. |
| 12 | Q. | Okay.  What does he do? |
| 13 | A. | He's a director. |
| 14 | Q. | Is he at the same facility that you're at? |
| 15 | A. | He works from home. |
| 16 | Q. | Okay.  Okay.  So you talked to Mr. Dobbins, |
| 17 | Mr. Shaw.  Anyone else? | |
| 18 | A. | Mickey Moza. |
| 19 | Q. | And who's Mickey Moza? |
| 20 | A. | He's our HR manager. |
| 21 | Q. | Okay.  Is he still employed by DHL? |
| 22 | A. | No, he's not. |
| 23 | Q. | Did he resign? |
| 24 | A. | Yes, he did. |
| 25 | Q. | Why? |

ADAM ELLIOTT - 4/13/2023

7

| | | |
|---|---|---|
| 1 | A. | I don't know. |
| 2 | Q. | Okay. |
| 3 | | All right.  Anyone else? |
| 4 | A. | Antonio Juarez. |
| 5 | Q. | Who? |
| 6 | A. | Antonio Juarez. |
| 7 | Q. | And who is that? |
| 8 | A. | He's director of HR. |
| 9 | Q. | And where is he located at? |
| 10 | A. | I'm not for sure.  Somewhere around Dallas. |
| 11 | Q. | Was he in the office with you when you made |

12  the decision to terminate?

13      A.   He was -- he was not in the office, but he

14  was involved.

15      Q.   Okay.  Was Mr. Dobbins in the office?

16      A.   No.

17      Q.   Mr. Moza and Mr. Shaw were in the office.

18      A.   I'm confused by what you mean by "in the

19  office."

20      Q.   Where did you make the decision to terminate

21  Mr. Walters?

22      A.   So they didn't come to the office.

23      Q.   Oh, okay.

24      A.   It was over phone calls and emails.

25      Q.   Everything's on the phone.

ADAM ELLIOTT - 4/13/2023

8

1    A.   Yeah, it was -- pretty much everything was

2  over the phone.

3    Q.   Okay.

4         Okay, have we missed anybody as far as

5  making -- decision-making?

6    A.   Meredith Singletary.

7    Q.   Who?

8    A.   Meredith Singletary.

9    Q.   And who is that?

10    A.   She's the senior director of HR.

11    Q.   And where is she located at?

12    A.   Somewhere in the DFW area.

13    Q.   Okay.  All right.  Anyone else?

14    A.   That'd be it.

15    Q.   Okay.

16         Now, have you ever talked to Jason

17  Walters?  Do you know who he is?

18    A.   Yes, I know who Jason Walters is.

19    Q.   How do you know that?

20    A.   He was a supervisor when I was the general

21  manager.

22    Q.   Okay.  And when did you come to the facility

23  there in Forney?

24    A.   January of 2022.

25    Q.   Okay.  And how many times had you talked to

```
 1            A.    That was it.

 2            Q.    That was it?

 3                  Did you talk to Ms. Hooper?

 4            A.    I did not speak to her, just had her witness

 5    statement.

 6            Q.    Okay.  So as far as sitting eyeball to

 7    eyeball, you didn't have anything to do with it.  You

 8    just got a witness statement.

 9            A.    Correct.

10            Q.    Okay.

11                  Did you look at any videos?

12            A.    Yes.

13            Q.    What video did you look at?

14            A.    I looked at a video of when Mr. Walters and

15    Ms. Hooper were out there in the pre-shift area.

16            Q.    Right.  And that's the only video that you

17    looked at?

18            A.    Yes.

19            Q.    Okay.

20                  Now, we had a deposition the other day

21    of Mr. Walters, and your attorney brought some

22    photographs.  Is that what you're referring to?

23            A.    Yes.

24            Q.    Is there anything else that you looked at in

25    the video?
```

ADAM ELLIOTT - 4/13/2023

24

1       Q.   Okay.

2       A.   E████ L███, J██ R██████, and then

3   D███████ N███.

4       Q.   I'm sorry.  Who?

5       A.   D████████ N████.

6       Q.   Recent hire?

7       A.   Yes.

8       Q.   Okay.

9                 Do you know a J███ O███?

10      A.   Yes.

11      Q.   And who is that?

12      A.   He was an operations supervisor.

13      Q.   Okay.  And he took over for Mr. Walters.  Is

14  that correct?

15      A.   That is incorrect.

16      Q.   Okay.  Who did?

17      A.   B███████ P███████.

18      Q.   Okay.  And J███ O███ is no longer employed.

19  Is that right?

20      A.   That is correct.

21      Q.   Okay.

22                Now, you're saying when Mr. Walters --

23  the next day, Mr. P███████ took over the operations

24  supervisor for Mr. Walters.  Is that right?

25                MS. BEZNEY:  Object to form.

ADAM ELLIOTT - 4/13/2023

25

```
 1          A.    Can you restate the question?
 2          Q.    (BY MR. WHITEHURST)  Sure.
 3                All right.  We know that Mr. Walters
 4    was terminated on March 16, 2022.
 5          A.    Yes.
 6          Q.    Okay.  And my question is simply,
 7    Mr. P        , Br      P        , took over March 16 to
 8    March 17, 2022.
 9          A.    No.
10          Q.    Okay.  When did he take over?
11          A.    I am not sure.  It was probably April or
12    May.
13          Q.    Of...?
14          A.    Of 2022.
15          Q.    Okay.
16                In the interim, who was the operations
17    supervisor?
18          A.    We were just short-staffed.
19          Q.    Short-staffed?  Okay.
20                Is J     O     still employed out there?
21          A.    No.
22          Q.    What happened to him?
23          A.    He quit.
24          Q.    Okay.  Do you know why he quit?
25          A.    For a higher-paying job.
```

ADAM ELLIOTT - 4/13/2023

31

```
 1          Q.   (BY MR. WHITEHURST)  Is that right?
 2          A.   That is incorrect.
 3          Q.   Okay.  What else did you make the decision
 4     on?
 5          A.   So we had the three documents --
 6          Q.   Right.
 7          A.   -- as well as Mr. Walters' statement, as
 8     well as video.
 9          Q.   Okay.  There's four things.
10               MS. BEZNEY:  Object to form.
11          A.   I --
12          Q.   (BY MR. WHITEHURST)  Mr. Walters' statement,
13     two statements, and the video.
14          A.   So -- so the things that we used were the
15     statements that were involved in this --
16          Q.   For the three ladies.
17          A.   For the three ladies.  -- Mr. Walters'
18     statement --
19          Q.   Okay.
20          A.   -- as well as the video evidence.
21          Q.   Had you had any problems with Mr. Walters
22     before?
23          A.   Not in my time there.
24          Q.   Okay.  Did you see any disciplinary action
25     against Mr. Walters prior to March 16 of 2022?
```

1    understanding, right around 5:00 o'clock.

2          Q.   Okay.  But you can't testify what happened

3    before you got there, correct?

4          A.   I cannot.

5          Q.   Okay.

6                    Are you aware of Mr. Walters

7    terminating anybody at that facility?

8          A.   Not during my time there.

9          Q.   Okay.  Are you aware of Mr. Walters hiring

10   anyone at that facility?

11         A.   The only thing is, the supervisors do

12   interviews for everyone that's hired, and then they

13   recommend hire or not.

14         Q.   Okay.  But they don't make any decisions.

15         A.   They do make the decision --

16         Q.   They just give an interview first.

17         A.   -- but -- and then they hand the paper to

18   the office supervisor, who then sends the offer

19   letter, based on their recommendation.

20         Q.   And who's the office supervisor?

21         A.   Currently, Sarah Nicklas.

22         Q.   Okay.  Is she the one that hires or not

23   hires?  Does she make the decision or Mr. Shaw or

24   yourself?  Who makes the decision to hire?

25         A.   The supervisor.

ADAM ELLIOTT - 4/13/2023

| | |
|---|---|
| 1 | Q.   Okay.  So Mr. -- and my understanding, sir, |
| 2 | is Mr. Walters makes a -- he interviews the person, |
| 3 | says okay, yeah, maybe not.  But who makes the actual |
| 4 | final decision to hire that person? |
| 5 | A.   It's completely based on their |
| 6 | recommendation.  So the process is, they do the |
| 7 | interview, fill out the interview form, and at the |
| 8 | top, it has a box; says "Hire: yes or no."  If they |
| 9 | mark yes, then the office supervisor then processes it |
| 10 | for hiring. |
| 11 | Q.   And that's Ms. Nicklas we talked about. |
| 12 | A.   Currently, yes. |
| 13 | Q.   Okay. |
| 14 | Now, just make a decision to terminate |
| 15 | someone, same process? |
| 16 | A.   For the supervisor? |
| 17 | Q.   Yes. |
| 18 | A.   They have to follow the process that we had |
| 19 | in place, per policy. |
| 20 | Q.   Okay.  And is that the same process -- |
| 21 | you've got a process in place for hiring, a process |
| 22 | for firing. |
| 23 | A.   Correct. |
| 24 | Q.   Okay. |
| 25 | Did Mr. Walters have an office? |

ADAM ELLIOTT - 4/13/2023

46

1        Q.   Okay.  Does he ever come to the facility?

2        A.   Occasionally.

3        Q.   Okay.

4             And I think you talked about a B█████

5   P████████?

6        A.   Yes.

7        Q.   Okay.  Are you aware of the headbutting

8   incident with Mr. P████████ and Mr. Walters?

9             MS. BEZNEY:  Object to form.

10       A.   I am not aware.

11       Q.   (BY MR. WHITEHURST)  Okay.  Have you heard

12   about it?

13       A.   I have never heard of a headbutting

14   incident.

15       Q.   Okay.

16             Was Mr. Dobbins -- when was Mr. Dobbins

17   at the facility, before Mr. Shaw?

18       A.   You're going to need to clarify.

19       Q.   Okay.  Sure.

20             You came in January of 2022, correct?

21       A.   Correct.

22       Q.   And who was the person in your position at

23   that time?

24       A.   Before me --

25       Q.   Yes.

ADAM ELLIOTT - 4/13/2023

71

1       ACKNOWLEDGMENT OF DEPONENT

2       I, ADAM ELLIOTT, do hereby certify that I have

3   read my oral deposition transcript taken on April 13,

4   2023, in Case 3:22-cv-01840-C, and that the same is a

5   correct transcription of the answers given by me to

6   the questions therein propounded, except for the

7   corrections or changes in form or substance, if any,

8   noted above.

9

10

11                                              6/13/2023

12          [DEPONENT SIGNATURE]              [DATE]

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
2                           DALLAS DIVISION
3     JASON WALTERS                )
                                   )
4     vs.                          )    CIVIL ACTION
                                   )    3:22-cv-01840-C
5                                  )    JURY REQUESTED
      EXEL, INC. D/B/A             )
6     DHL SUPPLY CHAIN             )
7                      REPORTER'S CERTIFICATE
                   ORAL DEPOSITION OF ADAM ELLIOTT
8                     THURSDAY, APRIL 13, 2023
```

9      I, MARIBEL TORRES, a Certified Shorthand Reporter

10 of the State of Texas, do hereby certify that the

11 foregoing proceedings were taken before me at the time

12 and place herein set forth; that any witness in the

13 foregoing proceedings, prior to testifying, was

14 administered an oath; that a record of the proceedings

15 was made by me using machine shorthand, which was

16 thereafter transcribed by me or under my direction;

17 that the foregoing transcript is a true record of the

18 testimony given.

19      I further certify that if the foregoing pertains

20 to the original transcript, that before the completion

21 of the proceedings, review of the transcript [ ] was

22 waived [ ] was not requested, [X] was requested.

23      I further certify I am neither financially

24 interested in the action nor a relative or employee of

25 any attorney or any party to this action.

ADAM ELLIOTT - 4/13/2023

73

1        IN WITNESS WHEREOF, I have this date, May 8,

2   2023, subscribed my name.

3

4

                    _Maribel Torres_
5                   _____
                    Maribel Torres
                    Texas Certified Stenographer #8597
6                   Expiration Date: 10/31/2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION
3    JASON WALTERS            )
                              )
4    vs.                      )    CIVIL ACTION
                              )    3:22-cv-01840-C
5                              )    JURY REQUESTED
     EXEL, INC. D/B/A          )
6    DHL SUPPLY CHAIN          )
7
8
9
                      ORAL DEPOSITION OF
10                       TAMMY WILLIAMS
                    THURSDAY, APRIL 13, 2023
11                    2:31 P.M. - 3:15 P.M.
12
13
14
15        ORAL DEPOSITION OF TAMMY WILLIAMS, produced as a
16   witness at the instance of the Plaintiff, and duly
17   sworn, was taken in the above-styled and -numbered
18   cause on the 13th day of April, 2023, from 2:31 p.m.
19   to 3:15 p.m., before Maribel Torres, Certified
20   Shorthand Reporter in and for the State of Texas,
21   reported by computerized stenotype machine at the law
22   offices of Fisher Phillips, LLP, 500 North Akard
23   Street, Suite 3550, Dallas, Texas, pursuant to the
24   Federal Rules of Civil Procedure and the agreements
25   herein after set for, if any.  Signature reserved.

```
 1     APPEARANCES
 2
       REPRESENTING THE PLAINTIFF:
 3     BOB WHITEHURST, ESQ.
       WHITEHURST & WHITEHURST, ESQ.
 4     5380 OLD BULLARD ROAD
       SUITE 600, #363
 5     TYLER, TEXAS 75703
       TELEPHONE: (903)593-5588
 6     EMAIL: whitehurstlawfirm@yahoo.com
 7
       REPRESENTING THE PLAINTIFF:
 8     THEANNA BEZNEY, ESQ.
       FISHER PHILLIPS, LLP
 9     500 NORTH AKARD STREET
       SUITE 3550
10     DALLAS, TEXAS 75201
       TELEPHONE: (214)220-8325
11     EMAIL: tbezney@fisherphillips.com
12
       ALSO PRESENT:
13     MR. JASON WALTERS, PLAINTIFF
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    I N D E X

2

        Appearances...........................            2
3       WITNESS:  TAMMY WILLIAMS
        Examination by Mr. Whitehurst........         4, 38
4       Examination by Ms. Bezney...........            29
        Acknowledgment.......................           44
5       Court Reporter's Certificate.........           46

6

                   PLAINTIFF'S EXHIBITS
7

8       NO.    DESCRIPTION                            PAGE

9
        5     Text Messages                             7
10

11                 DEFENDANT'S EXHIBIT

12
        2     DHL Supply Chain Employee               29
13            Handbook

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          THURSDAY, APRIL 13, 2023 - 2:31 P.M.
 3                  (REPORTER'S NOTE:  Names not spelled on
 4                  the record may be spelled phonetically.
 5                  Quotation marks may be used with
 6                  indirect, inexact quotes.)
 7                  THE COURT REPORTER:  This is the oral
 8     deposition of Tammy Williams, taken at Fisher Phillips
 9     in Dallas, Texas, on April 13, 2023.  The time is
10     2:31 p.m.  My name is Maribel Torres with Leigh &
11     Associates.
12                  Counsel, could you please state your
13     appearance for the record before I swear her in.
14                  MR. WHITEHURST:  Bob Whitehurst for
15     plaintiff.
16                  MS. BEZNEY:  Theanna Bezney from Fisher
17     Phillips, for defendant, Exel.
18                       TAMMY WILLIAMS,
19     having been duly administered the oath, testified as
20     follows:
21                       EXAMINATION
22     BY MR. WHITEHURST:
23          Q.   Would you state your name for the record,
24     please, ma'am?
25          A.   Tammy Williams.
```

1    co-worker."  Is that right?

2         A.   Yes, ma'am.

3         Q.   So is it your understanding that threatening

4    to inflict bodily harm on a coworker is a class 2 rule

5    violation?

6         A.   Yes, ma'am.

7         Q.   So would that be -- just a threat of

8    physical harm is a basis for termination?  Could be --

9         A.   Yes, ma'am.  Yes, ma'am.

10        Q.   Do you see any exceptions in this policy for

11   jokes about threatening bodily harm?

12        A.   No, ma'am.

13        Q.   To your understanding, is -- is there an

14   exception in the workplace at the facility for jokes

15   of threats of violence?

16        A.   I am not aware that there are.

17        Q.   Okay.  Are you aware of any instances where

18   someone has put their hands on another person and

19   threatened bodily harm against them and they were not

20   terminated?

21        A.   I was not present for any of those.

22        Q.   Okay.

23                  Are you aware of any instances, other

24   than Ms. Hooper, where Walters -- Mr. Walters put his

25   hands on another associate?

1        A.   Yes, ma'am.

2        Q.   And who was -- who did he put his hand on?

3        A.   He was a third-party logistics employee.

4   His name is Lorenzo, I believe.

5        Q.   Okay.  And what did Mr. Walters do to

6   Lorenzo on that occasion?

7        A.   He pushed Mr. Walt -- or pushed Lorenzo to a

8   position in pre-shift that he wanted him to be at.

9        Q.   And how do you know that?

10       A.   I saw a video of it.

11       Q.   So you personally saw this.

12       A.   Yes.

13       Q.   And in your opinion, was it just a gentle

14   nudge?  How would you describe the way he --

15       A.   It was an aggressive push.

16       Q.   You -- you believed it was aggressive.

17       A.   Yes.

18       Q.   Okay.

19            Did the company investigate that?

20       A.   Yes.

21       Q.   Okay.  Who investigated it?

22       A.   Eartis Shaw and John Dobbins.

23       Q.   To your knowledge?

24       A.   Yes, ma'am.

25       Q.   What was the outcome of that investigation?

```
1          A.    Yes.
2          Q.    Did you make any of those decisions just by
3    yourself, or did that have to be approved by somebody?
4          A.    HR had to approve it.
5          Q.    Can anyone at the facility level terminate
6    anybody, without HR's input or approval?
7          A.    No.
8          Q.    Even Mr. Elliott?  Still has to go through
9    HR?
10         A.    Yes, ma'am.
11         Q.    What about hiring?  Who does the hiring of
12   all the associates at that facility?
13         A.    The supervisors do the interviews.
14         Q.    Uh-huh.
15         A.    And then, once they determine they want to
16   hire someone, then they give it to the office
17   supervisor to start the hiring process.
18         Q.    Has Mr. Walters ever given you some
19   paperwork about somebody he wanted to hire?
20         A.    Yes.
21         Q.    Okay.  If he ever -- and do you recall any
22   instance where he recommended someone for hire to you
23   and you didn't give them an offer letter?
24         A.    No.
25         Q.    What about write-ups?  Did Mr. Walters ever
```

1    give anybody written counseling, to your knowledge?

2         A.    Yes.

3         Q.    Did he have to run that by you?

4         A.    No.

5         Q.    To your knowledge, do you have to run those

6    by anybody before issuing them?

7         A.    No.  Not a supervisor.

8         Q.    Okay.

9               An hourly associate that's going to be

10   terminated for whatever reason -- if, for example,

11   Mr. Walters -- are you aware of Mr. Walters

12   recommending termination for anybody?

13        A.    I am not aware.

14        Q.    Okay.  Are you aware of any operations

15   supervisors recommending that an hourly associate be

16   terminated?

17        A.    The way the process works, they have to go

18   through the steps.  So they have to have so-many

19   write-ups prior to discussions, unless it's a gross

20   misconduct, when they can go straight to a final order

21   termination.

22        Q.    Okay.  So the operations supervisors

23   participate along the way in issuing the write-ups.

24        A.    Yes, ma'am.

25        Q.    And then if an associate gets enough

```
1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
2                             DALLAS DIVISION
3    JASON WALTERS                 )
                                   )
4    vs.                           )   CIVIL ACTION
                                   )   3:22-cv-01840-C
5                                  )   JURY REQUESTED
     EXEL, INC. D/B/A              )
6    DHL SUPPLY CHAIN              )
7                        REPORTER'S CERTIFICATE
                   ORAL DEPOSITION OF TAMMY WILLIAMS
8                      THURSDAY, APRIL 13, 2023
```

9        I, MARIBEL TORRES, a Certified Shorthand Reporter

10   of the State of Texas, do hereby certify that the

11   foregoing proceedings were taken before me at the time

12   and place herein set forth; that any witness in the

13   foregoing proceedings, prior to testifying, was

14   administered an oath; that a record of the proceedings

15   was made by me using machine shorthand, which was

16   thereafter transcribed by me or under my direction;

17   that the foregoing transcript is a true record of the

18   testimony given.

19        I further certify that if the foregoing pertains

20   to the original transcript, that before the completion

21   of the proceedings, review of the transcript [ ] was

22   waived [ ] was not requested, [X] was requested.

23        I further certify I am neither financially

24   interested in the action nor a relative or employee of

25   any attorney or any party to this action.

47

1          IN WITNESS WHEREOF, I have this date, May 8,

2     2023, subscribed my name.

3

4                                    _Maribel Torres_____

5                              Maribel Torres
                              Texas Certified Stenographer #8597
6                              Expiration Date: 10/31/2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION
 3    JASON WALTERS              )
                                 )
 4    vs.                        )    CIVIL ACTION
                                 )    3:22-cv-01840-C
 5                               )    JURY REQUESTED
      EXEL, INC. D/B/A           )
 6    DHL SUPPLY CHAIN           )
 7
 8
 9
10          ORAL/VIDEOCONFERENCED DEPOSITION OF
                        JOHN DOBBINS
11             TUESDAY, JUNE 27, 2023
                 9:51 A.M. - 12:43 P.M.
12
13
14
15
16        ORAL DEPOSITION OF JOHN DOBBINS, produced as a
17   witness at the instance of the Plaintiff, and duly
18   sworn, was taken in the above-styled and -numbered
19   cause on the 27th day of June, 2023, from 9:51 a.m. to
20   12:43 p.m., before Maribel Torres, Certified Shorthand
21   Reporter in and for the State of Texas, reported by
22   computerized stenotype machine, held remotely,
23   pursuant to the Federal Rules of Civil Procedure and
24   the agreements herein after set forth, if any.
25   Signature reserved.
```

1    APPEARANCES
2
     REPRESENTING THE PLAINTIFF:
3    BOB WHITEHURST, ESQ.
     WHITEHURST & WHITEHURST, ESQ.
4    5380 OLD BULLARD ROAD
     SUITE 600, #363
5    TYLER, TEXAS 75703
     TELEPHONE: (903) 593-5588
6    EMAIL: whitehurstlawfirm@yahoo.com
7
     REPRESENTING THE DEFENDANT:
8    THEANNA BEZNEY, ESQ.
     FISHER PHILLIPS, LLP
9    500 NORTH AKARD STREET
     SUITE 3550
10   DALLAS, TEXAS 75201
     TELEPHONE: (214) 220-8325
11   EMAIL: tbezney@fisherphillips.com
12
     ALSO PRESENT:
13   MR. JASON WALTERS, PLAINTIFF
14
15
16
17
18
19
20
21
22
23
24
25

JOHN DOBBINS - 6/27/2023

3

1                        I N D E X

2

     Appearances..........................        2
3    WITNESS:  JOHN DOBBINS
     Examination by Mr. Whitehurst........   5, 90, 117
4    Examination by Ms. Bezney............      59, 109
     Acknowledgment.......................        121
5    Court Reporter's Certificate.........        123

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOHN DOBBINS - 6/27/2023

4

1                    PLAINTIFF'S EXHIBITS

2

     NO.    DESCRIPTION                            PAGE

3

4    A      Photographs                              16
     B      Emails, Exel_000368-369                  19
5    C      3/4/2022 Email from Adam Elliott         23
            to Forney Supervisors
6    D      Pass-down emails, Exel_00201, 203,       27
            205, 207, 209, 211, 213, 215, 217
7    E      Corrective Action Notice,                30
            Exel_00196-198
8    F      Text Message                             37
     G      Investigation Summary Form,              38
9           Exel_00112-113
     H      Corrective Action Form,                  45
10          Exel_00119
     I      Text Messages                            48
11

12                   DEFENDANT'S EXHIBITS

13

     J      Role Profile, Exel_000020-22            61
14   K      Note To File 08-20, Exel_001591         70
     L      Staff Statements, Exel_001590 and 1589  72
15   M      Statement from Omar Flores,             72
            Exel_001584
16   N      Jason Walters' Statement,               73
            Exel_001582
17   O      Statement by Jason Walters,             74
            Exel_001583
18   P      Complainant/Witness Statement Form,     80
            Exel_001575-1578
19   Q      March 11, 2022 Emails,                  81
            Exel_001579-1580
20

21

22

23

24

25

JOHN DOBBINS - 6/27/2023

5

```
1                P R O C E E D I N G S
2           TUESDAY, JUNE 27, 2023 - 9:51 A.M.
3                (REPORTER'S NOTE:  Names not spelled on
4                the record may be spelled phonetically.
5                Quotation marks may be used with
6                indirect, inexact quotes.)
7                (Prior to commencement, Plaintiff's
8                Exhibits A through I marked.)
9                THE COURT REPORTER:  We are on the
10   record.  This is June 27th, 2023, and this is the
11   remote oral deposition of John Dobbins, taken by Zoom.
12                      JOHN DOBBINS,
13   having been administered the oath, testifies as
14   follows:
15                      EXAMINATION
16   BY MR. WHITEHURST:
17        Q.   State your name for the record, please, sir.
18        A.   What was that?
19        Q.   Would you state your name for the record,
20   please, sir?
21        A.   It's John Dobbins.
22        Q.   And how are you employed, sir?
23        A.   Full-time employed with DHL Supply Chain.
24        Q.   And how long have you been so employed?
25        A.   Ten-plus years.
```

```
 1                        Have you reviewed any documents prior
 2      to your deposition here today?
 3           A.    No.
 4           Q.    Okay.
 5                        Now, from October of 2021 to present,
 6      you were director of operations at DHL?
 7           A.    That's correct.
 8           Q.    Okay.  And what do you do in that position?
 9           A.    So I have -- I have oversight from, like, a
10      contractual and just high-level overview of about five
11      different locations, with our Goodyear customer across
12      the United States.
13           Q.    So it's my understanding you work from home,
14      sir?
15           A.    I actually -- I'm based out of DFW Airport.
16      I travel quite a bit.
17           Q.    Okay.  And before October 2021, what was
18      your position at DHL?
19           A.    I was the -- did I hear something there?
20      Okay.
21                        I was the general manager of the
22      Goodyear Forney facility --
23           Q.    Okay.
24           A.    -- with DHL.
25           Q.    Now, during that position, did you know most
```

JOHN DOBBINS - 6/27/2023

17

```
 1   slightly for me?
 2              Sorry, I hit a button on my speaker.
 3   It's not supposed to be ringing.
 4              MR. WHITEHURST:  Mr. Dobbins, that's
 5   all right.  I'm a newbie at this, too, so just kind of
 6   bear with me.
 7              THE WITNESS:  All right.  Keep going,
 8   please.
 9        A.   All right.  There is one photo in there that
10   I do remember asking Mr. Walters to take.  I bel --
11   it's either 3 or 4.  And that was in relation to
12   making sure forklifts had been delivered.  It was the
13   image where it was the back of all the forklifts.
14        Q.   (BY MR. WHITEHURST)  Is that --
15        A.   That is the --
16        Q.   Go ahead, sir.
17        A.   Say that -- that's the only one I recall
18   asking for.
19        Q.   Okay.  All right.
20        A.   And -- yeah, go ahead.
21        Q.   Is that the location that Mr. Walters
22   usually worked, was out on the floor?
23        A.   That's correct.  He was a floor supervisor.
24        Q.   Okay.
25              Were you involved in the termination of
```

1    Jason Walters from DHL?

2         A.    I was involved in the approval process.

3         Q.    Did you look at any documents prior to the

4    approval?

5         A.    I -- I reviewed the video and the -- some of

6    the statements -- or the statements.  And then there

7    was a call reviewing the findings of the

8    investigation.

9         Q.    Okay.  And you say "the findings of the

10   investigation."  What are you talking about?

11        A.    So when the incident involving Jason Walters

12   and Evaite Hooper was brought up, there was an

13   investigation conducted at the facility between the

14   site general manager, Adam Elliott, and Mickey Moza,

15   the HR representative at that time.  They conducted an

16   investigation.  At the end of that investigation,

17   they, basically, summarized their findings and

18   their -- what do you call it, their -- the resolution

19   that they had come to for Mr. Walters.

20        Q.    Okay.  So you didn't make any decisions, or

21   did you make a decision?

22        A.    I agreed with the decision that was brought

23   to me by Adam and Mickey Moza.

24        Q.    Okay.

25                   Sir, I'm going to show you --

JOHN DOBBINS - 6/27/2023

61

1              (Defendant's Exhibit J marked.)

2          Q.   (BY MS. BEZNEY)  And I'll scroll through

3     this so you can see the whole thing.

4              Mr. Dobbins, do you recognize what this

5     Exhibit J is?

6          A.   I do.  That is a supervisor role profile

7     within DHL.

8          Q.   Is that, like, a job description?

9          A.   Correct.  So as we bring in prospective

10    new-hires and different things, this is the document

11    we try to model our supervisors' time around.

12         Q.   Was this the job description that was in

13    place when Mr. Walters served as an operations

14    supervisor?

15         A.   It was.

16         Q.   Now, according to this job description, the

17    key accountabilities for this role is 70 percent

18    associate interaction.  Examples include associate

19    development, one-on-one coaching, conflict resolution,

20    training, directing daily activities, delivering

21    associate orientation, training, performance reviews,

22    and/or development as appropriate, participating in

23    the management of turnover, and making sure associates

24    have the proper tools.

25              Is this a fair and accurate

1    representation of 70 percent of Mr. Walters' job

2    duties as an operations supervisor?

3        A.   I believe so.  I think Jason did those

4    activities very well.

5        Q.   It continues to say, 10 percent of the time

6    he was in charge of process improvement, including

7    action planning, project planning, space planning, and

8    the like.

9                 To your knowledge, did Mr. Walters

10   engage in those activities as an operations

11   supervisor?

12       A.   I would say yes, he's engaged.  Ten percent

13   of the time, that may not be entirely accurate, just

14   because some of the attention floats in between these

15   different items.  You know, I would probably say that

16   was more 5 percent there, but planning took another

17   10 percent.  So kind of just switched back and forth.

18       Q.   So the percentages might not be a hundred

19   percent accurate; but as far as the activities go, he

20   still did all those things, to your knowledge.

21       A.   Yes, he still took place in that.  And like

22   I said, I think, based on the week and the workload,

23   the priorities of these different things would switch.

24       Q.   All right.  So it also includes planning --

25       A.   Yep.

1   appropriate.  Call it out and, you know, address it,

2   yes, but the grabbing, no.

3        Q.   Okay.  I'm going to show you what I will

4   mark as Exhibit K.

5               (Defendant's Exhibit K marked.)

6        Q.   (BY MS. BEZNEY)  And let me just scroll down

7   to the bottom here.

8               Do you recognize this document?

9        A.   I do.

10       Q.   And what is this document?

11       A.   So on August 27th, there was an issue that

12  was brought to our attention, that there was an issue

13  that happened between Jason Walters and an Action

14  supervisor.  We -- it started off as anonymous, and

15  I -- I can't remember exactly who it was.  I apologize

16  on that.  But they just, hey, something we needed to

17  look into; so we did.

18               We started off, we looked at the camera

19  footage, and we saw -- like I said, I -- I think I

20  explained that earlier in the -- in the deposition,

21  where it looked like Mr. Walters had kind of directed

22  or -- kind of aggressively directed an individual in a

23  direction.

24               We did an investigation on it.  We got

25  Jason Walters' statements, the associate's statements,

1    and different things.  And, really, through that,
2    we -- through talking to the different people involved
3    and through the witness statements, we -- we found
4    that, really, there was -- there was no ill intent and
5    it was really that the supervisor, the Action
6    supervisor, got tripped up, when Jason was kind of
7    guiding him in the direction.
8                    So this was really to recap the
9    instance; what we looked on it; and, really, some
10   reminders for Jason Walters, going forward, about the
11   perception of that incident.
12       Q.   Are these your personal notes?  Did you
13   write this up?
14       A.   Yes, I did.
15       Q.   And here at the top, it says, "We spoke to
16   the associates that were present, both Action and DHL,
17   and the Action Supervisor involved."
18                    Did you speak with those folks, or did
19   someone else assist with those conversations?
20       A.   Yes, I was a part of that.
21                    So with it being -- with it being our
22   third party there, with Action, we had to have their
23   team involved, as well.  And then this individual,
24   English wasn't his first language, so we made sure we
25   had people that could accurately translate on both

```
 1    pre-shift; and then, a couple of days later, there was
 2    an argument about an associate not being where he was
 3    supposed to be or getting to work, so.
 4        Q.   All right.  So going back here to
 5    Exhibit K --
 6        A.   Uh-huh.
 7        Q.   -- your note to file.
 8             So after taking the statements and
 9    speaking with the witnesses, including the supervisor
10    who was pushed, you say here that the Action
11    supervisor "felt no ill intent, just thought it was
12    unprofessional."  Is that correct?
13        A.   Correct.  Correct.
14        Q.   And, then, you said Mr. Walters didn't deny
15    that he had put his -- you know, directed or pushed --
16        A.   Yeah.  And the --
17        Q.   -- the supervisor.
18        A.   -- big -- the big thing there is that the
19    supervi -- the -- and -- like I said, this is just
20    kind of in reflection here, but the supervisor was
21    more embarrassed that Jason had kind of called him out
22    to actually go be a supervisor.  He was more
23    embarrassed that Jason had called him out in front of
24    his peers.
25        Q.   Now, after the investigation, you and Eartis
```

1    Shaw spoke with Mr. Walters.  Is that correct?

2         A.    I -- I do not recall if Eartis was in the

3    room.  I know, for sure, I spoke to Jason.  I cannot

4    remember if Eartis was in the room, because I typed

5    this up prior to walking into the meeting with Jason.

6    So my goal would have been to have Eartis in the room,

7    so -- but I cannot remember if he was actually in the

8    room.

9         Q.    Do you know if Mr. Shaw spoke with

10   Mr. Walters in connection with the investigation but,

11   maybe, before it was finalized and you -- and you met

12   with him?

13        A.    Yeah.  Yeah, because typically what I'll do

14   is I'll write up my note to file so that I have it in

15   front of me and provide a copy, just to say, "Hey,

16   this is what we're going to cover."

17        Q.    When you met with Mr. Walters at the

18   conclusion of your investigation -- I see two numbered

19   items here below.  Did you discuss these items with

20   Mr. Walters?

21        A.    Yes.  In the conference room and at our

22   Forney location, we discussed it.

23        Q.    So it was in person.

24        A.    Correct.

25        Q.    And during that meeting, did you, in fact,

1    tell him that his behavior was ill advised and under

2    zero circumstances should happen again?

3        A.    Yes.  So we -- we discussed the

4    professionalism of the incident.  I was like, "Hey,

5    you know, as a supervisor, everything, we always have

6    to be cognizant of the perception of our actions," and

7    then we addressed the placing of the hands on the

8    individual, because, you know, it -- you know, it's

9    just one of the no-noes that we don't do.

10       Q.    And according to this investigation note to

11   file, it says, "This could have been easily addressed

12   with corrective action or even termination if the

13   result of the investigation had been different.

14   Jason, this serves as your one and only warning that

15   issues similar to this will be met with the above

16   mentioned outcomes should it happen again."

17            Did you advise Mr. Walters that, if he

18   placed his hands on another individual again, he could

19   be issued a corrective action or even terminated?

20       A.    Yeah, and I really focused in on, like, had

21   the results of it been -- of the investigation been

22   different.  You know, this one, you know -- DHL and

23   Action associates had said that there -- I -- that

24   there was a joke said, everything, that it -- there

25   was no ill intent, that there really wasn't the

1    proverbial push, that, you know, the associate -- or

2    the supervisor stumbled over himself.  You know, there

3    was a lot of things that went into this one that said,

4    hey, there's no ill intent here, there was no

5    threatening or anything like that, that this was just

6    kind of a -- this was an occurrence that the image

7    looked -- you know, the image looked terminable; the

8    outcome was not.

9         Q.   Okay.  And I'm going to direct you back to

10   Exhibit G.  And in here it says there were three

11   witnesses: Tenisha Thomas, Shaquel Thomas, and Jason

12   Walters?

13        A.   Uh-huh.

14        Q.   Did you review statements by each of those

15   when reviewing the decision on whether to not --

16   whether or not to approve termination of Mr. Walters?

17        A.   For me, with how I was involved in the -- in

18   this process, I got just kind of high-level summaries

19   of each of them.  I did not physically read the -- the

20   handwritten statement of them.

21             So by the -- you know, other than being

22   notified that the incident happened, you know, hey,

23   that this happened, we're going to look into it, as

24   Mickey and Adam started to get through their findings,

25   this is kind of the format at which I was involved in

1                     Yeah, anytime we terminate a exempt --
2       or -- we call it exempt, but, like, a salaried
3       associate, the approval process steps it up a notch.
4       So it -- it has to go through, you know, a couple of
5       different approver levels on our side.  It doesn't
6       just -- doesn't just stick with local HR.  It has to
7       go up the chain a little bit.
8            Q.   But even you, as the director of operations,
9       can't terminate a salaried employee without HR
10      approval?
11           A.   Correct.  So if at any point in the -- in
12      the chain of it that somebody blocks it, we either
13      have to pause and make -- we have to explain whatever
14      it is that they're questioning.  But in this case,
15      there were no pauses.
16           Q.   Are you aware of any other employees being
17      terminated from employment for violence or threatening
18      violence in the workplace?
19           A.                    was a sexual harassment claim,
20      and then we had an associate in mid-20- -- or early
21      2020.  His name, I am drawing a blank on.  But he
22      pushed another individual.  He was on our inventory
23      team.  He pushed another individual.  He was suspended
24      immediately, and then through the -- suspended
25      immediately, and then terminated in the following

1    days, for gross misconduct.

2        Q.    Who's J█████ A█████?

3        A.    J█████ A█████ is the name.

4        Q.    He was terminated --

5        A.    Yep.

6        Q.    He was the one terminated for workplace

7    violence?

8        A.    Correct.

9        Q.    Are you aware of anyone engaging in threats

10   of workplace violence or actual workplace violence who

11   was not terminated from employment?

12       A.    In my time, no.  I know we've had shouting

13   matches and different things, you know, where people

14   had disagreements, but it never turned physical.  And,

15   then, any -- if -- any claims of threats were usually

16   found, through investigation, to be either false or

17   embellishment, so there were no terminations related

18   to it.  There were some that we documented, where both

19   parties got into it and we documented both of them,

20   like, "Hey, we don't know exactly what happened

21   because it happened between you and it happened

22   between this person."  There were no witness

23   statements.  So we -- we did note to files or

24   correctives on both.  Like, "Hey, y'all both admitted

25   you argued, but you're saying you threatened him.

1          Q.    (BY MR. WHITEHURST)  Sure.

2                      Are you aware of the headbutt incident

3    that Mr. Walters was involved in?

4                      MS. BEZNEY:  Object to form.

5          A.    Headbutt incident.  Not specifically, no.

6          Q.    (BY MR. WHITEHURST)  What do you know

7    generally?

8          A.    I'm not aware of him being headbutted.

9          Q.    Okay.

10                     If there was an agreement between

11   Ms. Hooper and yourself, would it have gone -- to show

12   up late, would that have been in her file?

13                     MS. BEZNEY:  Object to form.

14         A.    No.  It would -- it would have been

15   reflected on the timekeeping side, so the admin and

16   Eartis would have been aware of it.  I'm unaware if it

17   made it down -- like I said, I do not know if it made

18   it down to Jason.

19         Q.    (BY MR. WHITEHURST)  Well, I mean, my

20   understanding, he was her supervisor, was he not?

21         A.    He was.

22         Q.    So why in the world wouldn't you tell him?

23         A.    I -- I am -- I cannot -- I cannot remember

24   if I told him specifically, is -- I may have; I -- I

25   may not have.  I do not know.

1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
2                            DALLAS DIVISION

3    JASON WALTERS                 )
                                   )
4    vs.                           )   CIVIL ACTION
                                   )   3:22-cv-01840-C
5                                  )   JURY REQUESTED
     EXEL, INC. D/B/A              )
6    DHL SUPPLY CHAIN              )

7                        REPORTER'S CERTIFICATE
                    ORAL DEPOSITION OF JOHN DOBBINS
8                       TUESDAY, JUNE 27, 2023

9         I, MARIBEL TORRES, a Certified Shorthand Reporter

10   of the State of Texas, do hereby certify that the

11   foregoing proceedings were taken before me at the time

12   and place herein set forth; that any witness in the

13   foregoing proceedings, prior to testifying, was

14   administered an oath; that a record of the proceedings

15   was made by me using machine shorthand, which was

16   thereafter transcribed by me or under my direction;

17   that the foregoing transcript is a true record of the

18   testimony given.

19        I further certify that if the foregoing pertains

20   to the original transcript, that before the completion

21   of the proceedings, review of the transcript [ ] was

22   waived [ ] was not requested, [X] was requested.

23        I further certify I am neither financially

24   interested in the action nor a relative or employee of

25   any attorney or any party to this action.

JOHN DOBBINS - 6/27/2023

124

1          IN WITNESS WHEREOF, I have this date, July 17,

2     2023, subscribed my name.

3

4

                        _Maribel Torres_
                        _____
5                       Maribel Torres
                        Texas Certified Stenographer #8597
6                       Expiration Date: 10/31/2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEIGH & ASSOCIATES COURT REPORTING AND VIDEO
(877) 790-3376    FAX (877) 790-3377

APP 112





9:27

Mickey HR-DHL
8172694794

Monday, March 21, 2022

Mickey I'm trying to figure out when my health and dental insurance expire on my family...I called the benefits number, they referred my back to HR. I need this information for the state...due to my special needs child.

11:32 AM

Tuesday, March 22, 2022

Is there another person I need to contact about this?

11:44 AM

The site management team must process the separation first, which they told me they just did yesterday. Then it typically takes 1-2 weeks for the benefits team to receive the separation notification, so you can follow up with them then.

12:33 PM

Of course the site sent me phone numbers that all



9:28

**Mickey HR-DHL**
8172694794

so you can follow up with them then.
12:33 PM

Of course the site sent me phone numbers that all referred me back to HR.
12:40 PM

Monday, March 28, 2022

I really am taken by suprisectgst my direct questions could not be answered when I clearly asked when my benefits would end being that i have a special needs child that has 24/7 nursing and medicine needed so that he does not have a stroke and die...I am more than aggravated at this point with how t

💬 View all                    ⟩
2:39 PM

You told me the 21st...now the info sent to my pharmacy says the benefits termed on the 16th...
2:58 PM

• • •

**Me**
2:39 PM, Mar 28

I really am taken by suprisectgst my direct questions could not be answered when I clearly asked when my benefits would end being that i have a special needs child that has 24/7 nursing and medicine needed so that he does not have a stroke and die...I am more than aggravated at this point with how this was mishandled.

Note to File 08-20



## Note to File

On August 27th 2020, I received notice of a incident during pre-shift.  The issues was that DHL Supervisor Jason Walter pushed the Action Supervisor as a response of lack of action.  Upon investigation and viewing the cameras, we found that Jason did indeed push the Action Supervisor in an associates direction.  At this time I, John Dobbins –GM, began to gather statements.

We spoke to associates that were present, both action and DHL, and the Action Supervisor involved.

From the associate conversations, we were informed that the incident did occur (the push) but from most accounts, all stated that there was no ill intent.

In speaking with the Action Supervisor, he felt no ill intent, just thought it to be unprofessional.

Once through those conversations, Eartis Shaw (OM) and I spoke with Jason on the issue.

Jason did not deny the incident occurred.  He stated that he asked the Action supervisor to translate an important issue and that he shied away from it.  Jason's intent was to ensure the message was received correctly prior to the beginning of the shift so he guided the supervisor in the associates direction.  From there, he thought nothing of the incident.

Based on the above investigation and speaking to both parties, we feel that the incident needed to be documented to show that the behavior displayed needed to be addressed and that the following items will be addressed with Jason:

1. Professionalism.  You are to conduct yourself in a professional manor at all times.  The behavior displayed was ill advised and under zero circumstances should happen again.
2. Placing hands on another individual.  This could have been easily addressed with corrective action or even termination if the results of the investigation been different.  Jason, this serves as your one and only warning that issues similar to this will be met with the above mentioned outcomes should it happen again.

EARTIS SHAW - 4/13/2023

1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION
3   JASON WALTERS              )
                               )
4   vs.                        )   CIVIL ACTION
                               )   3:22-cv-01840-C
5                              )   JURY REQUESTED
    EXEL, INC. D/B/A           )
6   DHL SUPPLY CHAIN           )
7
8
9
                    ORAL DEPOSITION OF
10                      EARTIS SHAW
                  THURSDAY, APRIL 13, 2023
11               11:25 A.M. - 2:23 P.M.
12
13
14
15       ORAL DEPOSITION OF EARTIS SHAW, produced as a
16  witness at the instance of the Plaintiff, and duly
17  sworn, was taken in the above-styled and -numbered
18  cause on the 13th day of April, 2023, from 11:25 a.m.
19  to 2:23 p.m., before Maribel Torres, Certified
20  Shorthand Reporter in and for the State of Texas,
21  reported by computerized stenotype machine at the law
22  offices of Fisher Phillips, LLP, 500 North Akard
23  Street, Suite 3550, Dallas, Texas, pursuant to the
24  Federal Rules of Civil Procedure and the agreements
25  herein after set for, if any.  Signature reserved.

EARTIS SHAW - 4/13/2023

2

1   APPEARANCES

2

    REPRESENTING THE PLAINTIFF:
3   BOB WHITEHURST, ESQ.
    WHITEHURST & WHITEHURST, ESQ.
4   5380 OLD BULLARD ROAD
    SUITE 600, #363
5   TYLER, TEXAS 75703
    TELEPHONE: (903)593-5588
6   EMAIL: whitehurstlawfirm@yahoo.com

7

    REPRESENTING THE PLAINTIFF:
8   THEANNA BEZNEY, ESQ.
    FISHER PHILLIPS, LLP
9   500 NORTH AKARD STREET
    SUITE 3550
10  DALLAS, TEXAS 75201
    TELEPHONE: (214)220-8325
11  EMAIL: tbezney@fisherphillips.com

12

    ALSO PRESENT:
13  MR. JASON WALTERS, PLAINTIFF

14

15

16

17

18

19

20

21

22

23

24

25

EARTIS SHAW - 4/13/2023

3

1                        I N D E X

2

Appearances..........................        2
3    WITNESS:  EARTIS SHAW
     Examination by Mr. Whitehurst........    4, 113
4    Examination by Ms. Bezney...........      100
     Acknowledgment.......................     142
5    Court Reporter's Certificate.........     144

6

7                  PLAINTIFF'S EXHIBITS

8    NO.    DESCRIPTION                       PAGE

9

     3     Text Messages                        37
10   4     Text Messages                        50

11

              REQUEST TO PROVIDE INFORMATION
12

13   Email.......................................   83

14

15

16

17

18

19

20

21

22

23

24

25

EARTIS SHAW - 4/13/2023

4

| 1 | P R O C E E D I N G S |
| 2 | THURSDAY, APRIL 13, 2023 - 11:25 A.M. |
| 3 | (REPORTER'S NOTE:  Names not spelled on |
| 4 | the record may be spelled phonetically. |
| 5 | Quotation marks may be used with |
| 6 | indirect, inexact quotes.) |
| 7 | THE COURT REPORTER:  We're on the |
| 8 | record.  This is the oral deposition of Eartis Shaw, |
| 9 | taken at Fisher Phillips in Dallas, Texas, on |
| 10 | April 13, 2023.  The time is 11:25 a.m.  My name is |
| 11 | Maribel Torres with Leigh & Associates. |
| 12 | Counsel, if you could please state your |
| 13 | appearances for the record before I swear him in. |
| 14 | MR. WHITEHURST:  Bob Whitehurst for |
| 15 | plaintiff. |
| 16 | MS. BEZNEY:  Theanna Bezney, Fisher |
| 17 | Phillips, for defendant, Exel. |
| 18 | EARTIS SHAW, |
| 19 | having been duly administered the oath, testified as |
| 20 | follows: |
| 21 | EXAMINATION |
| 22 | BY MR. WHITEHURST: |
| 23 | Q.   State your name for the record, please, sir. |
| 24 | A.   Eartis Ray Shaw. |
| 25 | Q.   And, sir, how are you employed? |

1                    If you'll look at the next document,
2    which is 113.  Have you seen this document?
3         A.   No, sir.
4         Q.   Mr. Shaw, I'm trying to -- well, let me just
5    back up.
6                    Who was involved in the termination of
7    Mr. Jason Walters, to your knowledge?
8         A.   As far as who told him?
9         Q.   Just --
10        A.   I'm trying to understand the question.
11        Q.   Who made the decision to terminate
12   Mr. Walters?
13        A.   The decision came down from HR, director
14   level, all the way down.
15        Q.   Okay.  Tell me who we're talking about.
16        A.   Mickey Moza, Antonio Juarez, Meredith
17   Singletary, John Dobbins.
18        Q.   Okay.  And John Dobbins is here in the area?
19        A.   Yes, sir.  He's the director.
20        Q.   Mickey Moza was or is in the area?
21        A.   Was.  I --
22        Q.   Right.
23        A.   -- don't know if he still is.
24        Q.   Right.
25                   And the other two -- did you say two or

1    three other names?

2         A.   Antonio Juarez and Meredith Singletary.

3         Q.   Where?

4         A.   I'm not sure where they're based out of.

5    They're both HR.  That would have been Mickey Moza's

6    boss and Mickey Moza's boss's boss.

7         Q.   Okay.  They're off somewhere else -- they

8    don't work in this area, in Texas, right?

9         A.   Oh, I'm not sure where they're based out of.

10        Q.   Okay.  But they're not at your facility.

11        A.   No, sir.

12        Q.   Okay.  All right.

13                  So if you didn't prepare the document,

14   is there anybody else in charge that would do this?

15        A.   That would prepare this document?

16        Q.   Yes, sir.

17        A.   This document, I've never seen.

18        Q.   Okay.  But you know you didn't do it.

19        A.   Yes, sir.  I didn't do it, no.

20        Q.   Okay.

21                  If you will look at the next page,

22   please, sir.  It should be Bates stamp --

23        A.   Fourteen.

24        Q.   -- 114.  Sir, in the right-hand corner is a

25   114 --

15

| | | |
|---|---|---|
| 1 | A. | Okay, yes, sir. |
| 2 | Q. | All right.  Is that -- have you seen that |
| 3 | document? | |
| 4 | A. | Yes, sir -- yeah, this is a statement. |
| 5 | Q. | Right. |
| 6 | A. | Yes, sir. |
| 7 | Q. | Okay.  You have seen that document. |
| 8 | A. | Yes, sir. |
| 9 | Q. | Okay. |
| 10 | A. | This has handed to me by Miss Evaite. |
| 11 | Q. | By who? |
| 12 | A. | Miss Evaite, DeNeill. |
| 13 | Q. | Okay.  Now, does she type? |
| 14 | A. | I don't know. |
| 15 | Q. | Did she type this up? |
| 16 | A. | Yes, sir. |
| 17 | Q. | She typed it up? |
| 18 | A. | She brought it to me typed up, yes, sir. |
| 19 | Q. | Okay. |
| 20 | | Where did -- did she -- is there an |
| 21 | office that she can go type it up in? | |
| 22 | A. | There's multiple offices. |
| 23 | Q. | Okay.  So this thing is dated 9:30 a.m., at |
| 24 | the bottom.  Next page.  It's signed by her. | |
| 25 | A. | Okay. |

1        Q.   All right.

2               Now, did you use this document in

3    terminating Mr. -- making the decision to terminate

4    Mr. Walters?

5               MS. BEZNEY:   Object to form.

6        A.   I used this document as part of the evidence

7    gathered --

8        Q.   (BY MR. WHITEHURST)   Okay.

9        A.   -- in the investigation.

10       Q.   Now, Mr. Shaw, I understand these other

11   individuals, that we've talked about, are out of the

12   area.   They don't -- they don't have any information

13   on any of this.   Is that right?

14              MS. BEZNEY:   Object to form.

15       Q.   (BY MR. WHITEHURST)   Well, besides what

16   you're telling me.

17       A.   The investigation paperwork, what we've

18   sent, all the statements.

19       Q.   Right.   You're sending them documents -- did

20   you send them a copy of the video?

21       A.   I personally did not, no.   I gave it to

22   Adam.

23       Q.   You did what?

24       A.   I gave the video to Adam.

25       Q.   Okay.   But looking at what we've seen, we --

EARTIS SHAW – 4/13/2023

32

1    was sometime in 2021 -- 2022?  Excuse me.

2         A.   Yes, sir, when we turned in the

3    investigation.

4         Q.   Okay.

5              And who took over for Mr. Walters?

6         A.   B███████  P████████.

7         Q.   Okay.  And when did Mr. P██████  take over?

8         A.   Do not know the exact date off the top of my

9    head.

10        Q.   Okay.

11             Are you aware of an altercation between

12   Mr. P███████  and Mr. Walters?

13        A.   I heard rumors.

14        Q.   Okay.  About a headbutting incident?

15        A.   I -- there was a rumor of multiple different

16   ways told.

17        Q.   Would that be grounds for termination?

18        A.   Well, yes, sir.

19        Q.   After you heard the rumors, did you

20   investigate?

21        A.   It was already being investigated, from my

22   understanding.  It was reported to the general

23   manager.

24        Q.   And who was that?

25        A.   Greg Mahoney.

1    longer than that.

2        Q.   Okay.  When all this was going on, did

3    Mr. -- was Mr. Moza there, or was he at home, or

4    wherever he is?  Was he at the facility when all this

5    was going on with Mr. Walters?

6        A.   No, sir.

7        Q.   So all this stuff is coming from these three

8    documents and the video, Mr. Walters' termination.  Is

9    that right?

10            MS. BEZNEY:  Object to form.

11        A.   No, sir.

12        Q.   (BY MR. WHITEHURST)  Okay.  What else?

13        A.   Mr. Walters' statements.

14        Q.   Right.  And what did Mr. Walters say?

15        A.   I don't know what the statement is.  It had

16    to be written twice.  The first one did not refer to

17    any of the incident, and the second one had to be

18    written about the incident.

19        Q.   Okay.  So did Mr. Walters say, "Yeah, hey, I

20    did it"?

21        A.   I can't say -- we had a discussion, a heart

22    to heart, a lot of talking.  I cannot tell you

23    everything that was involved in it, because I don't

24    know.  I don't remember.  I can't recall.

25        Q.   Isn't it true that Mr. Walters denied saying

EARTIS SHAW - 4/13/2023

64

```
 1                    MS. BEZNEY:  Thank you.
 2                    MR. WHITEHURST:  I think it's 2.  Two.
 3         Q.   (BY MR. WHITEHURST)  Let me just show -- I
 4    think your attorney's just handed you Exhibit No. --
 5    all right, lower right-hand --
 6         A.   119?
 7         Q.   Sir?
 8         A.   119?
 9         Q.   Yes.
10                    That is your signature?
11         A.   Yes, sir.
12         Q.   Okay.  And it says, "Eartis Shaw met with
13    you on 3/16/2022 to discuss the following."
14                    So you met with Mr. --
15         A.   This was a phone conversation.
16         Q.   So you didn't meet with him.
17         A.   Just on the phone.
18         Q.   Okay.
19                    "Termination for violating work rule #2
20    class 2 Gross Misconduct.
21                    "Grabbing associates clothing and
22    pulling closer to body."
23                    Did you see that?
24         A.   In the video, and he did admit that he had
25    grabbed right here --
```

| | |
|---|---|
| 1 | becomes an issue, they'll write you up for infraction. |
| 2 | Q.  And did Mr. Walters say, "She didn't have on |
| 3 | the right equipment"? |
| 4 | A.  No. |
| 5 | Q.  That never came up. |
| 6 | A.  During the statements, they talked about |
| 7 | PPE, but wasn't talking about PPE. |
| 8 | Q.  Right.  Did -- to your knowledge, on |
| 9 | March 10, 2022, did Ms. Hooper have on the proper |
| 10 | equipment? |
| 11 | A.  To my knowledge, yes. |
| 12 | Q.  Yes or no or don't know?  Don't remember? |
| 13 | A.  Well, from what I see in the video, I see |
| 14 | the proper PPE on. |
| 15 | Q.  Okay.  If she did not, would it be the |
| 16 | responsibility of Mr. Walters to correct her and say, |
| 17 | "You need to put on the proper equipment"? |
| 18 | A.  Yes, it would be the supervisor's |
| 19 | responsibility -- |
| 20 | Q.  Okay. |
| 21 | A.  -- to verify they're wearing their PPE. |
| 22 | Q.  Okay.  Then it says, "Telling the associate |
| 23 | to calm down before he put her in a choke hold." |
| 24 | Did Mr. Walters say that? |
| 25 | A.  To her? |

| | |
|---|---|
| 1 | Q.   Yes. |
| 2 | A.   I don't know.  I was not privy to the |
| 3 | conversation; I do not know. |
| 4 | Q.   But that's the reason for the termination. |
| 5 | A.   The statements. |
| 6 | Q.   That's coming from -- |
| 7 | A.   Multiple people. |
| 8 | Q.   Multiple people.  And we've talked about |
| 9 | Ms. Hooper and the two ladies. |
| 10 | A.   Uh-huh. |
| 11 | Q.   Anybody else? |
| 12 | A.   No, sir. |
| 13 | Q.   But there's also people out there that |
| 14 | didn't see anything.  They were right in the area and |
| 15 | didn't see anything happen.  You didn't talk to them, |
| 16 | right? |
| 17 | A.   I asked them if they seen or witnessed |
| 18 | anything with the alleged, and they told me no. |
| 19 | Q.   But you didn't get that -- |
| 20 | A.   As you just stated, it's loud. |
| 21 | Q.   But you didn't put that in writing. |
| 22 | A.   No, sir.  There was no -- |
| 23 | Q.   Did you ask these two people to make the |
| 24 | statements, Ms. Thomas -- |
| 25 | A.   Did I ask them? |

68

```
 1          Q.   Yes.
 2          A.   I went to them and asked them were they
 3     privy to it.  They told me what they knew.  And I
 4     asked them, "Okay, do you mind putting that in a
 5     statement?"
 6          Q.   Okay.
 7          A.   They said yes.
 8          Q.   Now, both of these ladies say, "We thought
 9     he was just joking.  He didn't mean it."  Right?  "But
10     I think he was playing with us."  Even if it's true,
11     she says, "I think he was playing with us."
12          A.   No -- I'm sorry, the question again?
13          Q.   Sure.
14               Okay.  117, there's a Bates stamp, the
15     right-hand corner.
16          A.   Uh-huh.
17          Q.   You see that?
18          A.   Uh-huh.
19          Q.   "Choke hold" -- "I think he was playing...us
20     when he said it," okay.
21               I didn't see that in the report -- this
22     final report.  It didn't say anything about "playing
23     with us."
24          A.   So are you saying the statement is referring
25     to Evaite saying that?
```

```
1        A.    Meredith.

2        Q.    I'm sorry?

3        A.    Meredith Singletary.

4        Q.    And Mr. ...?

5        A.    Antonio Juarez.

6        Q.    Juarez.

7              And how do we spell Singletary?

8        A.    S-i-n-g-l-e-t-a-r-y?

9        Q.    Pretty close?

10       A.    I think -- I think that's it.

11       Q.    Okay.  All right.

12             So the other two individuals that we're

13   dealing with are Antonio and Meredith, right?

14       A.    Correct.

15       Q.    Anybody else?

16       A.    Not that I'm aware of.

17       Q.    Okay.  Why would you not be aware of it?

18       A.    The investigation, I started it off; I sent

19   everything that was requested, to HR.

20       Q.    Mickey Moza.

21       A.    Yes, sir.

22             And then informed my general manager.

23       Q.    Adam Elliott.

24       A.    And then I had nothing else to do with it,

25   unless I was requested for any other information.
```

EARTIS SHAW - 4/13/2023

1          Q.    (BY MR. WHITEHURST)   Okay.

2          A.    That's when he was contacted.

3          Q.    Are you aware of the fact the Texas

4     Unemployment Commission found no reason for discharge?

5          A.    No, sir.

6          Q.    You didn't know that?

7          A.    No, sir.

8          Q.    Do you think that's kind of important, the

9     fact that you got a government agency coming in and

10    finds that "We don't find any reason for discharge"?

11                MS. BEZNEY:   Object to form.

12         A.    No, sir.   I don't know I've ever been told

13    that.

14         Q.    (BY MR. WHITEHURST)  Okay.  All right.  If

15    that's the case, would you say, "Hey, maybe we made a

16    mistake"?

17                MS. BEZNEY:   Object to form.

18         A.    Again, opinion-based, it would have been a

19    biased decision, because Mr. Walters was a friend.

20         Q.    (BY MR. WHITEHURST)  But it's my

21    understanding from what you're telling me, sir,

22    Mr. Walters has no idea what he's accused of, and DHL

23    never submitted --

24         A.    When he was suspended, he was called in my

25    office.  We discussed what Miss Evaite had talked

```
 1                     What I'm trying to ascertain is --
 2      there's got to be something I'm missing; I just don't
 3      see it.  Mr. Shaw, I'm looking at the statements, and
 4      then I'm looking at the video.  There's got to be
 5      something else that you've looked at at that time.
 6           A.   I got statements; I got a video.  Sent it to
 7      HR.
 8           Q.   Okay.  So you didn't make the decision.  HR
 9      made the decision.
10           A.   I sent it up to HR; it went through them.
11      The decision -- it went down how they would proceed.
12      Adam and possibly myself would have had to agree with
13      it to administer it.
14           Q.   So Mr. Elliott and yourself agreed to it.
15           A.   I would have had to agree to it to
16      administer it.
17           Q.   All right.  But could HR make -- overrule
18      it?
19           A.   Could they force us?
20           Q.   Yes.
21           A.   No, sir.
22           Q.   Okay.  So it basically came down to you and
23      Mr. Elliott made the decision to terminate
24      Mr. Walters.
25           A.   Based --
```

```
 1              A.    Well, the first statement had absolutely

 2      nothing to do with any of it.  That's why HR had me

 3      reach out to have a second statement.

 4              Q.    Okay.

 5                    This is a correction action form.  Is

 6      that correct?

 7                    MS. BEZNEY:  You're looking at document

 8      119.

 9              Q.    (BY MR. WHITEHURST)  That you signed.

10              A.    Yes, I -- I -- this is what I administered.

11              Q.    Okay.  And -- so you're saying that

12      Mr. Walters -- yeah.

13                    I assume this is -- it is Bates stamped

14      113.

15                    (Pause in proceedings.)

16              A.    Okay.

17              Q.    (BY MR. WHITEHURST)  Okay.

18                    So looking at that, sir, he didn't --

19      he denies it.  Right?

20              A.    Correct.

21              Q.    Okay.

22                    All right.  So there is -- Mr. Shaw,

23      there's nothing else that I'm missing other than the

24      documents that I've showed you here today.  Is that

25      right?
```

1                        Besides the incident with Ms. Hooper,
2       if that had not occurred, would you rehire
3       Mr. Walters?
4            A.    DHL?
5            Q.    Yes.
6            A.    I cannot answer for them.
7            Q.    Okay.  All right.  For you?
8            A.    For me, personally?  We were friends.
9            Q.    I know, but would you rehire him?
10           A.    Possibly.
11           Q.    Well, Mr. Shaw, all I got is documents.
12      That's all I got.  I don't see him goofing off,
13      messing around, drunk, drugs, fights, anything like
14      that.  And he showed up on time.  Apparently --
15           A.    No, sir.
16           Q.    -- he did a pretty good job.
17           A.    No, sir.  Many times he was late.
18           Q.    Mr. Walters was?
19           A.    Yes, sir.
20           Q.    Okay.  How do you know that?
21           A.    I would receive a text.
22           Q.    From...?
23           A.    Or I would be notified by the night shift
24      sup that he was still not there, or Mr. Walters would
25      text me.  I'd get texts that, "My stomach hurts.  I

EARTIS SHAW - 4/13/2023

100

1     not looked at the video in over a year.
2          Q.    Right.  But would you terminate an
3     individual that you couldn't see for sure?
4          A.    Would I terminate?
5          Q.    Mr. Walters, based on this -- you don't know
6     who he's talking to.
7          A.    No, sir.
8          Q.    You would not?
9          A.    The termination didn't come just from the
10    video, sir.
11         Q.    Oh, it came from the statements.
12         A.    Statements, videos, evidence, I assume.  I
13    gathered it; I sent it to HR.
14         Q.    Mr. Moza.
15         A.    Yes, sir.
16         Q.    Okay.
17                    MR. WHITEHURST:  Pass the witness.
18                    MS. BEZNEY:  Thank you.
19                         EXAMINATION
20    BY MS. BEZNEY:
21         Q.    Mr. Shaw, in kind of a summary, how would
22    you explain the duties of an operations supervisor?
23         A.    It's multiple.  It's anything from coming in
24    to assigning your associates to where they need to be,
25    watching performance, interviews, monthly/yearly

1    reviews, reviews for new associates, 30/60/90s,

2    mentoring, training, corrective actions, employee

3    relations, summing it up or keeping the production

4    going, cost of movement.  So you got to know multiple

5    areas, multiple functions, multiple job duties,

6    multiple expectations.

7         Q.   And to your knowledge, did Mr. Walters do

8    all of those things?

9         A.   Yes, ma'am.

10        Q.   He did training?

11        A.   Yes, ma'am.

12        Q.   He conducted interviews?

13        A.   Yes, ma'am.

14        Q.   And as a result of those interviews, would

15   he, you know, fill out forms?

16        A.   Yes, ma'am.

17        Q.   And on those -- on the top of those forms,

18   did he indicate to, you know, hire or not hire?

19        A.   Yes.

20        Q.   And then what would he do with those forms?

21        A.   He would turn them in to the office

22   supervisor.

23        Q.   Okay.

24        A.   And at the time, that would have been Tammy

25   Williams.

1          Q.   And if he had marked at the top "yes" for
2    hire, to your knowledge, were those individuals
3    offered employment?
4          A.   Yes, employment would proceed.
5          Q.   Was there anyone that had a secondary review
6    over Mr. Walters' hire recommendations?
7          A.   No.
8          Q.   Okay.  So if he said hire them, you would
9    hire them.
10         A.   As long as they passed the background check
11   and went through all the stuff to be able to be
12   eligible for hire.
13         Q.   Okay.
14              You said employee discipline,
15   corrective actions.  Did Mr. Walters have to get
16   approval from anyone before issuing a corrective
17   action to someone, an hourly associate?
18         A.   No.
19         Q.   And you're familiar with the employee
20   handbook you mentioned earlier?
21         A.   Yes.
22         Q.   Okay.
23         A.   I mean, I'm familiar with bits and pieces
24   and parts of it.  I still have to refer back to it.
25   It's a lot of pages.

EARTIS SHAW - 4/13/2023

108

1           A.    Of running both shifts all weekend, yes.

2           Q.    Okay.

3           A.    Most cases, more sporadic.  End of month,

4      end of quarter is a real busy time because there's a

5      lot of business trying to be shoved into either a

6      month or a quarter.

7           Q.    Okay.

8                 Now, on the morning of March 10, 2022,

9      you mentioned earlier that Evaite Hooper texted you

10     that she needed to talk to you?

11          A.    Correct.

12          Q.    And so did you meet with her when you came

13     in?

14          A.    As soon as I got to work, I called her; told

15     her I was there.  She came up to the front.  She was

16     very emotional.

17          Q.    Explain to me what you mean by that.

18          A.    She was crying.  She was hard to understand

19     at first, hard to talk.  She was very worked up.

20          Q.    Okay.

21          A.    She -- she was not what an associate would

22     be if they were just having a bad day.

23          Q.    Is that typical of Ms. Hooper?

24          A.    To me, no.  She may come up and gripe about

25     something every once in a while, but she was not a

1    colors.  She was all over the board.  And I cannot
2    remember the entire conversation.  Like I said, it
3    was -- it was very erratic and not something I
4    expected at 7:00, 7:30 in the morning when I first
5    walked in the door.  So kind of just, kind of, hit.
6            Q.    Uh-huh.
7                  Do you recall her mentioning him saying
8    anything about choking her?
9            A.    I don't recall that in the conversation.
10   She could have.  I was more into trying to diffuse the
11   situation, see what I needed to do, where I needed to
12   go, what needed to be done, and make sure everything
13   was okay.
14           Q.    And at the end of that meeting, where did
15   Ms. Hooper go?  Did she go back to work?
16           A.    I do think she went back to -- back to work.
17   I called Mr. Walters up.  We had a discussion about
18   why she'd came in there and what all she had told me
19   and what all was going on.  I decided to talk to
20   Mickey, HR, let Adam know, because I was the only
21   person on site.
22           Q.    Okay.  So after Ms. Hooper left your office,
23   you then called Mr. Walters in?
24           A.    Me and Mr. Walters had a discussion, yeah.
25   I can't remember if I called HR before or after that

111

```
1    point.

2        Q.    Okay.  And when you were talking to

3    Mr. Walters, you explained to him what Ms. Hooper --

4        A.    Correct.

5        Q.    -- had reported to you?

6        A.    Yes.

7        Q.    Did he say at that time that he did touch

8    her jacket?

9        A.    Yes.

10       Q.    And what did he say about that?

11       A.    He talked about holding it to -- when he was

12   referring to safety colors.

13       Q.    So he admitted to you that he pulled on her

14   jacket.

15       A.    Uh-huh.

16       Q.    And did he demonstrate it, like you are now?

17       A.    Uh-huh.

18       Q.    Did he say anything about the choking

19   comment?

20       A.    I cannot recall from the conversations on

21   that, whether he said he did or if he denied it.

22       Q.    Okay.

23             And from there, did Mr. Walters go back

24   to work?

25       A.    I got his statement.  I sent everything in,
```

EARTIS SHAW - 4/13/2023

112

1    and I think they requested that I suspend him.  One of
2    our natural deals, if there's aggression between two
3    associates, is we would separate and suspend.
4         Q.    When did he write the handwritten statement
5    that you got from him?
6         A.    The handwritten -- Mr. Walters?
7         Q.    Yes.
8         A.    He wrote one statement when he was there at
9    work.
10        Q.    So it was that morning?
11        A.    Yes.
12        Q.    Okay.
13                   The two witness statements that you got
14   from Tenisha and Shaquel Thomas, why didn't they sign
15   them?
16        A.    They said they would fill out the statement,
17   but they did not want to be part of anything.
18        Q.    They just didn't want to be involved?
19        A.    Yes.
20        Q.    Did you tell them what to write?
21        A.    No.
22        Q.    Did you tell Ms. Hooper what to write?
23        A.    Huh?
24        Q.    Did you tell Ms. Hooper what to write in her
25   typed statement?

1          A.   The text requesting it?  No.  HR was the one

2    that told me to text him and ask him for -- to get the

3    personal email to get a statement.

4          Q.   Okay.  So my question, I guess, is: did

5    Mr. Walters ever see the statements of Ms. Hooper

6    and/or the other two ladies?

7          A.   Personally, I did not give it to him, so.

8          Q.   So no --

9          A.   I did -- I did not give it to him, no.

10         Q.   Do you -- that would have come from

11   Mr. Moza.

12         A.   I assume.  I don't know exactly how much

13   Mr. Walters and Mr. Moza even spoke afterwards.  I was

14   not previewed or discussed to that in any way.

15         Q.   Okay.

16              Ms. Hooper was outside.  Did you see

17   her?

18         A.   Yes, sir.

19         Q.   Okay.  There was a gentleman with her.  Is

20   that right?

21         A.   Her son?

22         Q.   Yes.

23         A.   Quincy?

24         Q.   Quincy?

25         A.   Yes.

1          A.    Well, I -- that, I couldn't answer for them.

2          Q.    If the choke had not been in there, would

3     they have terminated Mr. Walters?

4                    MS. BEZNEY:  Object to form.

5          A.    That's still an assumption, so -- I really

6     don't know because it all depends -- I don't know what

7     all was discussed, what all wasn't.  I turned in the

8     evidence, so everything that went from there never

9     came back to me.

10         Q.    (BY MR. WHITEHURST)  Okay.  So if an

11    employee touches another employee, that is a violation

12    for termination -- good cause for termination.

13         A.    Could cause, yes, sir, especially if the

14    other person's taking it as aggressive.

15         Q.    Okay.  All right.  So who makes the decision

16    to terminate him or not?

17         A.    Every termination has to be fed through HR.

18         Q.    Okay.  So there was a headbutt incident with

19    Mr. Walters and somebody else.  Do you know about

20    that?

21                    MS. BEZNEY:  Object to form.

22         A.    There -- just the rumors, I heard about it.

23         Q.    (BY MR. WHITEHURST)  Okay.

24         A.    I was not involved in it.  It was not

25    reported to me.  I was directly -- nothing involved in

EARTIS SHAW - 4/13/2023

143

1            ACKNOWLEDGMENT OF DEPONENT

2        I, EARTIS SHAW, do hereby certify that I have

3    read my oral deposition transcript taken on April 13,

4    2023, in Case 3:22-cv-01840-C, and that the same is a

5    correct transcription of the answers given by me to

6    the questions therein propounded, except for the

7    corrections or changes in form or substance, if any,

8    noted above.

9

10

11                                           06/08/2023

12            [DEPONENT SIGNATURE]            [DATE]

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1               IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION
 3     JASON WALTERS                )
                                    )
 4     vs.                          )  CIVIL ACTION
                                    )  3:22-cv-01840-C
 5                                  )  JURY REQUESTED
       EXEL, INC. D/B/A             )
 6     DHL SUPPLY CHAIN             )
 7                    REPORTER'S CERTIFICATE
                   ORAL DEPOSITION OF EARTIS SHAW
 8                   THURSDAY, APRIL 13, 2023
```

9      I, MARIBEL TORRES, a Certified Shorthand Reporter

10   of the State of Texas, do hereby certify that the

11   foregoing proceedings were taken before me at the time

12   and place herein set forth; that any witness in the

13   foregoing proceedings, prior to testifying, was

14   administered an oath; that a record of the proceedings

15   was made by me using machine shorthand, which was

16   thereafter transcribed by me or under my direction;

17   that the foregoing transcript is a true record of the

18   testimony given.

19      I further certify that if the foregoing pertains

20   to the original transcript, that before the completion

21   of the proceedings, review of the transcript [ ] was

22   waived [ ] was not requested, [X] was requested.

23      I further certify I am neither financially

24   interested in the action nor a relative or employee of

25   any attorney or any party to this action.

1           IN WITNESS WHEREOF, I have this date, May 8,

2    2023, subscribed my name.

3

4                         _____

5                         Maribel Torres
                          Texas Certified Stenographer #8597
6                         Expiration Date: 10/31/2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENEILL HOOPER - 4/13/2023

1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION
3   JASON WALTERS            )
                             )
4   vs.                      )   CIVIL ACTION
                             )   3:22-cv-01840-C
5                            )   JURY REQUESTED
    EXEL, INC. D/B/A         )
6   DHL SUPPLY CHAIN         )
7
8
9
                     ORAL DEPOSITION OF
10                     DENEILL HOOPER
                  THURSDAY, APRIL 13, 2023
11                 3:24 P.M. - 4:19 P.M.
12
13
14
15        ORAL DEPOSITION OF DENEILL HOOPER, produced as a
16   witness at the instance of the Plaintiff, and duly
17   sworn, was taken in the above-styled and -numbered
18   cause on the 13th day of April, 2023, from 3:24 p.m.
19   to 4:19 p.m., before Maribel Torres, Certified
20   Shorthand Reporter in and for the State of Texas,
21   reported by computerized stenotype machine at the law
22   offices of Fisher Phillips, LLP, 500 North Akard
23   Street, Suite 3550, Dallas, Texas, pursuant to the
24   Federal Rules of Civil Procedure and the agreements
25   herein after set for, if any.  Signature reserved.

1    APPEARANCES
2
     REPRESENTING THE PLAINTIFF:
3    BOB WHITEHURST, ESQ.
     WHITEHURST & WHITEHURST, ESQ.
4    5380 OLD BULLARD ROAD
     SUITE 600, #363
5    TYLER, TEXAS 75703
     TELEPHONE: (903)593-5588
6    EMAIL: whitehurstlawfirm@yahoo.com
7
     REPRESENTING THE PLAINTIFF:
8    THEANNA BEZNEY, ESQ.
     FISHER PHILLIPS, LLP
9    500 NORTH AKARD STREET
     SUITE 3550
10   DALLAS, TEXAS 75201
     TELEPHONE: (214)220-8325
11   EMAIL: tbezney@fisherphillips.com
12
     ALSO PRESENT:
13   MR. JASON WALTERS, PLAINTIFF
14
15
16
17
18
19
20
21
22
23
24
25

1                        I N D E X

2

        Appearances...........................        2
3       WITNESS:  DENEILL HOOPER
        Examination by Mr. Whitehurst........      4, 60
4       Examination by Ms. Bezney...........        56
        Acknowledgment.......................        60
5       Court Reporter's Certificate.........        62

6

7                  PLAINTIFF'S EXHIBITS

8       NO.    DESCRIPTION                        PAGE

9

        6       Facebook Posts                      37
10      7       Text Messages                       37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DENEILL HOOPER - 4/13/2023

4

```
 1                    P R O C E E D I N G S
 2            THURSDAY, APRIL 13, 2023 - 3:24 P.M.
 3                 (REPORTER'S NOTE:  Names not spelled on
 4                 the record may be spelled phonetically.
 5                 Quotation marks may be used with
 6                 indirect, inexact quotes.)
 7                 THE COURT REPORTER:  We're on the
 8   record for the oral deposition of DeNeill Hooper,
 9   taken at Fisher Phillips in Dallas, Texas, on
10   April 13, 2023.  The time is 3:24 p.m.  My name is
11   Maribel Torres with Leigh & Associates.
12                 Counsel, could you please state your
13   appearance for the record before I swear her in.
14                 MR. WHITEHURST:  Bob Whitehurst for
15   plaintiff.
16                 MS. BEZNEY:  Theanna Bezney from Fisher
17   Phillips for defendant, Exel.
18                 DENEILL HOOPER,
19   having been duly administered the oath, testified as
20   follows:
21                         EXAMINATION
22   BY MR. WHITEHURST:
23        Q.   Would you state your name for the record,
24   please, ma'am.
25        A.   DeNeill Evaite Hooper.
```

1          A.    Last year.

2          Q.    In 2021?  2022?

3          A.    2022.

4          Q.    Okay.  January, February, March, the best
5     you remember?

6          A.    Maybe October.

7          Q.    Of 2022.

8          A.    Yes.

9          Q.    After Mr. Walters was gone.

10         A.    Yes.

11         Q.    Okay.

12               Do you know who Adam Elliott is?

13         A.    He's the GM.

14         Q.    Okay.  Have you ever talked to him?

15         A.    When I need to, yes.

16         Q.    What have you talked to Mr. Elliott about?
17    What about?

18         A.    Just -- if he comes and talk to me, I'll
19    talk about whatever he had -- whatever he needs to
20    talk about.

21         Q.    Okay.

22               Now, you prepared a statement on
23    March 10, 2022; and I'm handing you what's been marked
24    as Exhibit, first of all, 2.

25               Have you ever seen that statement?

```
1        A.   Yes.
2        Q.   Okay.  Did you prepare that statement?
3        A.   Yes.
4        Q.   Did you type that statement?
5        A.   Yes.
6        Q.   Where did you type that statement?
7        A.   Where?
8        Q.   Yes.
9        A.   I typed it on my computer at home.
10       Q.   On that day?
11       A.   Yes.
12       Q.   Okay.
13            So you show up at 6:00 o'clock.  Is
14   that right?
15       A.   About 6:04.
16       Q.   6:04.
17            And was the agreement between you and
18   Mr. Shaw that she could be late?
19       A.   Yes.
20       Q.   Okay.  That was because of your child --
21   grandchild.
22       A.   Yes.
23       Q.   Okay.  Did any other employees have an
24   agreement?
25       A.   I don't know about any other employees.
```

DENEILL HOOPER - 4/13/2023

1    else?

2          A.    No.

3          Q.    Okay.  You know he had a meeting with you.

4    We know there's seven or eight other people.  There's

5    Ms. Tenisha and Shaquel Thomas --

6          A.    Uh-huh.

7          Q.    -- right?  Is that right?

8          A.    Yes.

9          Q.    Okay.  But you're the only one he had a

10   meeting with.

11         A.    After the -- after the -- after the meeting

12   with the six or seven or eight other people, yes.

13         Q.    Okay.  So where did y'all have that meeting

14   at?

15         A.    Right in the area where we have pre-shift.

16         Q.    Okay.

17         A.    After everyone left.

18         Q.    So there was no one else around?

19         A.    No.

20         Q.    Okay.  Did -- okay.  So these eight other

21   people -- seven or eight other people had already

22   left.

23         A.    Yes.

24         Q.    Okay.  And during that meeting, what was

25   discussed between you and Mr. Walters?

1        A.    Oh, mis -- we were still talking about me
2   being late, and then he wanted to say -- he wanted to
3   say -- he want to tell me to calm down, which I wasn't
4   upset.
5        Q.    Okay.
6        A.    And then he tells me -- he walks in to me
7   and he leans in, tells me to calm down, before he puts
8   me in a chokehold.
9        Q.    Okay.
10       A.    And he grabs my jacket.
11       Q.    Okay.  Now, does he grab the heck out of you
12  (demonstrating), just like that?
13       A.    No, he does not.
14       Q.    Ma'am?
15       A.    No.
16       Q.    How does he grab you?
17       A.    He just tugged on my jacket.
18       Q.    Okay.  Did you have a correct uniform on?
19       A.    Yes, I do, every day.
20       Q.    Okay.  And what is -- what am I talking?
21  What's a correct uniform?
22       A.    I have to have on my safety colors, have on
23  my safety boots.
24       Q.    Okay.  So you had on your safety boots and
25  safety colors.

Case 3:22-cv-01840-K  Document 57  Filed 02/16/24  Page 159 of 243  PageID 890

DENEILL HOOPER - 4/13/2023

19

```
1        A.   Yes.

2        Q.   When he said, "Hey, you don't have on your

3   correct uniform" --

4        A.   We didn't even talk about me being in my

5   safety uniform.  We had -- that was not even part of

6   the conversation.

7        Q.   Okay.  What -- okay, he's grabbed you.  And

8   why did he grabbed you?

9        A.   Repeat that.

10       Q.   Okay.  You said he grabbed you.

11       A.   Yes.

12       Q.   I'm asking why did he grab you.

13       A.   I don't know.  That might be a question you

14  have to ask him.

15       Q.   Okay.  Well, you thought it was offensive.

16       A.   Yes, I did.

17       Q.   Okay.  And how long was that conversation?

18       A.   Oh, after he grabbed -- after he tugged on

19  my jacket, the conversation ended.

20       Q.   So you walked off?  He walked off?

21       A.   Yes, I did.

22       Q.   Okay.

23            All right.  Where did you go after you

24  walk off?

25       A.   I went to work.
```

LEIGH & ASSOCIATES COURT REPORTING AND VIDEO
(877) 790-3376    FAX (877) 790-3377

APP 157

DENEILL HOOPER - 4/13/2023

20

```
 1          Q.   Okay.
 2          A.   And waited on my super -- my immediate
 3    supervisor to get there.
 4          Q.   Who was Mr. Shaw.
 5          A.   Yes.
 6          Q.   Okay.  And so you go up and talk to
 7    Mr. Shaw.  Is that in the same building, different
 8    building, or what?
 9          A.   Same building.
10          Q.   Okay.  How far is that?
11          A.   Not far.
12          Q.   Okay.
13               All right.  Were you upset at anything
14    about that day?
15          A.   After the fact, yes.  I --
16          Q.   Okay.
17          A.   -- was very --
18          Q.   Before you got --
19          A.   -- upset.
20          Q.   -- to work, were you upset about anything?
21          A.   No, I wasn't.
22          Q.   Okay.  Okay.
23               Now, my understanding is -- Mr. Shaw is
24    your immediate supervisor?
25          A.   He is.
```

DENEILL HOOPER - 4/13/2023

23

| | |
|---|---|
| 1 | A.   Shaquel may be using that last name, Thomas. |
| 2 | I don't know.  But her mother's name is -- her last |
| 3 | name is Wells, so I put Shaquel Wells.  I don't know |
| 4 | if she use "Thomas" or not; I don't know. |
| 5 | Q.   Okay.  Well, what I'm trying to figure out, |
| 6 | there's a statement from Tenisha Thomas and a Shaquel |
| 7 | Thomas.  Are they two different people? |
| 8 | A.   Yes.  Those are two different people. |
| 9 | Q.   Okay. |
| 10 | Okay.  Have you seen the statements |
| 11 | from these Thomases? |
| 12 | A.   No, I haven't. |
| 13 | Q.   Okay. |
| 14 | May I see that, please, ma'am?  Thank |
| 15 | you.  The first -- last page.  All right. |
| 16 | So you leave and go home at 7:00.  Is |
| 17 | that right? |
| 18 | A.   Yes. |
| 19 | Q.   Then what happens?  Do you check out, clock |
| 20 | out? |
| 21 | A.   Yes.  I left for the day. |
| 22 | Q.   Okay, clock out for the day. |
| 23 | A.   Yes. |
| 24 | Q.   Okay.  Then what happens? |
| 25 | A.   I go to work the next day. |

1           Q.   (BY MR. WHITEHURST)  Was he supposed to do
2    what the office -- or general manager and everybody
3    else told him to do?
4           A.   Supposed to.
5           Q.   Okay.  And if he didn't do that, he wouldn't
6    be doing his job.  Is that right?
7           A.   Right.
8           Q.   Is that right, yes or no?
9           A.   Yes.
10          Q.   Okay.
11                    Did you ask either of these two ladies
12   to write a statement for you?
13          A.   No.
14          Q.   You didn't, okay.
15                    Did anyone else, after this incident
16   happened, come to you and ask you anything?
17          A.   No.
18          Q.   Okay.  I'm going to show you what I think is
19   marked as No. 10 here.  Is that the incident you're
20   talking about?
21          A.   Yes.  This is the incident.
22          Q.   Okay.
23                    All right.  Have you seen the video?
24          A.   No.
25          Q.   Okay.  Is -- there's a second page, I

1    there, around.  They didn't see the incident, right?

2         A.    No, they didn't.

3         Q.    So all of this is based on your word.

4                   MS. BEZNEY:  Object to form.

5         A.    All this is based on this video.

6         Q.    (BY MR. WHITEHURST)  Oh, okay.  But you've

7    not seen the video.

8         A.    No, I haven't.

9         Q.    Okay.  And looking at that document right

10   there, that could be anybody in the world.

11                  MS. BEZNEY:  Object to form.

12        A.    No, that can't be.

13        Q.    (BY MR. WHITEHURST)  Can you recognize

14   yourself?

15        A.    Yeah.

16        Q.    How do you --

17        A.    I know that's me.

18        Q.    -- recognize?

19        A.    Because that's my uniform.  I wear that

20   uniform almost every day.

21        Q.    Okay.

22        A.    Unless it's hot outside.

23        Q.    So are there other people that wore the same

24   uniform?

25        A.    They have the same jacket, but I know my

50

1     pants and I know my shoes.

2          Q.   Okay.

3          A.   I got that uniform on now.

4          Q.   Did you ask -- tell Mr. Shaw this?

5          A.   Tell Mr. Shaw what?

6          Q.   That this was you.

7          A.   Yeah, I told him it was me.

8          Q.   Okay.

9          A.   I let him know where we were standing when

10    this happened.

11         Q.   Had you looked at the video when you talked

12    to Mr. Shaw?

13         A.   I have not seen the video right until this

14    day.  This is the only thing I have ever seen.  I have

15    not seen the video.

16         Q.   So you've never seen the video?

17         A.   No.

18         Q.   Okay.  I assume you haven't seen the entire

19    video.

20         A.   I haven't seen the video at all, period.

21         Q.   You've not seen it at all.

22         A.   I have not seen the video.

23         Q.   Okay.  And this is the only thing you've

24    seen --

25         A.   This is the only thing I have ever seen.  I

58

```
1          A.    Yes.

2          Q.    Okay.

3                 After you talked to Mr. Shaw on the day

4    of the incident, but before you left, did anyone come

5    talk to you?

6          A.    No.

7          Q.    Okay.  How did you know about Mr. Walters

8    telling Shaquel and Tenisha Thomas that he had choked

9    them out?

10         A.    They told me.

11         Q.    When did they tell you?

12         A.    When did they tell -- they told me when I

13   came back to work on -- I don't -- I don't remember

14   exactly what day of the week this was, but when -- I

15   think it's, like, on a Wednesday or Thursday.  So they

16   didn't see me until the following week.

17         Q.    But you knew about them when you wrote this

18   statement out.

19         A.    Oh, she called me.  They called me.  Because

20   they didn't know I had left for the day.  They called

21   me and told me.

22         Q.    What did they tell you?

23         A.    They told me that he came and told them

24   about this meeting.

25         Q.    And what did he tell --
```

```
 1          A.    About --
 2          Q.    -- them about it?
 3          A.    -- about him saying that he told me to calm
 4   down before he puts me in a chokehold, and that he was
 5   just playing.
 6          Q.    Did you take it as a joke?
 7          A.    No.
 8          Q.    Was he laughing when he said it to you?
 9          A.    No.
10          Q.    Do you often joke around with Mr. Walters?
11          A.    No.
12          Q.    Are you friends?
13          A.    No.
14          Q.    He hasn't joked with you before about
15   choking?
16          A.    No.
17          Q.    And you didn't take it this time as a joke.
18          A.    No.
19          Q.    And you didn't think it was a joke when he
20   grabbed you.
21          A.    No.
22          Q.    And you know it's against company policy for
23   anyone to put their hands on another employee.
24          A.    Yes.
25          Q.    In any kind of way.
```

DENEILL HOOPER - 4/13/2023

64

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2        I, DENEILL HOOPER, do hereby certify that I have
 3   read my oral deposition transcript taken on April 13,
 4   2023, in Case 3:22-cv-01840-C, and that the same is a
 5   correct transcription of the answers given by me to
 6   the questions therein propounded, except for the
 7   corrections or changes in form or substance, if any,
 8   noted above.
 9
10
11        _Deneill Hooper_    _6/8/2023_
12          [DEPONENT SIGNATURE]        [DATE]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DENEILL HOOPER - 4/13/2023

65

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION
 3    JASON WALTERS                )
                                   )
 4    vs.                          )   CIVIL ACTION
                                   )   3:22-cv-01840-C
 5                                 )   JURY REQUESTED
      EXEL, INC. D/B/A             )
 6    DHL SUPPLY CHAIN             )
 7                      REPORTER'S CERTIFICATE
                   ORAL DEPOSITION OF DENEILL HOOPER
 8                    THURSDAY, APRIL 13, 2023
 9        I, MARIBEL TORRES, a Certified Shorthand Reporter
10    of the State of Texas, do hereby certify that the
11    foregoing proceedings were taken before me at the time
12    and place herein set forth; that any witness in the
13    foregoing proceedings, prior to testifying, was
14    administered an oath; that a record of the proceedings
15    was made by me using machine shorthand, which was
16    thereafter transcribed by me or under my direction;
17    that the foregoing transcript is a true record of the
18    testimony given.
19        I further certify that if the foregoing pertains
20    to the original transcript, that before the completion
21    of the proceedings, review of the transcript [ ] was
22    waived [ ] was not requested, [X] was requested.
23        I further certify I am neither financially
24    interested in the action nor a relative or employee of
25    any attorney or any party to this action.
```

1          IN WITNESS WHEREOF, I have this date, May 8,

2    2023, subscribed my name.

3

4

                    _Maribel Torres_
5                    _____
                     Maribel Torres
                     Texas Certified Stenographer #8597
6                    Expiration Date: 10/31/2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

To whom it may concern:

On March 10, 2022 after our pre-shift meeting Jason Walters called another meeting with the associates (DHL) that was late. During that meeting, he told us that we are to be there on time at 6 am. I ,Evaite, told Jason why I was late. Jason felt like I disrespected him and told me that we would have a meeting when he let us out that meeting. He told me "that I called him out in front of the other associates." If we need to have a meeting about us being late, shouldn't that meeting be held with all the associates in a corporate setting? I repeated my reason for being late, he pulled my coat and told me "to calm down before he puts me in a choke hold." I have the right as an associate to voice my opinion and a right to defend myself in a respectful manner. I wasn't irate, trying to cause a scene or using foul language. If a supervisor is trying to make an example out of someone,  take the problem up with that associate. After everything is said and done, Jason goes and tells Shaquel Wells and Tenisha Thomas what he said to me. I feel threatened and violated. I feel like I need to go and get a lawyer, so that I can be protected being in the same workspace with him. This man has been on trial for murder, though he was found not guilty. Jason has been heard saying "that you can get off if you have money." This is common knowledge to the associates.



I take all these things to heart because I have been in an abusive relationship. This is not a joking matter to me and if he thinks it is, it's not. You can't say things like that or put your hand on someone's person.  I don't feel comfortable working under him anymore. He has pulled his last straw with me. I try my best to get to work on time after I drop my grandson off at daycare. Daycare doesn't open until 6am. I can't leave him on the sidewalk and tell him to stay there until someone shows up. I had taken my situation up with Eartis and John last year.


DeNeill Hooper
3/10/2022       *DeNeill Hooper*
9:30 am

EXEL_00115

1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3    JASON WALTERS                )
                                   )
 4    vs.                          )    CIVIL ACTION
                                   )    3:22-cv-01840-C
 5                                 )    JURY REQUESTED
      EXEL, INC. D/B/A             )
 6    DHL SUPPLY CHAIN             )
 7
 8
 9
10          ORAL/VIDEOCONFERENCED DEPOSITION OF
                       MICKEY MOZA
11               TUESDAY, JUNE 27, 2023
                  1:15 P.M. - 3:06 P.M.
12
13
14
15
16        ORAL DEPOSITION OF MICKEY MOZA, produced as a
17    witness at the instance of the Plaintiff, and duly
18    sworn, was taken in the above-styled and -numbered
19    cause on the 27th day of June, 2023, from 1:15 p.m. to
20    3:06 p.m., before Maribel Torres, Certified Shorthand
21    Reporter in and for the State of Texas, reported by
22    computerized stenotype machine, held remotely,
23    pursuant to the Federal Rules of Civil Procedure and
24    the agreements herein after set forth, if any.
25    Signature reserved.
```

```
 1   APPEARANCES
 2
     REPRESENTING THE PLAINTIFF:
 3   BOB WHITEHURST, ESQ.
     WHITEHURST & WHITEHURST, ESQ.
 4   5380 OLD BULLARD ROAD
     SUITE 600, #363
 5   TYLER, TEXAS 75703
     TELEPHONE: (903) 593-5588
 6   EMAIL: whitehurstlawfirm@yahoo.com
 7
     REPRESENTING THE DEFENDANT:
 8   THEANNA BEZNEY, ESQ.
     FISHER PHILLIPS, LLP
 9   500 NORTH AKARD STREET
     SUITE 3550
10   DALLAS, TEXAS 75201
     TELEPHONE: (214) 220-8325
11   EMAIL: tbezney@fisherphillips.com
12
     ALSO PRESENT:
13   MR. JASON WALTERS, PLAINTIFF
14
15
16
17
18
19
20
21
22
23
24
25
```

MICKEY MOZA - 6/27/2023

3

1                            I N D E X

2

       Appearances..........................          2
3      WITNESS:  MICKEY MOZA
       Examination by Mr. Whitehurst........      4,  75
4      Examination by Ms. Bezney............         73
       Acknowledgment.......................         97
5      Court Reporter's Certificate.........         99

6

              PREVIOUSLY MARKED PLAINTIFF'S EXHIBITS

7

8      NO.    DESCRIPTION                          PAGE

9

       E      Corrective Action Notice,            51
10            Exel_00196-198
       F      Text Message                         12
11     G      Investigation Summary Form,          19
              Exel_00112-113
12     H      Corrective Action Form,              26
              Exel_00119
13     I      Text Messages                        28

14

              PREVIOUSLY MARKED DEFENDANT'S EXHIBITS

15

16     P      Complainant/Witness Statement Form,  73
              Exel_001575-1578
17     Q      March 11, 2022 Emails,               76
              Exel_001579-1580

18

19

20

21

22

23

24

25

4

```
1                    P R O C E E D I N G S
2              TUESDAY, JUNE 27, 2023 - 1:15 P.M.
3                  (REPORTER'S NOTE:  Names not spelled on
4                   the record may be spelled phonetically.
5                   Quotation marks may be used with
6                   indirect, inexact quotes.)
7                  THE COURT REPORTER:  We are on the
8     record.  Today's date is June 27, 2023, and the time
9     is 1:15 p.m.  This is the remote oral deposition of
10    Mickey Moza, taken by Zoom.
11                        MICKEY MOZA,
12    having been administered the oath, testifies as
13    follows:
14                        EXAMINATION
15    BY MR. WHITEHURST:
16        Q.   Would you state your name for the record,
17    please, sir?
18        A.   Mickey Moza.
19        Q.   And how are you currently employed?
20        A.   I'm not sure -- what do you mean by that?
21        Q.   Who do you work for right now?
22        A.   I work for JPMorgan Chase.
23        Q.   And what do they do?
24        A.   They're a bank.
25        Q.   I'm sorry, what?
```

1          A.    That sounds right.

2          Q.    Okay.  All right.

3                What part did you play in the

4    termination of Mr. Walters?

5          A.    I helped to -- I helped with the

6    investigation process; and I put together a summary

7    document, as is the normal practice at DHL.  And I

8    gave a recommendation, which, again, would be the

9    normal practice.

10         Q.    Who else, besides yourself, was involved?

11         A.    Many people were involved.  What specific

12   part are you asking about, who else is involved?

13         Q.    Who's all involved?  I didn't know there

14   were many.  Who else is involved?

15         A.    So the investigation, I believe the

16   operations manager, is who, I believe, was Jason

17   Walters' manager at the time, Eartis Shaw, was

18   involved.

19         Q.    Okay.

20         A.    I believe that -- and, then, from the HR

21   department, there -- the summary form for the

22   investigation -- or the summary for the investigation

23   that I put together, I provided that to the HR

24   leadership at DHL, the ones that I report to.

25         Q.    Okay.  Well, you were the person in charge

1          Q.    Well, first of all, in general, yeah.

2          A.    Yes.  We had conversations when I worked at

3    DHL, but not regarding this matter.

4          Q.    She would know you well enough to call you

5    Mickey.  Is that right?

6          A.    Back then -- when I was at DHL, yes.

7          Q.    Okay.  All right.

8                MR. WHITEHURST:  Then if you'd go to

9    the second page, please, ma'am.

10         Q.    (BY MR. WHITEHURST)  Okay.  And it's got

11   "Mickey HR-DHL" at the top, and it's got

12   "817-269-4794."  Is that your phone number?

13         A.    When I was at DHL, that was the phone

14   number, yes, that I had.

15         Q.    Yes.

16               And, then, it looks like a history of

17   calls, March 16th, one, two, three, four, five -- six

18   calls.  Did Mr. Walters try to contact you at that

19   time?

20         A.    I believe so, yes.

21         Q.    Okay.  All right.  And do you know why?

22         A.    Regarding his termination, yes, I believe

23   so.

24         Q.    Okay.  Did you ever tell Mr. Walters why he

25   was terminated?

1          A.     I don't recall if there was a policy or not
2     that stated that we had to tell you you were fired or
3     not.   What I do know is that we do provide the
4     information, and I believe it's related to that
5     corrective action form that you showed earlier.   I
6     would, basically, relay that information to the
7     individual.   So whatever was communicated with regards
8     to his termination would have been communicated --
9     should -- I would have expected it probably would have
10    been communicated based on that form.
11                    However, with that said, I don't know
12    what was or wasn't communicated to him regarding why
13    he was being terminated, because, one, I don't recall
14    he and I's -- he and I's conversation that we had that
15    one time, specifically whether -- what that
16    conversation entailed, but also because HR is not --
17    not the -- not the -- HR does not provide termination
18    notification.   That's something that management does.
19    And I don't believe -- I don't recall whether I
20    notified him he was terminated or not.
21         Q.    (BY MR. WHITEHURST)   Okay.
22                    MR. WHITEHURST:   Go to the next page,
23    please, ma'am.
24         Q.    (BY MR. WHITEHURST)   Okay.   Now, this is
25    dated March 21st, 2022.   It says, "Mickey I'm trying

1    to figure out when my health and dental insurance

2    expire on my family...I called the benefits number,

3    they referred me back to HR."  HR is you, is that not?

4         A.    Not necessarily.  I don't know who -- who

5    is -- who they're referring to when -- or who he's --

6    who they told him, you know, that HR is.

7         Q.    Okay.  "I need this information for the

8    state...due to my special needs child."

9               Do you remember this?

10        A.    I don't recall this specifically, no.

11        Q.    You don't recall this, either?

12        A.    I -- I recall something about him needing to

13   get the COBRA information, I believe it was.  This

14   specific message, with all this information, no, I

15   don't recall all this information, no.  I just -- but

16   I do remember something about him needing to get the

17   COBRA information.

18        Q.    For his child.

19        A.    That, I don't know.  I don't recall that.

20        Q.    Okay.

21               "Is there another person that I need to

22   contact about this."  Your response --

23               MR. WHITEHURST:  If you'll scroll down,

24   please.

25        Q.    (BY MR. WHITEHURST)  -- says, "The site

1          Q.    Yes.

2          A.    At that location, it should be the general

3     manager, I'm pretty sure.

4          Q.    And that would have been Adam Elliott?

5          A.    I believe so.

6          Q.    Okay.

7                Did you talk to Adam Elliott about

8     this?

9          A.    I don't recall.

10         Q.    Okay.  Did you talk to John Dobbins about

11    this?

12         A.    I don't recall.

13         Q.    Okay.

14               Then it says, "Then it typically takes

15    1 to 2 weeks for the benefits team to receive" -- "the

16    benefits team to receive the separation notification,

17    so you can follow up with them."  So is that correct?

18         A.    Yes.  And I can explain what that means, if

19    that's helpful.

20         Q.    Okay.  Yeah.

21         A.    So I -- this is, I believe, the process when

22    I was at DHL for all employees who terminate, is that

23    once you're terminated, your management team submits

24    the termination in a system that DHL has; and then,

25    from there, once it's processed in the system, it --

1    the third-party administrator that DHL used, I
2    believe, receives that information.  This part, I
3    don't know, because I'm not directly involved in it --
4    or was not directly involved in it at that time.  But
5    I believe that, after the separation is processed,
6    then the benefits team, I believe I'm referring to
7    there, is that third-party team or company, who then
8    provides or processes the COBRA information to be --
9    or letter, I would say, I believe it is, to be
10   emailed -- or, sorry, mailed, I believe, to the
11   employee.
12              So what I'm notifying him there is
13   that -- I believe what I'm notifying him there is that
14   it typically takes about one to two weeks after a
15   termination is processed for the benefits team, which
16   is that third-party administrator, to receive the
17   separation notification; and at that time, you can
18   follow up with them to find out, "Hey, where's my
19   COBRA information?  Where is my COBRA letter?"
20              Because the COBRA information is not
21   something that HR -- local HR, like myself, have any
22   involvement in.  I don't have access to anyone's
23   benefits information, when I was there.  I can't -- I
24   have no access to any benefits system, where I can
25   provide that information.  It's basically just based

1    again.  And I would just have to state that this is a
2    common thing that came up at DHL, which is that, you
3    know, a lot of employees thought that -- well, let
4    me -- let me rephrase that.  This was -- this was a
5    thing that happened sometimes at DHL where employees
6    think that HR, myself as local HR, can process their
7    benefits for them, their enrollment, make changes,
8    et cetera, when I have zero connection with any of
9    that.  That's all done by that third-party
10   administrator.  And so that's what I'm trying to make
11   clear to him there.
12              And, of course, when -- when we do
13   annual enrollment, which is a process that happens
14   every year--at least once a year, everybody has to go
15   through annual enrollment--everybody has to go to that
16   website or call the number of that same third-party
17   administrator, which, likely, I'm guessing Mr. Walters
18   had done before, to make changes to his benefits, like
19   I've had to do when I was there, like any employee
20   would have to do.  That's what I'm referring to "them"
21   in that text message, I believe, because that's the
22   number you should -- you should contact, because I
23   have no connection to it.
24              So, no, I don't agree that -- or -- you
25   know, that I would understand him being aggravated

1                    MS. BEZNEY:  Object to form.
2          A.    I don't know if that's true.
3          Q.    (BY MR. WHITEHURST)  Okay.  Whose job would
4     it be to explain that to them?
5          A.    To explain what to --
6                    MS. BEZNEY:  Object to form.
7          Q.    (BY MR. WHITEHURST)  Go ahead, Mr. Moza.
8          A.    I said to explain what to them.
9          Q.    I'm sorry?
10         A.    I don't understand the question.  To explain
11    what --
12         Q.    Who would explain -- who would explain to an
13    employee the COBRA benefits at DHL?
14         A.    The benefits number, who you contact for all
15    benefits questions, which is the same third-party
16    administrator company, the "benefits team," that I'm
17    referring to there.
18         Q.    Okay.
19                    All right.  Do you understand the
20    frustration Mr. Walters was going through, in looking
21    at these emails and texts?
22                    MS. BEZNEY:  Object to form.
23         A.    Do I understand that maybe he was
24    frustrated?  Is that the --
25         Q.    (BY MR. WHITEHURST)  Yes.  Yes.

1          A.    Yes.

2          Q.    And that recommendation was based on

3    Ms. Hooper's complaint, Mr. Walters' statements, the

4    statements of those two other individuals.  You said

5    you watched the video.  Was there anything else that

6    you took into account when making that termination

7    recommendation?

8          A.    No.  Just the -- the video and the

9    statements, that's all I took into account to make my

10   recommendation.

11         Q.    And I know it's been a while since you've

12   seen the video, but what do you remember it showing?

13         A.    I recall that Mr. Walters walked in front of

14   or almost got -- you know, got close to -- you know,

15   almost face-to-face, with Ms. Hooper.  And I believe I

16   recall him wagging his finger at her, Ms. Hooper.  And

17   I do recall him, you know, grabbing her by the jacket,

18   grabbing Ms. Hooper by the jacket.

19         Q.    And you couldn't hear anything that was

20   said.

21         A.    No.  There's no audio, so.

22         Q.    Based on what you saw in that video, did it

23   appear to you to be a friendly or joking conversation?

24         A.    No, it did not.

25         Q.    What was your impression of the tone of that

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION
 3    JASON WALTERS                    )
                                       )
 4    vs.                             )    CIVIL ACTION
                                       )    3:22-cv-01840-C
 5                                     )    JURY REQUESTED
      EXEL, INC. D/B/A                 )
 6    DHL SUPPLY CHAIN                 )
 7                        REPORTER'S CERTIFICATE
                     ORAL DEPOSITION OF MICKEY MOZA
 8                      TUESDAY, JUNE 27, 2023
```

 9      I, MARIBEL TORRES, a Certified Shorthand Reporter

10   of the State of Texas, do hereby certify that the

11   foregoing proceedings were taken before me at the time

12   and place herein set forth; that any witness in the

13   foregoing proceedings, prior to testifying, was

14   administered an oath; that a record of the proceedings

15   was made by me using machine shorthand, which was

16   thereafter transcribed by me or under my direction;

17   that the foregoing transcript is a true record of the

18   testimony given.

19      I further certify that if the foregoing pertains

20   to the original transcript, that before the completion

21   of the proceedings, review of the transcript [ ] was

22   waived [ ] was not requested, [X] was requested.

23      I further certify I am neither financially

24   interested in the action nor a relative or employee of

25   any attorney or any party to this action.

MICKEY MOZA - 6/27/2023

100

1          IN WITNESS WHEREOF, I have this date, July 18,

2     2023, subscribed my name.

3

4                         _Maribel Torres_

5                         Maribel Torres
                          Texas Certified Stenographer #8597
6                         Expiration Date: 10/31/2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP 184

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JASON WALTERS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:22-cv-01840-K** |
| | § | |
| **EXEL, INC. D/B/A DHL SUPPLY CHAIN,** | § | |
| | § | |
| *Defendant.* | § | |

## DECLARATION OF ANTONIO JUAREZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

I, Antonio Juarez , declare under the penalty of perjury the following:

1.      My name is Antonio Juarez  I am over the age of eighteen years, of sound mind, and am capable of making this declaration. I have personal knowledge of the facts stated herein and know them to be true and correct.

2.      Defendant in this lawsuit, Exel, Inc. d/b/a DHL Supply Chain ("Exel"), is a global leader in supply chain management, providing customer-focused solutions to a wide range of manufacturing and retail industries.

3.      I have been employed by Exel since August 2009.  My current position is HR Director.

4.      In my role as HR Director, as part of my responsibilities, I have gained familiarity with general Exel operations as well as the policies and procedures that Exel implements as part of its business, especially as they relate to Exel employees. As part of my job duties, I have also become familiar with Exel's current and past internal policies and procedures. As part of my job

duties, I have access to and reviewed personnel records and data maintained by Exel in the regular course of business.

5.     Through my position, I know that all of the attached 23 pages of documents are true and correct copies of Exel's business records made and kept in the course of Exel's regularly conducted activity. It was the regular course of that business for an employee or representative of the business with knowledge of the act, event, condition, or opinion recorded to make the records or to transmit information thereof to be included in such records.  The records were made at or near the time of the act, event, condition, or opinion recorded, or reasonably soon thereafter.

6.     Through my position, I know that the attached video (Bates EXEL_00118) is a true and correct copy of Exel's business records made and kept in the course of Exel's regularly conducted activity. It was the regular course of that business for an employee or representative of the business with knowledge of the act, event, condition, or opinion recorded to make the record or to transmit information thereof to be included in such record.  The record was made at or near the time of the act, event, condition, or opinion recorded, or reasonably soon thereafter.

7.     Employee JA[1], Employee No. 185446 was 44 years old at the time of termination on or about May 27, 2020.

8.     Plaintiff Jason Walters' ("Plaintiff") date of birth is December 22, 1972. At the time of his termination on March 16, 2022, Plaintiff was 49 years old.

9.     Employee BP, Employee No. 051671's date of birth is December 3, 1980. He was 41 years old at the time of Plaintiff's termination on March 16, 2022. His hire date with Exel was November 26, 2012.

---

[1] Initials of non-party employees are used for privacy.

DECLARATION OF ANTONIO JUAREZ  – PAGE 2
FP 49622926.1

**APP 186**

10.     At the time of Plaintiff's termination on March 16, 2022, there were at least nine Operations Supervisors (including Plaintiff) over the age of 40, six of whom were age 50 or older.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on February 15, 2024

*Antonio Juarez*
Antonio Juarez (Feb 15, 2024 18:12 CST)

Antonio Juarez

# Walters - Juarez Decl ISO MSJ

**Final Audit Report**           2024-02-16

| | |
|---|---|
| Created: | 2024-02-15 |
| By: | Yorleny Hernandez (yhernandez@fisherphillips.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA1UWQkc-E90uVqb-yYQhy-DCuHiApQqPk |

## "Walters - Juarez Decl ISO MSJ" History

📄 Document created by Yorleny Hernandez (yhernandez@fisherphillips.com)
2024-02-15 - 11:51:14 PM GMT

📧 Document emailed to antonio.c.juarez@dhl.com for signature
2024-02-15 - 11:51:36 PM GMT

📄 Email viewed by antonio.c.juarez@dhl.com
2024-02-16 - 0:10:43 AM GMT

🔏 Signer antonio.c.juarez@dhl.com entered name at signing as Antonio Juarez
2024-02-16 - 0:12:36 AM GMT

🔏 Document e-signed by Antonio Juarez (antonio.c.juarez@dhl.com)
Signature Date: 2024-02-16 - 0:12:38 AM GMT - Time Source: server

✅ Agreement completed.
2024-02-16 - 0:12:38 AM GMT

**Adobe Acrobat Sign**

# Role Profile

| Role Title: | SUPERVISORS.Operations Supervisor | Job Code: | 7005 |
|---|---|---|---|
| Location: | Varies | FLSA Status: | Exempt |
| Created By/Date: | Human Resources – September 2011 | Job Family: | GENOPS |
| Revised By/Date: | Compensation –  May 2020 | Job Function: | Logistics |

| Reports to *(Title)*: | Supervises *(Titles)*: |
|---|---|
| OM/GM | Hourly Associates |

## Role Purpose / Position Summary

Supervises the daily and weekly activities that occur within assigned area of the location/operation; provides leadership, motivation, training, and development of workforce; executes customer/site requirements; participates in continuous improvement activities as part of the site management team and ensures company policies are followed and site develops positive work culture

## Key Accountabilities / Primary Duties & Responsibilities

**Associate Interaction** (70% time) – Example activities include Associate Development, one on one coaching, walking throughout work area during assigned shift, conflict resolution among associates, associate group meetings and training. Specifically:
- Direct the necessary daily activity to ensure a safe, secure, clean and fair work environment for associates.
- Deliver associate orientation, training, performance reviews, and/or development as appropriate
- Participate in the management of turnover among hourly staff consistent with the site turnover objectives.
- Ensure the associates have proper access to the necessary tools to perform their assigned duties and that the tools are routinely inspected and maintained.

**First Choice / Process Improvement** (10% time) – Example activities include action planning with client, project planning follow-up, space planning, turnover review and workshop participation. Specifically:
- Organize and lead the focus on improved productivity levels in a manner that first stresses effectiveness by improving processes and secondly stresses the efficiency of associate work.
- Collaborate with the regional sites to share in safety, labor sharing, and best practice initiatives.
- Participate in the completion of workshop action plans, projects and best practice sharing/implementation.

**Planning** (5% time) - Example activities include manpower planning, equipment maintenance, work flow prioritization and daily scheduling. Specifically:
- Plan, manage, and adjust the daily workload and staffing to minimize the unplanned overtime.
- Ensure shift/daily/weekly workload planning and volume forecasting routines are accomplished (i.e., staffing, equipment, space).

**Human Resources** (5% time) - Example activities include identifying labor needs, interviews and recruiting activities, implementing training, and coaching / counseling for improved performance. Specifically:
- Ensure company policies are communicated, applied, and enforced (i.e., safety, accounting, operational, regulatory, and administrative).
- Maximizes quality and productivity by understanding job standards for each function, and evaluating performance variances in order to identify root cause and corrective action.

**Communications** (5% time) - Example activities include staff meetings, customer interactions, vendor/service provider interactions, and internal communications with peers, staff and internal business unit departments.  Specifically:
- Effectively communicate work task Standard Operating Procedures, convey key information during pre-shift meetings and ensure appropriate shift hand-offs.
- Provide a professional environment with relation to external customers and vendors such as drivers, dispatchers, and customer representatives.

The above statements are intended to describe the general nature and level of work being performed by people assigned to this job.  They are not intended to be an exhaustive list of all responsibilities, duties, and skills required of personnel so classified.  Management maintains the right to assign or reassign duties and responsibilities to this job at any time.

Rev. 06/08

EXEL_000020

**Reporting** (5% time) - Example activities include Key Performance Indicator tracking, quality reports, audits, financial reporting, material handling equipment reports, site or individual performance tracking and customer required reports.  Specifically:
- Execute daily customer / vendor contract requirements and identify accessorial activity (work outside commercial contracts) and ensure necessary documentation.
- Ensure inventory integrity by timely and accurate receiving, picking, shipping, and inventory management.
- Participate in the collection of performance measurements consistent with customer, vendor, and site requirements.

| People Management Responsibilities |
| :---: |
| **[Refer to DSC Experience NA for additional information]** |

Recruitment and Selection:  determine labor needs; understand and use the Company's interviewing process and tools; implement on boarding (Passport orientation, etc.).

Managing & Rewarding Performance:  set clear performance expectations (Passport, Performance Management Process); provide regular feedback and reviews; resolve team conflicts; encourage a positive and safe environment, use coaching and corrective action for underperformance; understand and use voluntary/involuntary termination processes.

Training & Development:  understand and coach others on processes, tools and standards (SOP's); ensure training requirements are met; identify and address skill gaps; discuss career interests.

Communicate & Engagement:  communicate site, company, and other pertinent information to team (pre shift, one on one, etc.); share customer and Exel information on regular basis.

| Scope of Responsibility |
| :---: |

**Resources** *(e.g., budget, staff, etc.): Manager completes this section.*

**Decision Making Authority:**
- In accordance with the approved level of authority as assigned by company policy (i.e., procurement, staffing adjustments, deployment).
- Customer / vendor requests are limited to the contract restrictions and agreed budget.
- To approve overtime and staffing specifically related to the completion of the daily workload.

| Key Relationships *(External & Internal)* | Focus *(Nature of interaction)* |
| :--- | :--- |
| **Internal** | **Applies to all Internal** |
| General Manager | Development and execution of the shift/daily/weekly plans. |
| Operations Manager | Workload planning, staffing, volume |
| Supervisors | Shift hand-offs, status updates, work priorities |
| Group Leader | Resource deployment to complete required tasks |
| Direct Reports | See People Management Responsibilities above |
| Customer Services | Assist in addressing customer inquires, investigate / resolve issues, order status, etc. |
| Administrative assistant | Approve payroll hours and address payroll / attendance issues |
| **External** | **Applies to all External** |
| Customer representatives | Service Performance |
| Vendors | Customer/vendor visits |
| Auditors (regulatory / governmental) | Regulatory / governmental compliance |
| Carriers | Orders released timely |

The above statements are intended to describe the general nature and level of work being performed by people assigned to this job.  They are not intended to be an exhaustive list of all responsibilities, duties, and skills required of personnel so classified.  Management maintains the right to assign or reassign duties and responsibilities to this job at any time.

Rev. 06/08

| Performance Indicators *(What criteria will be used to assess performance)* |
|---|
| - Operational performance metrics such as: on-time shipping, on-time receipt, order accuracy, inventory accuracy, % overtime, safety incident rate and other items as identified by the site / customer scorecard – (to be defined in detail by the operations performance team) <br> - Compliance of objectives established with Performance Management Process (PMP) |

| Qualifications / Capability Profile | | |
|---|---|---|
| **Minimum Education** | **Essential?** | **Desirable?** |
| - Bachelor's degree or equivalent experience | | X |

| **Minimum Experience** | **Essential?** | **Desirable?** |
|---|---|---|
| - Operations background | X | |
| - 1-2 years logistics industry experience | | X |
| - 0-3 years experience in lead/supervisor/management role | X | |

| **Minimum Knowledge/Skills / Abilities** | **Essential?** | **Desirable?** |
|---|---|---|
| - Meets corporate competency model requirements | X | |
| - Objective setting | X | |
| - Organizational skills | X | |
| - Staff management | X | |
| - Workload planning | X | |
| - Preventative maintenance routines | | X |
| - Facility management (i.e., maintenance, sanitation, etc.) | | X |
| - Interviewing skills | | X |
| - Communication skills | X | |
| - People skills | X | |
| - Fluency in English | X | |

| Travel Requirements | None (0%) | Minimal (0-10%) | Occasional (10-25%) | Frequent (> 25%) |
|---|---|---|---|---|
| **National Travel** | | X | | |
| **International Travel** | | X | | |

| Approvals | | | | |
|---|---|---|---|---|
| | **Name** | **Title** | **Signature** | **Date** |
| **Appointing Manager Name** | | | | |
| **Designated HR Representative Name** | | | | |
| **Manager of Appointing Manager Name** | | | | |

The above statements are intended to describe the general nature and level of work being performed by people assigned to this job. They are not intended to be an exhaustive list of all responsibilities, duties, and skills required of personnel so classified. Management maintains the right to assign or reassign duties and responsibilities to this job at any time.

Rev. 06/08

To whom it may concern:

On March 10, 2022 after our pre-shift meeting Jason Walters called another meeting with the associates (DHL) that was late. During that meeting, he told us that we are to be there on time at 6 am. I ,Evaite, told Jason why I was late. Jason felt like I disrespected him and told me that we would have a meeting when he let us out that meeting. He told me "that I called him out in front of the other associates." If we need to have a meeting about us being late, shouldn't that meeting be held with all the associates in a corporate setting? I repeated my reason for being late, he pulled my coat and told me "to calm down before he puts me in a choke hold." I have the right as an associate to voice my opinion and a right to defend myself in a respectful manner. I wasn't irate, trying to cause a scene or using foul language. If a supervisor is trying to make an example out of someone,  take the problem up with that associate. After everything is said and done, Jason goes and tells Shaquel Wells and Tenisha Thomas what he said to me. I feel threatened and violated. I feel like I need to go and get a lawyer, so that I can be protected being in the same workspace with him. This man has been on trial for murder, though he was found not guilty. Jason has been heard saying "that you can get off if you have money." This is common knowledge to the associates.

EXEL_00114

I take all these things to heart because I have been in an abusive relationship. This is not a joking matter to me and if he thinks it is, it's not. You can't say things like that or put your hand on someone's person.  I don't feel comfortable working under him anymore. He has pulled his last straw with me. I try my best to get to work on time after I drop my grandson off at daycare. Daycare doesn't open until 6am. I can't leave him on the sidewalk and tell him to stay there until someone shows up. I had taken my situation up with Eartis and John last year.


DeNeill Hooper
3/10/2022
9:30 am

EXEL_00115

APP 193



DHL Supply Chain

## COMPLAINANT/WITNESS STATEMENT FORM

Site Name: DHL Forney                    Date: 8-10-22

Investigation Topic:

☐ Complainant          ☑ Witness          ☐ Alleged Violator

Explain specifically what happened.  Provide as much detailed information as possible, and attach a separate sheet if necessary.

Include the following information in your statement, to the best of your ability:
- Date and time of occurrence(s)
- Parties involved
- Where the occurrence(s) took place
- Possible witnesses
- Frequency of occurrence(s)

Add the specific details of the statement here

We were loading our carts and Jason stopped and told us "thankyou for listening and not mouthing back" and we said your welcome, he then said in a playful way that he was gonna put her in a choke choke hole, I don't think he ment any harm and I don't know what he said after preshift to her because I wasn't there.



**COMPLAINANT/WITNESS STATEMENT FORM**

Site Name:                               Date: 3/10/22

Investigation Topic:

☐ Complainant          ☐ Witness          ☐ Alleged Violator

Explain specifically what happened.  Provide as much detailed information as possible, and attach a separate sheet if necessary.

Include the following information in your statement, to the best of your ability:
- Date and time of occurrence(s)
- Parties involved
- Where the occurrence(s) took place
- Possible witnesses
- Frequency of occurrence(s)

Add the specific details of the statement here

Around 6:30 Jason was on his way to front
I stop him & told him we needed ~~cassette~~ Ribbons
And he was saying ~~to release cant~~ Thank you
for not Mouthing me & Listen & not going off
like Evette was & he said he told her he was
gonna put her In a choke whole but I think
he was playing with us when he ~~said~~ said it
but I dont know how he said it to there
because I wasnt there when he talked
to her outside of pre shift

DHL Supply Chain

## Corrective Action Form
## Exempt Level Associates

**Associate Name:**    **Jason Walters**
**Associate Number:**    **015448**
**Manager Name:**    **Eartis Shaw**
**Date:**    **3/16/2022**
**Re:**    **Corrective Action - Exempt**

This document serves as official notification that your performance regarding Class 2 work rule #2 Gross Misconduct "threatening associate" has been deemed unacceptable and therefore we are terminating your employment effective immediately.

**Eartis Shaw** met with you on 3/16/2022to discuss the following:

1. Termination for violating work rule #2 class 2 rules Gross Misconduct

2. Grabbing associates clothing and pulling closer to body

3. Telling the associate to calm down before being put in choke hold

4. Associate was termed by phone 3/16/2022@ 9:25am by Eartis Shaw (OM) and witnessed by Adam Elliott (GM)

The expectation(s) going forward is for you to:
1. Return any company property in accordance with this termination.


*I have received and read this Corrective Action – Exempt Level form.  I understand the original document will become a part of my personnel file.  My signature does not necessarily mean I agree.*

Associate's Signature

Manager's Signature

Date

3-16-2022

Date

Distribution:  Original - Personnel File
Copy - Associate

**CONFIDENTIAL**

EXEL_00120

**APP 196**

POLICIES & PROCEDURES
# 510.3A GENERAL WORK AND SAFETY RULES
FOR INTERNAL USE ONLY | POLICY DATE: 04-2019

**PURPOSE**

DHL Supply Chain will not tolerate associate behavior that is offensive or harmful to the health, safety or morale of other associates, or to the interests of the organization or its customers. DHL Supply Chain communicates its stand in this area by developing policies to describe the kinds of behavior that are unacceptable and the rights and responsibilities of all parties.

**SCOPE**

This policy applies to all DHL Supply Chain associates and sites in the United States and Canada, as well as visitors and others performing work at a DHL Supply Chain location. It includes expectations for behavior, as well as the consequences for when those expectations are not met.  It also includes references to key related policies.

**POLICY AND PROCEDURE**

1.  RESPONSIBILITIES
    1.1   It is management's responsibility to establish and enforce the General Work Rules and Safety Rules to maintain a safe and positive workplace.
    1.2   It is management's responsibility to perform a complete and thorough investigation of a situation prior to enforcing disciplinary action.
    1.3   It is the associate's responsibility to adhere to the guidelines, procedures and rules established by management. Associates are encouraged to speak with their manager or supervisor when clarification is needed.
    1.4   Any associate who believes they have been unjustly accused of violating company policy may appeal, either orally or in writing, at any stage in the proceedings. Associates should refer to the Associate Concern Resolution Process for guidelines on addressing such issues.
2.  ACKNOWLEDGEMENTS AND DOCUMENTATION OF GENERAL WORK AND SAFETY RULES AND VIOLATIONS
    2.1   A copy of the General Work and Safety Rules is available at each DHL Supply Chain operation and a copy will be given to each associate during their new hire orientation. The Work and Safety Rules supplement this policy as Policies 510.3B and 510.3C.
    2.2   Associates are asked to sign an Associate Acknowledgement Form to ensure receipt and understanding of both the General Work Rules and Safety Rules during orientation. Signed acknowledgements are filed in associates' personnel files at the operation.
    2.3   General Work and Safety Rules violations are categorized as Class One and Class Two violations:
        2.3.1   Class One rule violations are subject to the 4-step progressive corrective action process as defined in Policy 210.5 Corrective Action.
            2.3.1.1   Review of First and Second Written Notifications must be done by first-level supervision and next-level management. Signatures on First and Second Written Notifications are required from first-level supervision and next-level management.

EXEL_00142

POLICIES & PROCEDURES
**510.3A GENERAL WORK AND SAFETY RULES** (CONTINUED)

        2.3.1.2   Review of Final Written Notifications and Terminations must be done by first-level supervision, next-level management, senior site/department manager, director and local HR representative. Signatures on Final Written Notifications and Terminations are required from first-level supervision, next-level management, senior site/department manager and local HR representative.

   2.3.2   A Class Two rule violation is considered gross misconduct and is grounds for termination of employment.

2.4   The Work and Safety Rules are provided in the attached documents and are intended to show the types of conduct and performance problems for which the progressive corrective action system is normally applied. In addition to the published rules, supplemental regulations and customer requirements may be added at different DHL Supply Chain operations as deemed necessary by site management.

3.   ADMINISTRATION OF RULES VIOLATIONS

   3.1   Progressive corrective action is administered within three types of violations:

        3.1.1   Work and Safety Rules as listed in the attached documents (Policies 510.3B and 510.3C).

        3.1.2   Performance and Productivity rules as listed in the attached document (Policy 510.3B).

        3.1.3   Attendance requirements as outlined in 520.1 Attendance and Punctuality (US) and Attendance Policy (CAN).

   3.2   Corrective Action levels reached will remain in place for 12 months from date assessed and determine the next step in the progressive corrective action process. Final Written Notifications will remain relevant for 12 months from the date of issue unless otherwise indicated on the corrective action document.

EXEL_00143

POLICIES & PROCEDURES
## 510.3B GENERAL WORK RULES (CONTINUED)

**PERFORMANCE AND PRODUCTIVITY RULE VIOLATIONS**

1) Poor work performance and/or failure to follow proper procedures.
   a. Failure to meet productivity standards.
   b. Failure to meet established quality standards.

B. Class Two rule violations are extremely important. Due to the serious nature of these rules, violation is considered gross misconduct and is grounds for termination of employment on the first occurrence.

**WORK RULE VIOLATIONS**

1) Dishonesty of any kind, including, but not limited to, falsifying employment data, reports, timecards, or time records. This includes knowingly punching another's timecard.

2) Threatening or inflicting bodily harm on a co-worker, supervisor, manager or customer.

3) Theft of another associate's property, company property, customer property, or government property; or contributing to the theft of any property. Offenders may be prosecuted.

4) Sabotage, tampering with, or deliberate destruction of any associate, company, customer or vendor property. Offenders may be prosecuted.

5) Conviction of a serious felony that closely relates to the nature of the position held. The company reserves the right to inquire about additional circumstances to make an individualized assessment.

6) Possession of firearms, explosives or other weapons on company premises, unless specifically authorized pursuant to law.

7) Possession of, unauthorized use of, sale or distribution of, or being under the influence of intoxicating beverages, unauthorized prescriptions or illegal drugs while on company property or in company vehicles; testing positive for illegal drugs, or being under the influence of intoxicating beverages during working time. See Policy 220.9 Drug- and Alcohol-Free Workplace (US) for specific information regarding these restrictions. 

8) Failure to report and adhere to any work restrictions that may limit one's ability to perform expected duties. This is inclusive of the use of prescription drugs or over-the-counter medications that could impact job performance. See Policy 220.9 Drug- and Alcohol-Free Workplace (US) for additional information.

9) Misuse of Leave of Absence, using for purposes or reasons other than designated in application for Leave of Absence, illness or disability per Leave of Absence Policies.

10) Unauthorized communication of confidential information.

11) Sleeping on the job during working hours.

12) Failure to report for a scheduled company physical examination or drug screen, or the submission of an altered specimen during a drug test.

13) The malicious use of obscene, profane or abusive language and/or hand or body gestures toward fellow associates, vendors, customers or managers.

14) Acts of insubordination or refusal to perform work assignments or follow direct instructions as directed by management.

15) Off-duty misconduct that impairs the essential basis for trust in the associate's honesty and safety.

EXEL_00145

POLICIES & PROCEDURES
## 510.3B GENERAL WORK RULES (CONTINUED)

16) Workplace harassment as defined by Policy 220.10 and Policy 230.1 Workplace Harassment.
17) Unauthorized entering or leaving company premises.
18) Endangering others by recklessness or horseplay.
19) Intentionally neglecting job duties or responsibilities.
20) Intentional restriction or delay of production or inciting others to do the same.
21) The use of a camera, video recorder, or audio recorder by an associate, (inclusive of those hidden/undisclosed photographic, video or voice recording capabilities on phones or similar devices) on Company property without the consent and approval from Human Resources Director and Legal.

POLICIES & PROCEDURES
# 520.5 WORKPLACE VIOLENCE PREVENTION
FOR INTERNAL USE ONLY | POLICY DATE: 04-2015

## PURPOSE

DHL Supply Chain is committed to maintaining a workplace that is free from violence or threat of violence. Threats, threatening behavior, or acts of violence against associates, visitors, guests, or other individuals by anyone on Company property, customer's property or other locations associated with the workplace will not be tolerated. Violations of this policy will lead to disciplinary action up to and including termination of employment.

## POLICY AND PROCEDURE

Examples of behaviors and situations deemed workplace violence include, but are not limited to, the following:

- Actual or threatened physical contact (e.g. fights, pushing, intimidation)
- Direct, indirect or veiled threats
- Verbal threats, including, abusive, intimidating or harassing behavior
- Possession of a weapon on Company property or a job site, unless specifically authorized pursuant to law. (A weapon is defined as any firearm, explosive device, knife or other weapon specifically designed or intended to be used to inflict physical harm)
- Malicious acts of destruction or sabotage against Company property, customer property or another's personal property
- Stalking
- Violation of a restraining order, temporary protection order or permanent protection order
- Threats of suicide

Any person who makes threats, exhibits physically threatening behavior or engages in violent acts on Company property will be removed from the premises as quickly as safety permits and shall remain off Company premises pending the outcome of an investigation. No existing Company policy, practice or procedure should be construed to prohibit decisions or actions designed to prevent a threat from being carried out, a violent act from occurring or a life threatening situation from developing.

All Company associates are responsible for immediately notifying management of any threats, threatening behavior or acts of violence, which they have witnessed, received or have been told that another person has witnessed or received. Even without an actual threat, associates should also report any behavior they have witnessed that they regard as threatening, intimidating or violent. Associates are responsible for making this report regardless of the relationship between the individual who initiated the threat or threatening behavior and the person or persons who were threatened or were the focus of the threatening behavior. There will be no retaliation against an associate who, in good faith, reports or complains about a threat, intimidation or violence. Reports will be investigated promptly and, if warranted, actions taken.

Please reference the documents outlining procedures on handling a bomb threat as well as a situation involving an active shooter. These documents are posted on Experience North America as supplements to this policy.

**IMPORTANT NOTICE: Reporting incidents of workplace violence to the company is not a replacement for calling 911 for emergencies. For emergencies and/or incidents presenting perceived imminent danger you should immediately call 911 or the local authorities.**

EXEL_00183

**APP 201**

POLICIES & PROCEDURES
## 520.5 WORKPLACE VIOLENCE PREVENTION (CONTINUED)

Site managers are responsible for ensuring that a copy of this policy is available in the site's Policies & Procedures binder, and that the related CEO Letter Workplace Violence Prevention is posted in an area accessible by all associates.

For those situations where you may want to report threats, threatening behavior or acts of violence separate from your chain of command or Associate Concern Resolution Process, you should use the NEAR hotline at 1-866-678-6327.

Any associate obtaining a protective or restraining order from a court or other governmental authority listing the Company as a location that is protected, must provide to the responsible site management representative, a copy of the temporary protective or restraining order that was granted or a copy of any protective or restraining order that is made permanent.



DHL Supply Chain

# Corrective Action Notice

Associate's Name: J███ A████

Associate's Number: _____

Job Title: Returns Lead _____

Location/Region: Terrell/ Goodyear

Supervisor's Name: Josiah Fuqua _____

Date of Warning: 5/27/2020

Date and time of violation:  5/27/2020 _____

Check one:
☐ 1st Written Notification    ☐ 2nd Written Notification    ☐ Final Written Notification    ☒ Termination

Corrective Action History:
Has this performance or behavior issue been discussed with the associate previously? Yes _____ No _X__
Date(s): _____

Has this associate received other corrective actions in the last 12 months?     Yes _____ No __x_
Date(s): _____

Identify specific facts, events or behaviors requiring discipline (attach additional pages if needed):
**On Wednesday May, 27 of 2020 J███ A████ got into an argument with K████ C████ over the incorrect count of a pallet that was to be scrapped. During the argument J███ A███ physically pushed K███ C████ and more arguing continued. Statements were taken by both associates, as well of the associate who witness the altercation. Workplace violence Policy 520.5 Examples of behaviors and situations deemed workplace violence include, but are not limited to, the following: Actual or threatened physical contact (e.g. fights, pushing, intimidation)**

List any documents or supporting evidence (attach to back):

**Statements attached of both individuals and witness statemen as well.**

Performance plan (list expected improvement and consequences for not improving):

**Due to the severity of incident and policy violation this incident has resulted in termination.**

Associate's comments:

*I understand that either failure to improve my performance/behavior or the occurrence of additional incidence(s) of unsatisfactory performance/behavior will result in further corrective action up to and including termination of my employment.*

*I have read this notice and understand it.  My signature does not necessarily mean I agree.*

_____          _____
Associate's Signature          Date

_____          _____
Supervisor's Signature          Date

Distribution:  Original  - Personnel File
               Copy      - Associate

Revised 2/04

EXEL_00361

**APP 203**

# K█ C███████/J██ A███ Altercation          5/27/20

3 PAGES

## Statement A████:

A████ was scrapping tires, and he claims K████ came to the scrap area already fired up. He said there was a discrepancy on one of the pallets. 2 tires short. K████ was upset that the count was wrong.

A████ **said** *"did you count the tires before you brought the tires to the scrap area"*

K███ **replied** *"no you counted them"*

A███ **said** *"we both counted them, Can you go away and let me figure it out, it is only 2 pallets , I can fix it and finish it myself"*

K███ **said** *"you are not my boss, you cannot tell me what to do"*

A███ was going to unload the truck and recount and scan, K████ said that A████ didn't count at the beginning. A████ tried to communicate in Spanish and get on the same page. Some freight handlers told J███ that K████ has been "hot" recently.

**K████ was standing in between A████ and his forklift, A████ put his hand on K███ to move him aside to get to his forklift. A████ claims he was not angry or aggressive in anyway. Simply put his hands on him to gently move him out of the way.**

After J███ touched K████, K████ claimed that J███ pushed him and that he(K████ was then going to get report and get him fired. "K███ was hot"

Yesterday everything was good. They were working together and today something was wrong.

A████ says K████ repeatedly said "J███ is not his boss, and can not tell him what to do"

"I have no excuses, I did touch him" "I was afraid after he was going to punch me. K████ was mad, got red in the face" "I take full responsibility for touching him, I did do it"

"I tried to apologize to him and he would not listen to him or communicate with him"

Statement Isidro: Witness

**Heard the 2 arguing about the counts being wrong. Isidro saw A███ push K███ hard with both hands.** And heard K███ say "if you hit me you'll be sorry". Isidro claims that A███ was being aggressive and escalated the situation.

.



**COMPLAINANT/WITNESS STATEMENT FORM**

Site Name: N65 B FORNEY          Date: 3/10/22

Investigation Topic: LATE TO PRESHIFT NOTIFICATION

☐ Complainant        ☐ Witness        ☑ Alleged Violator

WALTERS, JASON R.

Explain specifically what happened. Provide as much detailed information as possible, and attach a separate sheet if necessary.

Include the following information in your statement, to the best of your ability:
- Date and time of occurrence(s)
- Parties involved
- Where the occurrence(s) took place
- Possible witnesses
- Frequency of occurrence(s)

Add the specific details of the statement here

This morning (3/10/2022) I started pre-shift @ 0600 AND WAS GOING THROUGH OUR MORNING INFORMATION ABOUT I/B & O/B ON OUR SCHEDULES FOR THE DAY. AFTER A FEW MINUTES I NOTICED A NEW FACE & I LOOKED AROUND FOR A TRAINER. THERE WASN'T ONE ON DECK AND AFTER A FEW MORE MINUTES BOTH MY TRAINERS SHOWED UP, ALONG WITH ANOTHER TRAINEE & 4 MORE LABEL CLERKS. I REPEATED MY PRESHIFT & ASKED EVERYONE THAT WASN'T IN PRESHIFT @ 0600 TO PLEASE MEET ME IN THE PRESHIFT AREA AS SOON AS WE STRETCHED AND BROKE FOR SHIFT.

**EXEL_001575**
**APP 206**

WITH THE NEW PEOPLE ON BOARD, **DHL Supply Chain** I THOUGHT IT WAS BAD FORM TO THINK IT IS OK TO BE LATE TO PRE-SHIFT, SO I INCLUDED THEM. I MADE IT SHORT AND SWEET TELLING THEM THE EXPECTATION WAS TO BE HERE WITH SAFETY COLORS & STEEL TOE SHOES @ 0600. I DID NOT SINGLE ANY-ONE OUT AND I DIDN'T WANT TO COME ACROSS AS CROSS. EVERYONE NODDED THAT THEY UNDERSTOOD AND THEN Deneill "EVAITE" HOOPER STARTED COMPLAINING ABOUT ME SAYING ANYTHING ABOUT IT & THAT SHE WAS EXEMPT B/C OF AN AGREEMENT W/ EARTIS SHAW AND SHE WASN'T LEAVING HER GRANDSON OUTSIDE OR ALONE. I TOLD HER, OF COURSE, NO ONE WOULD EXPECT THAT SHE WOULD. I TOLD HER WE COULD SPEAK AFTER WE BROKE FROM THIS SHORT MEETING, SHE KEPT COMPLAINING AND BEING DISRESPECTFUL. I TOLD HER ONCE AGAIN THAT I WOULD SPEAK WITH HER AFTERWARDS. SHE SEEMED VERY UPSET FOR SUCH A SMALL CORRECTION. THERE WAS SOME

**Associate Signature**          **Date**

**Managers and supervisors: Please submit this form to your HR Generalist along with any other written statements, related documentation, or supporting evidence.**

2

**EXEL_001576**
**APP 207**

BANTER BACK AND FORTH AS WE BOTH OFTEN DO. WE ALWAYS END UP LAUGHING ABOUT IT. I TOLD HER THAT THE CALLOUT FOR NOT BEING IN PRESHIFT WAS FOR MY TRAINEES + MY TRAINERS BUT I INCLUDED EVERYONE THAT WAS LATE, REGARDLESS OF ANY AGREEMENT FOR OUR PARENTS/GRANDPARENTS TO BE LATE B/C OF TAKING CHILDREN/GRANDCHILDREN TO SCHOOL, DAY CARE OR A SITTER'S. IT DID NOT SEEM TO REGISTER WITH HER, AND I TOLD HER I WASN'T SPECIFICALLY TALKING ABOUT HER. I HAVE A TERMINALLY ILL CHILD AT HOME MYSELF AND CAN UNDERSTAND HAVING TO MAKE SACRIFICES AND DECISIONS FOR HIS WELFARE ALL THE TIME. BEING SHE WAS SO UPSET, I FIGURED I WOULD TALK TO HER LATER, AS WE OFTEN DO. ABOUT 7:48 AM SHE CAME TO THE FRONT DESK AND YELLED SHE WAS LEAVING. OBVIOUSLY EVEN MORE UPSET I GOT UP AND WENT TO HER FORKLIFT AND ASKED IF SHE WAS OK? SHE SAID "NO I'M NOT", "IT'S PERSONAL." I TRIED TO TALK TO HER AND TELL HER NOT TO DRIVE WHILE SHE IS UPSET. SHE STARTED TO DRIVE AWAY AND SHE PARKED HER LIFT + LEFT.

OVER

3

EXEL_001577
APP 208

I TALKED TO SEVERAL OF THE PEOPLE THERE AND EVERYONE SAID I WAS NICE ABOUT IT AND DIDN'T DISRESPECT ANYONE. IT WAS ALSO SAID IF ANYONE WAS OUT OF LINE, IT WAS MS. HOOPER. I'M USED TO HER VENTING AND ENCOURAGE HER TO DO SO, BUT IN A RESPECTFUL, APPROPRIATE MANNER. I PERSONALLY THINK THIS WAS BLOWN WAY OUT OF PROPORTION, AND DIDN'T NEED TO GET OUT OF HAND.

WITNESSES
DAVID WINFREY
ROGER HEASTER
ANSY GALAN
SHAY THOMAS
TENISHA THOMAS
2 TRAINEES

Jason Walter
OPS SUP.
N65B FORNEY

4.

EXEL_001578
APP 209

| | |
|---|---|
| **From:** | Eartis Shaw |
| **Sent:** | Friday, March 11, 2022 11:27 AM |
| **To:** | Mickey Moza (DHL Supply Chain); Adam Elliott (DHL Supply Chain) |
| **Subject:** | FW: [EXT] Re: Needed for statement |

Mickey see below from Jason

Eartis Shaw
Operations Manager
DHL Supply Chain c/o The Goodyear Tire & Rubber Company
1500 Akron Way
Forney, TX 75126
Mobile: 972-877-9732
Office: 972-703-6052

**From:** jason walters <m249sawgunr@yahoo.com>
**Sent:** Friday, March 11, 2022 11:25 AM
**To:** Eartis Shaw-CONT <eartis_shaw@goodyear.com>
**Subject:** [EXT] Re: Needed for statement

External Email....WARNING....Think before you click or respond....WARNING


On Thursday morning in preshift I addressed all the associates that were late to pre-shift and asked them to meet me where I was standing in the protected area we designate for preshift after everyone else had finished and headed to work. I addressed everyone in general and no-one specifically. As I was talking about the pre-shift topics, Ms. Hooper started talking over me and arguing...I asked her to hold on we could speak in private afterwards, as I felt that her approach undermined the things I was saying. I did not grab her jacket...I may have touched it saying something about safety colors and steel toes...but in no way did I maliciously address or touch anyone. I did not threaten to choke her either. I included everyone that was late, for whatever reason, to be fair. Last week, I asked about if there was a grace period for coming in to pre-shift late, I was told there was no such grace period. I am very understanding when it comes to life's ups and downs. I also know, that when people habitually come in late, it is bad for moral and order, not to mention it comes out of their attendance bucket whether I know about it or not. I care about all of my people, and I try my best to keep them from getting themselves into an attendance issue (used to be points) or any other trouble.

Jason R. Walters
Operations Supervisor
N65B Forney

Sent from Yahoo Mail on Android

Sr$Jvm@ ev$55@$466$ex$55$46$EQ $Ievm$Nle{ 1GSRX$
@ievmwcwle{ D kssh}ievzasg B${ vsxi$

Jason,

1

Couple things needed for the statement.

- Telling the associate to calm down before you put them in a choke hold
- Pulling this associates jacket.

Need to know if this happened or not and if so why.

Eartis Shaw

Operations Manager

DHL Supply Chain c/o The Goodyear Tire & Rubber Company

1500 Akron Way

Forney, TX 75126

Mobile: 972-877-9732

Office: 972-703-6052

EXEL_001580
APP 211

**DECLARATION OF ANTONIO JUAREZ**

# —ATTACHMENT—

# VIDEO
# EXEL_00118

*(Flash Drive)*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JASON WALTERS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-cv-01840-K |
| | § | |
| EXEL, INC. D/B/A DHL SUPPLY CHAIN, | § | |
| | § | |
| *Defendant.* | § | |

<u>**DECLARATION OF BRUCE GILLIS**</u>

STATE OF KENTUCKY        §
                         §
COUNTY OF JEFFERSON      §

I, Bruce Gillis, declare under the penalty of perjury the following:

1.     My name is Bruce Gillis. I am over the age of eighteen years, of sound mind, and am capable of making this declaration. I have personal knowledge of the facts stated herein and know them to be true and correct.

2.     I have been employed by Businessolver.com, Inc. ("Businessolver") since December 11, 2017.  My current position is Head of Compliance.

3.     In my role as Head of Compliance, as part of my responsibilities, I have gained familiarity with general Businessolver's COBRA operations as well as the policies and procedures that Businessolver implements as part of its business. As part of my job duties, I have access to and reviewed records and data maintained by Businessolver in the regular course of business, and specifically on behalf of Defendant and its member, Plaintiff Jason Walters.

4.      Businessolver is the COBRA Administrator and Benefits Administration software provider for Defendant Exel, Inc. d/b/a DHL Supply Chain ("Exel").  Businessolver administers the employee benefits, including COBRA, on behalf of and at the direction of Exel.

5.      Through my position, I know that all of the attached documents are true and correct copies of Businessolver's business records made and kept in the course of Businessolver's regularly conducted activity regarding its COBRA administration. It was the regular course of that business for an employee or representative of the business with knowledge of the act, event, condition, or opinion recorded to make the record or to transmit information thereof to be included in such record.  The record was made at or near the time of the act, event, condition, or opinion recorded, or reasonably soon thereafter.

6.      On or about March 22, 2022, Exel notified Businessolver regarding Plaintiff's termination of employment.

7.      On or about March 22, 2022, Businessolver sent Plaintiff the required COBRA information on behalf of Defendant regarding the continuation of Plaintiff's health care coverage and other health care options at his last known address, 142 County Road 2437, Mineola, Texas 75773. Exhibit A attached is a true and correct copy of the COBRA Qualifying Event Notice / Election Form sent to Plaintiff.

8.      On or about March 21, 2022, Plaintiff contacted Businessolver regarding his benefits. The matter was resolved on the same day.

9.      Exhibit B attached is a screenshot of the Businessolver Benefits Administration system, showing the COBRA Qualifying Event Notice/Election Notice printed and sent to the participant on or about March 22, 2022.

//

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on February 15, 2024.

_____

Bruce Gillis

**Be Secure (c/o Businessolver, Inc.)**
1025 Ashworth Road
West Des Moines, IA 50265



Jason Walters and Family                                                    **Notice Date: March 22, 2022**
142 COUNTY ROAD 2437
MINEOLA, TX 75773

---

**IMPORTANT – COBRA CONTINUATION COVERAGE & OTHER HEALTH COVERAGE ALTERNATIVES**
You're getting this notice because you recently lost coverage under Be Secure group health plan ("the Plan"). This notice has important information about your right to COBRA continuation coverage, which is a temporary extension of coverage under the Plan. Please read the information in this notice very carefully before you make your decision.

---

This notice has important information about your right to continue your health care coverage under the Plan, as well as other health coverage options that may be available to you, including coverage through Medicaid or the Health Insurance Marketplace. To sign up for Marketplace coverage, visit **www.HealthCare.gov** or call 1-800-318-2596 (TTY: 1-855-889-4325). People in most states use **www.HealthCare.gov** to apply for and enroll in health coverage; if your state has its own Marketplace platform, you can find contact information here: **www.HealthCare.gov/marketplace-in-your-state/**.

Please read the information in this notice very carefully before you make your decision. If you choose to elect COBRA continuation coverage, you should enroll online at **www.YourBenefitLink.com** or use the Election Form provided later in this notice.

---

**IT TAKES JUST THREE EASY STEPS TO REVIEW AND ENROLL IN YOUR COBRA COVERAGE OPTIONS ONLINE:**

1. **Go to www.YourBenefitLink.com** and log in with your username and password. If you don't know them, select **Register** then provide your company key (**besecure**), your Social Security Number and your Date of Birth.

2. **Review and make your COBRA elections.** The online enrollment process makes it easy to select the coverage you're eligible for.

3. **Choose the payment method you want.**
   a. **Pay Online** – Provide your preferred payment method and account information. You can set up automatic monthly payments and avoid the usual $2.00 monthly convenience fee.
   b. **Pay by Check** – Make your check payable to **Be Secure**.

*Please note, if you are electing COBRA as a dependent of a former employee who is not also electing COBRA or due to dependent qualifying event (such as a divorce or child reaching maximum age), you cannot enroll online. You will need to return the paper election form found in this package. Once enrolled, you will be able to login to **www.YourBenefitLink.com** and create your online account.*

---

Coverage provided by Be Secure to you and/or your covered dependent(s) ends on 03/16/2022 due to the qualifying event marked below:

| QUALIFYING EVENT | COBRA EFFECTIVE DATE | DURATION OF COVERAGE |
|---|---|---|
| Employment Termination | 03/17/2022 | 18 months |

Only members covered at the time of Qualifying Event are eligible for continuation. The following Qualified Beneficiaries are eligible to continue coverage under COBRA:



JASON WALTERS
███ WALTERS
███ WALTERS
███ WALTERS

**Para ver el texto de este aviso en español, visite:**
**https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/cobra/model-election-notice-spanish.docx**.
Si tiene preguntas sobre esta información por favor contacte Businessolver, Inc. at 877-411-4455. Los representantes están disponibles de lunes a viernes durante el horario comercial normal.

**GENERAL COBRA INFORMATION**
Federal Law requires that most group health plans (including this Plan) give employees and their families the opportunity to continue



**EXHIBIT A**

**APP 216**

their health care coverage through COBRA continuation coverage when there is a "qualifying event" that would result in a loss of coverage under the Plan. Depending on the type of qualifying event, "qualified beneficiaries" can include the employee covered under the group health plan, the covered employee's spouse, and/or dependent children of the covered employee. COBRA continuation coverage is the same coverage the Plan gives to active employees. Each qualified beneficiary who elects continuation coverage will have the same rights under the Plan as other participants or beneficiaries covered under the Plan.

**WHAT'S COBRA CONTINUATION COVERAGE?**
COBRA continuation coverage is the same coverage that the Plan gives to other participants or beneficiaries who aren't getting continuation coverage. Each "qualified beneficiary" (described below) who elects COBRA continuation coverage will have the same rights under the Plan as other participants or beneficiaries covered under the Plan.

**WHO ARE THE QUALIFIED BENEFICIARIES?**
Each person ("qualified beneficiary") listed on the Election Form below can independently elect COBRA continuation coverage. COBRA continuation coverage is available to all qualified beneficiaries from 03/17/2022 to 09/16/2023 (the end of the maximum period). Dependents not covered at the time of the qualifying event may be added only during Open Enrollment, if HIPAA special enrollment applies, or a status change event occurs to establish a right to enroll.

Only one of you needs to elect COBRA continuation coverage for your spouse and dependent child(ren), if any, who wish to continue coverage. (Please note, a parent or legal guardian (regardless of whether they are a qualified beneficiary) may elect COBRA continuation coverage on behalf of a minor child, as applicable.) Furthermore, because COBRA gives you the right to elect coverage independently, you, your spouse or dependent child(ren), if any, may elect single coverage and not include those individuals who do not wish to continue coverage. However, you may not decline coverage on behalf of your spouse or non-minor child.

Continuation coverage for a qualified beneficiary will be terminated before the end of the maximum period, if:

1. the required premium is not paid in full, on time;
2. after electing continuation coverage, the qualifying beneficiary becomes covered under another group health plan;
3. after electing continuation coverage, the qualified beneficiary becomes entitled to Medicare (under Plan A, Plan B, or both); or
4. the employer ceases to provide any group health plan for its employees.

Continuation coverage may also be terminated for any reason the Plan would terminate coverage of a participant or beneficiary not receiving continuation coverage (such as fraud).

**ARE THERE OTHER COVERAGE OPTIONS BESIDES COBRA CONTINUATION COVERAGE?**
Yes. Instead of enrolling in COBRA continuation coverage, there may be other coverage options for you and your family through the Health Insurance Marketplace, Medicare, or other group health plan coverage options (such as a spouse's plan) through what is called a "special enrollment period." Additionally, you may apply for and, if eligible, enroll in Medicaid at any time. Some of these options may cost less than COBRA continuation coverage.

You should compare your other coverage options with COBRA continuation coverage and choose the coverage that is best for you. For example, if you move to other coverage you may pay more out of pocket than you would under COBRA because the new coverage may impose a new deductible.

When you lose job-based health coverage, it's important that you choose carefully between COBRA continuation coverage and other coverage options, because once you've made your choice, it can be difficult or impossible to switch to another coverage option until the next available open enrollment period.

**IF I ELECT COBRA CONTINUATION COVERAGE, WHEN WILL MY COVERAGE BEGIN AND HOW LONG WILL COVERAGE LAST?**
If elected, COBRA continuation coverage will begin on 03/17/2022 and can last until 09/16/2023. You may elect any of the options for COBRA continuation coverage listed within the Election Form below.

Continuation coverage may end before the date noted above in certain circumstances, like failure to pay premiums, fraud, or if you become covered under another group health plan or entitled to Medicare.

Note, due to the COVID-19 National Emergency, the Department of Labor, the Department of the Treasury, and the Internal Revenue Service issued a Notice of Extension of Certain Timeframes for Employee Benefit Plans, Participants, and Beneficiaries Affected by the COVID–19 Outbreak ("Joint Notice"). This notice provided relief for certain actions related to employee benefit plans required or permitted under Title I of ERISA and the Code, including the 60-day initial election period for COBRA continuation coverage. The Department of Labor's Employee Benefits Security Administration (EBSA) provided further guidance on this relief in EBSA Disaster Relief Notice 2021-01.

**CAN I EXTEND THE LENGTH OF COBRA CONTINUATION COVERAGE?**
If you elect continuation coverage, you may be able to extend the length of continuation coverage if a qualified beneficiary is disabled, or if a second qualifying event occurs. You must notify Businessolver, Inc. of a disability or a second qualifying event within a certain time period to extend the period of continuation coverage. If you don't provide notice of a disability or second qualifying event within the required time period, you will lose your right to extend the period of continuation coverage.

For more information about extending the length of COBRA Continuation coverage visit
**https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/an-employees-guide-to-**



221338116

**APP 217**

health-benefits-under-cobra.pdf.

*Disability*
An 11-month extension of coverage may be available if any of the qualifying beneficiaries are determined by the Social Security Administration (SSA) to be disabled. The disability has to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of continuation coverage.

This notice must be mailed to the COBRA Administrator at the address provided in this notice. The notice must be received within 60 days after the latest of:

1. the date of the SSA disability determination;
2. the date on which the qualifying event occurred;
3. the date on which the qualified beneficiary loses (or would lose) coverage under the terms of the Plan as a result of the covered employee's termination or reduction of work hours; or
4. the date on which the qualified beneficiary is informed of the obligation to provide the disability notice.

Regardless of the 60-day deadline described above, your notice must be provided no later than 18 months after your COBRA coverage began or you will not be eligible for a disability extension.

Each qualified beneficiary who has elected continuation coverage will be entitled to the 11-month disability extension. If the qualified beneficiary is determined by SSA to no longer be disabled, you must notify Businessolver, Inc. of that fact at the address below within 30 days after SSA's determination. COBRA coverage will terminate (retroactively, if applicable) on the first day of the first month that begins at least 30 days after the date of the SSA determination that the qualified beneficiary is no longer disabled or the end of the maximum coverage period that applies to the qualified beneficiary without regard to the disability extension.

*Second Qualifying Event*
An 18-month extension of coverage may be available to spouses and dependent children who maintain continuation coverage if a second qualifying event occurs within the first 18-months of continuation coverage. The maximum amount of continuation coverage available when a second qualifying event occurs is 36 months. Second qualifying events may include the death of a covered employee, divorce or separation from the covered employee, the covered employee's becoming entitled to Medicare benefits under Part A, Part B, or both, or a dependent child's ceasing to be eligible for coverage as a dependent under the Plan. These events *may* be second qualifying events *only* if they would have caused the qualified beneficiary to lose coverage under the Plan if the first qualifying event had not occurred. If you want to extend your continuation coverage you must notify Businessolver, Inc. at the address below of the event within 60 days starting from the latest of: (1) the date on which the qualifying event occurs; (2) the date on which the qualified beneficiary loses (or would lose) coverage under the Plan as a result of the second qualifying event; or (3) the date on which the qualified beneficiary is informed, through the furnishing of the SPD or the COBRA general notice, of the responsibility to notify the Plan of the second qualifying event and the procedures for doing so.

Second Qualifying Event documentation must be mailed to the Businessolver, Inc. at the address provided in this notice.

**HOW MUCH DOES COBRA CONTINUATION COVERAGE COST?**
**Please review the Election Form for details of COBRA continuation cost.**

Other coverage options may cost less. If you choose to elect continuation coverage, you don't have to send any payment with the Election Form. Additional information about payment will be provided to you after the Election Form is received by the Plan. Important information about paying your premium can be found in this notice. Please note, premiums are subject to change.

You may be able to get coverage through Medicaid or the Health Insurance Marketplace®. You can learn more about the Marketplace below.

**WHAT IS THE HEALTH INSURANCE MARKETPLACE?**
The Marketplace offers "one-stop shopping" to find and compare private individual health insurance options. In the Marketplace, you could be eligible for a subsidy that lowers your monthly premiums and for cost-sharing reductions (that lower your out-of-pocket costs for deductibles, coinsurance, and copayments) right away, and you can see what your subsidized premium, deductibles, and out-of-pocket costs will be before you make a decision to enroll. Through the Marketplace you'll also learn if you qualify for free or low-cost coverage from Medicaid or the Children's Health Insurance Program (CHIP). People in most states use HealthCare.gov to apply for and enroll in Marketplace coverage; if your state has its own Marketplace platform you can find contact information for your State Marketplace at the web address below.



| | |
|---|---|
| Health Insurance Marketplace: | **https://www.healthcare.gov** |
| State-based Marketplace: | **https://www.healthcare.gov/marketplace-in-your-state/** |
| Medicaid: | **https://www.healthcare.gov/do-i-qualify-for-medicaid** |
| Children's Health Insurance Program (CHIP): | **https://www.healthcare.gov/are-my-children-eligible-for-chip** |

Being offered COBRA continuation coverage won't limit your eligibility for Medicaid. It also won't limit your eligibility for Marketplace coverage or for a subsidy through the Marketplace, if you are a former employee of the employer offering the coverage. But you won't be eligible for a subsidy or a tax credit during any month that you're enrolled in COBRA continuation coverage. Therefore, if you want to use a special enrollment period to enroll in Marketplace coverage with a subsidy or a tax credit, you must end your COBRA continuation coverage before your Marketplace coverage starts. Coverage through the Health Insurance Marketplace may cost less than COBRA continuation coverage.

**APP 218**

If you are currently employed by the employer offering the COBRA continuation coverage with premium assistance, you may enroll in Marketplace coverage but you may be ineligible for a subsidy or a premium tax credit for the Marketplace coverage for the period you are offered the COBRA continuation coverage with premium assistance.

**WHEN CAN I ENROLL IN MARKETPLACE COVERAGE?**
Marketplace-eligible consumers can enroll in Marketplace coverage if they qualify for a special enrollment period. For example, Marketplace-eligible consumers always have 60 days from the time they lose your job-based coverage to enroll in the Marketplace, or they can apply up to 60 days beforehand if they know they'll lose coverage ahead of time. **After 60 days your special enrollment period will end and you may not be able to enroll unless you qualify for another special enrollment period, so you should take action right away if you want to enroll in Marketplace coverage.** In addition, during what is called an "open enrollment" period, Marketplace-eligible consumers can enroll from November 1 – December 15 in Marketplace coverage that starts on January 1. Finally, they may apply for and, if eligible, enroll in Medicaid coverage at any time.

To find out more about enrolling in the Marketplace, such as when the next open enrollment period will be and what you need to know about qualifying events and special enrollment periods, visit **www.HealthCare.gov/coverage-outside-open-enrollment/special-enrollment-period/.** If your state has its own Marketplace platform, you can find contact information for your State Marketplace here: **https://www.HealthCare.gov/marketplace-in-your-state/**. Note, you may apply for and, if eligible, enroll in Medicaid coverage at any time.

**IF I SIGN UP FOR COBRA CONTINUATION COVERAGE, CAN I SWITCH TO COVERAGE IN THE MARKETPLACE? WHAT ABOUT IF I CHOOSE MARKETPLACE COVERAGE AND WANT TO SWITCH BACK TO COBRA CONTINUATION COVERAGE?**
If you sign up for COBRA continuation coverage, you can switch to a Marketplace plan during the annual Marketplace open enrollment period. You can also choose to end your COBRA continuation coverage early and switch to a Marketplace plan if you have another qualifying event such as marriage or birth of a child through something called a "special enrollment period." But be careful though - if you terminate your COBRA continuation coverage early without another event that qualifies you for special enrollment, you may have to wait to enroll in Marketplace coverage until the next available open enrollment period, and could end up without any health coverage in the interim.

Alternatively, once you've exhausted your COBRA continuation coverage and the coverage expires, you may be eligible for a special enrollment period to enroll in Marketplace coverage, even if Marketplace open enrollment has endedand no other qualifying events apply. For more information on COBRA continuation coverage and the Marketplace, see **www.HealthCare.gov/unemployed/cobra-coverage/**.

If you sign up for Marketplace coverage instead of COBRA continuation coverage, you cannot switch to COBRA continuation coverage under any circumstances once your COBRA election period ends.

**CAN I ENROLL IN ANOTHER GROUP HEALTH PLAN?**
You may be eligible to enroll in coverage under another group health plan (like a spouse's plan), if you request enrollment within 30 days of the loss of coverage.

If you or your dependent chooses to elect COBRA continuation coverage instead of enrolling in another group health plan for which you're eligible, you'll have another opportunity to enroll in the other group health plan within 30 days of losing your COBRA continuation coverage.

**CAN I ENROLL IN MEDICARE INSTEAD OF COBRA CONTINUATION COVERAGE AFTER MY GROUP HEALTH PLAN COVERAGE ENDS?**
In general, if you don't enroll in Medicare Part A or B when you are first eligible because you are still employed, after the Medicare initial enrollment period, you have an 8-month special enrollment period to sign up for Medicare Part A or B, beginning on the earlier of:

1. The month after your employment ends; or
2. The month after group health plan coverage based on current employment ends.



These rules are different for people with End Stage Renal Disease (ESRD). See **https://www.medicare.gov/sign-up-change-plans/how-do-i-get-parts-a-b/part-a-part-b-sign-up-periods** for more information.

If you don't enroll in Medicare Part B and elect COBRA continuation coverage instead, you may have to pay a Part B lifetime late enrollment penalty and you may have a gap in coverage if you decide you want Part B later. If you elect COBRA continuation coverage and later enroll in Medicare Part A or B before the COBRA continuation coverage ends, the Plan may terminate your continuation coverage. However, if Medicare Part A or B is effective on or before the date of the COBRA election, COBRA coverage may not be discontinued on account of Medicare entitlement, even if you enroll in the other part of Medicare after the date of the election of COBRA coverage.

You must notify Businessolver, Inc. in writing within 30 days if, after electing COBRA, a qualified beneficiary becomes entitled to Medicare (Part A, Part B, or both) or becomes covered under other group health plan coverage. Correspondence can be mailed to your COBRA Administrator at the address noted in this notice.

COBRA coverage is subject to termination retroactive to the date (after your COBRA election date) when the qualified beneficiary becomes entitled to Medicare or becomes covered under other group health coverage, regardless of when notice of other coverage is provided.

221338116

**APP 219**

If you are enrolled in both COBRA continuation coverage and Medicare, Medicare will generally pay first (primary payer) and COBRA continuation coverage will pay second. Certain plans may pay as if secondary to Medicare, even if you are not enrolled in Medicare. For more information visit **https://www.medicare.gov/medicare-and-you**, or, for more specific information regarding the Plan, contact your Plan Administrator.

**WHAT FACTORS SHOULD I CONSIDER WHEN CHOOSING COVERAGE OPTIONS?**
When considering your options for health coverage, you may want to think about:

- Premiums: Your previous plan can charge up to 102% of total plan premiums for COBRA coverage (or up to 150% of total plan premiums after 18 months if you choose to extend the COBRA continuation coverage period beyond 18 months due to the disability of a qualified beneficiary) Other options, like coverage on a spouse's plan, Medicaid, or through the Marketplace, may be less expensive at that point.
- Provider Networks: If you're currently getting care or treatment for a condition, a change in your health coverage may affect your access to a particular health care provider. You may want to check to see if your current health care providers participate in a network and whether you will have access to that network through any other option as you consider options for health coverage.
- Drug Formularies: If you're currently taking medication, a change in your health coverage may affect your costs for medication – and in some cases, your medication may not be covered by another plan. You may want to check to see if your current medications are listed in drug formularies for other health coverage.
- Severance payments: If you lost your job and got a severance package from your former employer, your former employer may have offered to pay some or all of your COBRA payments for a period of time. In this scenario, you may want to contact the Department of Labor at 1-866-444-3272 to discuss your options.
- Service Areas: Some plans limit their benefits to specific service or coverage areas – so if you move to another area of the country, you may not be able to use your benefits. You may want to see if your plan has a service or coverage area, or other similar limitations.
- Other Cost-Sharing: In addition to premiums or contributions for health coverage, you probably pay copayments, deductibles, coinsurance, or other amounts as you use your benefits. You may want to check to see what the cost-sharing requirements are for other health coverage options. For example, one option may have much lower monthly premiums, but a much higher deductible and higher copayments. You may also want to consider whether you have met your deductible or maximum out-of-pocket limit under your COBRA continuation coverage.

**FOR MORE INFORMATION**
This notice does not fully describe continuation coverage or other rights under the Plan. More information about continuation coverage and your rights under the Plan is available in the summary plan description or from Benefits Committee c/o DHL Supply Chain (the "Plan Administrator").

If you have any questions about the information in this notice or your rights to COBRA continuation coverage, you should contact the COBRA Administrator:

Be Secure (c/o Businessolver, Inc.)
PO BOX 850512
MINNEAPOLIS, MN 55485-0512
877-411-4455

If you have questions about the Plan or would like to request a copy of the Plan's summary plan description, you should contact your Plan Administrator:

Benefits Committee c/o DHL Supply Chain
360 Westar Blvd
Westerville, Ohio 43082
614-865-8500

For more information about your rights under the Employee Retirement Income Security Act (ERISA), including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), the Patient Protection and Affordable Care Act, and other laws affecting group health plans, visit the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) website at **https://www.dol.gov/agencies/ebsa**, contact them electronically at **askebsa.dol.gov**, or call their toll-free number at 1-866-444-3272 For more information about health insurance options available through the Health Insurance Marketplace, and to locate an assistor in your area who you can talk to about the different options, visit **www.healthcare.gov**.

**KEEP YOUR PLAN INFORMED OF ADDRESS CHANGES**
In order to protect you and your family's rights, you should keep the COBRA Administrator informed of any changes in your address and the addresses of family members. You should also keep a copy, for your records, of any notices you send to the COBRA Administrator or Plan Administrator.

**IMPORTANT INFORMATION ABOUT PAYMENT**

***First Payment for Continuation Coverage***
If you elect COBRA you should pay the total premium due at the time you send in the Election Form in order to complete your enrollment and continue your coverage. Although you are not required to send any payment with the Election Form, you must make your first payment for continuation coverage no later than 45 days after the date of your election (this is the date the Election Notice is postmarked if sent by mail or the date you complete your online enrollment). **If you do not make your first payment in full within 45**

days after the date of your election, **you will lose all continuation coverage rights under the Plan.** You're responsible for making sure that the amount of your first payment is correct. You may contact the COBRA Administrator to confirm the correct amount of your first payment using the contact information provided within this notice.

**IMPORTANT: Your first payment must cover the cost of COBRA coverage from the time your coverage under the Plan would have otherwise terminated up through the end of the month before the month in which you make your first payment.**

*For example, Employee A's employment terminates on September 30th, and they lose coverage on September 30th. Employee A then elects COBRA coverage on November 15th. The initial premium payment Employee A sends in must include the premium amount for October and November and is due on or before December 30th, (the 45th day after the postmarked date on the COBRA Election Form.) Also, please note that Employee A's December premium is due December 1st and that premium must be postmarked by December 31st for it to be considered timely.*

Due to the COVID-19 National Emergency, the Department of Labor, the Department of the Treasury, and the Internal Revenue Service issued guidance extending timeframes for certain actions related to health coverage under group health plans sponsored by private employers. This guidance may give you more time to make COBRA premium payments.  For additional information about this guidance visit: **https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/disaster-relief**.

*Periodic Payments for Continuation Coverage*
After your first payment for COBRA continuation coverage, subsequent payments for continuation coverage are due on the first day of each month of coverage. The date your payment is made is determined by the postmark on the envelope (e.g. May premiums must be postmarked on or before May 31, *see grace period described below*). The amount due is listed on the enclosed Election Form. Please make a copy of this for your records. The COBRA administrator provides billing periodic notices of payments due, but, **as a COBRA participant, it is your responsibility to remit payments on a timely basis.** If you make a periodic payment on or before the first day of the coverage period to which it applies, your coverage under the Plan will continue for that coverage period without any break.

**Checks returned for insufficient funds or checks that otherwise cannot be cashed are considered non-payment of premium and a replacement premium payment must be received by the end of the 30-day grace period (see the next paragraph) or coverage will terminate back to the end of the last fully paid period** and you will lose all rights to COBRA coverage under the Plan. You may not be notified that a payment was returned due to insufficient funds until after the end of your grace period and after your COBRA coverage terminates. Once your COBRA coverage terminates, it will not be reinstated. Therefore, it is your responsibility to ensure funds are available to cover the required premium and, if a check is returned by the bank, to ensure a replacement check is submitted within the appropriate timeframe.

*Grace Periods for Periodic Payments*
Although periodic payments are due on the first of the month, you will be given a grace period of 30 days from the payment due date, except as previously described regarding your initial payment. You'll get continuation coverage for each coverage period as long as payment for that coverage period is made before the end of the grace period. **If you pay a period payment later than the first day of the coverage period to which it applies, but before the end of the grace period for the coverage period, your coverage will be suspended as of the first day of the coverage period and then retroactively reinstated (going back to the first day of the coverage period) when the periodic payment is received. This means that any claim that you submit for benefits while your coverage is suspended may be denied and may have to be resubmitted once your coverage is reinstated.**

If you fail to make a periodic payment before the end of the grace period for the coverage period, you will lose all rights to continuation coverage under the Plan.

Your first payment and all periodic payments for continuation coverage should be made payable to **Be Secure.**

Please mail payments to:

Be Secure (c/o Businessolver, Inc.)
ATTN: COBRA Administration
PO BOX 850512
MINNEAPOLIS, MN 55485-0512

**TO CHECK ON PAYMENT AND ACCOUNT STATUS**
Go to **www.YourBenefitLink.com** using your previous log in information. If you previously used a company intranet to log in; please register using the company key of: besecure. If you have questions, please contact your COBRA Administrator at 877-411-4455.

## COBRA CONTINUATION COVERAGE ELECTION INSTRUCTIONS

Under federal law, you have 60 days from the date of original notice or the coverage termination date, whichever is later, to elect COBRA continuation coverage under the Plan, unless you are entitled to additional time under a federal policy or program. For example, you may be entitled to more time because of a national emergency.

---

**IT TAKES JUST THREE EASY STEPS TO REVIEW AND ENROLL IN YOUR COBRA COVERAGE OPTIONS ONLINE:**

1. **Go to www.YourBenefitLink.com** and log in with your username and password. If you don't know them, select **Register** then provide your company key (**besecure**), your Social Security Number and your Date of Birth.

2. **Review and make your COBRA elections.** The online enrollment process makes it easy to select the coverage you're eligible for.

3. **Choose the payment method you want.**
   a. **Pay Online** – Provide your preferred payment method and account information. You can set up automatic monthly payments and avoid the usual $2.00 monthly convenience fee.
   b. **Pay by Check** – Make your check payable to **Be Secure**.

*Please note, if you are electing COBRA as a dependent of a former employee who is not also electing COBRA or due to dependent qualifying event (such as a divorce or child reaching maximum age), you cannot enroll online. You will need to return the paper election form found in this package. Once enrolled, you will be able to login to **www.YourBenefitLink.com** and create your online account.*

---

If you choose to submit your completed Election Form by mail, it must be postmarked no later than **05/22/2022**.

Completing your enrollment online at **www.YourBenefitLink.com** is the fastest and most secure way to ensure continuation coverage for you and your family. **Requests received by mail can take up to 7-10 days from receipt to complete processing.** For elections submitted by mail, send the completed form to:

Be Secure (c/o Businessolver, Inc.)
ATTN: COBRA Administration
PO BOX 850512
MINNEAPOLIS, MN 55485-0512

If you do not submit a completed Election Form or complete **your online enrollment** by the due date shown above, you will lose your right to elect COBRA continuation coverage. If you reject/waive COBRA continuation coverage before the due date, you may change your mind and revoke your rejection/waiver as long as you complete your enrollment online at **www.YourBenefitLink.com** or submit a completed Election Form before the due date. However, if you change your mind after first rejecting COBRA continuation coverage, your COBRA continuation coverage will begin on the date you submit the completed Election Form.

Your decision whether to elect COBRA continuation coverage will affect your future right to portability of group health coverage, guaranteed access to individual health coverage and special enrollment. Additional information about such rights is included in your Plan's summary plan description.

If you elect to continue coverage, and if you meet all other requirements explained on the enclosed document, your COBRA continuation coverage will begin on **03/17/2022.**

You must make your first payment for COBRA coverage no later than 45 days after the postmark date of your election (this is the date your Election Form is mailed) or completion of **your online enrollment**. If you do not make your first payment for COBRA coverage in full within 45 days after the date of your election, you will lose all COBRA rights under the Plan.



**IMPORTANT: Your first payment must cover the cost of COBRA coverage from the time your coverage under the Plan would have otherwise terminated up through the end of the month before the month in which you make your first payment.**

Subsequent payments are due on the 1st of the month. If you do not remit the full premium on a timely basis, your coverage may be terminated. Refer to the PREMIUM PAYMENT INFORMATION section for more information.

221338116

**APP 222**

## COBRA CONTINUATION COVERAGE ELECTION FORM
*(FOR BSC USE ONLY: Be Secure – mm_num:27031376)*

Read the important information about your rights included in this packet before completing your Election Form below.

**Your COBRA Continuation elections must be completed and/or postmarked no later than 05/22/2022.**

Completing your enrollment online at **www.YourBenefitLink.com** is the fastest and most secure way to ensure continuation coverage for you and your family. **Elections received by mail can take up to 7-10 days from receipt to complete processing.** To enroll by mail, complete this form and return to the COBRA Administrator at the address provided in the COBRA Continuation Coverage Election Instructions.

Please note, if you are electing COBRA as a dependent of a former employee who is not also electing COBRA or due to dependent qualifying event (such as a divorce or child reaching maximum age), you cannot enroll online. You will need to return the paper election form found in this package. Once enrolled, you will be able to login to **www.YourBenefitLink.com** and create your online account.

Only members covered at the time of Qualifying Event are eligible for continuation. The following Qualified Beneficiaries are eligible to continue coverage under COBRA:

| PLACE AN "X" BY QUALIFIED BENEFICIARY TO BE COVERED: | QUALIFIED BENEFICIARY | SOCIAL SECURITY NUMBER |
|---|---|---|
| [ ] | JASON WALTERS | XXX-XX |
| [ ] | WALTERS | XXX-XX |
| [ ] | WALTERS | XXX-XX |
| [ ] | WALTERS | XXX-XX |

I/We elect COBRA continuation coverage as indicated below:

| PLACE AN "X" BY COVERAGE SELECTION: | MONTHLY COST |
|---|---|
| **Anthem Basic** | |
| [ ] Employee Only | $ 544.40 /Monthly |
| [ ] Employee and One Child plus Spouse | $ 1,677.78 /Monthly |
| [ ] Employee and Two Children plus Spouse | $ 1,677.78 /Monthly |
| [ ] Employee and Three Children plus Spouse | $ 1,677.78 /Monthly |
| [ ] Employee and Four Children plus Spouse | $ 1,677.78 /Monthly |
| [ ] Employee and Spouse | $ 1,224.89 /Monthly |
| [ ] Employee and Children | $ 1,007.14 /Monthly |
| [ ] Family | $ 2,014.28 /Monthly |
| **Standard Dental** | |
| [ ] Employee Only | $ 27.45 /Monthly |
| [ ] Employee and One Child plus Spouse | $ 96.09 /Monthly |
| [ ] Employee and Two Children plus Spouse | $ 96.09 /Monthly |
| [ ] Employee and Three Children plus Spouse | $ 96.09 /Monthly |
| [ ] Employee and Four Children plus Spouse | $ 96.09 /Monthly |
| [ ] Employee and Spouse | $ 57.65 /Monthly |
| [ ] Employee and Children | $ 68.62 /Monthly |
| [ ] Family | $ 96.09 /Monthly |
| **VSP-Vision** | |
| [ ] Employee Only | $ 11.42 /Monthly |
| [ ] Employee and One Child plus Spouse | $ 39.07 /Monthly |
| [ ] Employee and Two Children plus Spouse | $ 39.07 /Monthly |
| [ ] Employee and Three Children plus Spouse | $ 39.07 /Monthly |
| [ ] Employee and Four Children plus Spouse | $ 39.07 /Monthly |
| [ ] Employee and Spouse | $ 22.85 /Monthly |
| [ ] Employee and Children | $ 24.46 /Monthly |
| [ ] Family | $ 39.07 /Monthly |



NOTE:  If you were enrolled in a Health Care Flexible Spending Account benefit on the day prior to your COBRA Qualifying Event and you do not see the FSA plan election option above, you may still be eligible to continue your Health Care Flexible Spending Account through COBRA.  This continuation will last through the end of the plan year in which your COBRA Qualifying Event occurred, and your monthly premium for Health Care FSA continuation will be equal to your annual election minus your year-to-date contributions, divided over the remaining months of the plan year.

To enroll in Health Care FSA, please contact your COBRA Administrator at 877-411-4455 .



**APP 223**

As a COBRA Qualified Beneficiary you are being given the opportunity to continue the EAP program through COBRA. If you elect to take this coverage, your coverage will extend to your COBRA end date or until you explicitly terminate the coverage, whichever is earlier. The cost for this coverage will be the employer contribution, plus the employee contribution amount of the benefit, multiplied by 102%

[ ] Yes, I wish to elect the EAP program.

[ ] No, I do not wish to elect this plan.

**COBRA PREMIUMS ARE SUBJECT TO CHANGE.**

**Signature**

**Date**

**Print Name**

**Email Address**
*(Recommended to receive future reminders and notifications regarding your account and payments due)*

**Telephone Number**

**Mailing Address**

**Questions?** For faster service, we recommend first reviewing the information provided within your account via **www.YourBenefitLink.com**. This information is available at your convenience, with no wait times.



221338116

**APP 224**

**EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JASON WALTERS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:22-cv-01840-K** |
| | § | |
| **EXEL, INC. D/B/A DHL SUPPLY CHAIN,** | § | |
| | § | |
| *Defendant*. | § | |

## <u>DECLARATION OF ANDREW ETTER</u>

| | |
|---|---|
| STATE OF OHIO | § |
| | § |
| COUNTY OF FRANKLIN | § |

I, Andrew Etter, declare under the penalty of perjury the following:

1.      My name is Andrew Etter. I am over the age of eighteen years, of sound mind, and am capable of making this declaration. I have personal knowledge of the facts stated herein and know them to be true and correct.

2.      My current position is Associate General Counsel with Defendant Exel, Inc. d/b/a DHL Supply Chain.

3.      On August 26, 2022, I sent Plaintiff Jason Walters'("Plaintiff") counsel, Bob Whitehurst, an email with a copy of the COBRA Qualifying Event Notice dated March 22, 2022, that was sent to Plaintiff. Attached as Exhibit A is a true and correct copy of the email and attachments I sent to Bob Whitehurst on August 26, 2022.

4.      On August 30, 2022, despite receiving a copy of the COBRA Qualifying Event Notice, Mr. Whitehurst emailed me and informed me that Plaintiff still intended to pursue his

claim. Attached as Exhibit B is a true and correct copy of the email I received from Bob Whitehurst on August 30, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on February 16, 2024.

Andrew Etter (Feb 16, 2024 16:31 EST)

ANDREW ETTER

# Walters - Etter Decl ISO MSJ

**Final Audit Report**          2024-02-16

| | |
|---|---|
| Created: | 2024-02-16 |
| By: | Yorleny Hernandez (yhernandez@fisherphillips.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA3j4vg_dcyttAFXLpCwFTfa5O-tkzSYS7 |

## "Walters - Etter Decl ISO MSJ" History

📄 Document created by Yorleny Hernandez (yhernandez@fisherphillips.com)
2024-02-16 - 9:29:43 PM GMT

✉️ Document emailed to Andrew Etter (andrew.etter@dhl.com) for signature
2024-02-16 - 9:30:06 PM GMT

📄 Email viewed by Andrew Etter (andrew.etter@dhl.com)
2024-02-16 - 9:30:40 PM GMT

✒️ Document e-signed by Andrew Etter (andrew.etter@dhl.com)
Signature Date: 2024-02-16 - 9:31:41 PM GMT - Time Source: server

✅ Agreement completed.
2024-02-16 - 9:31:41 PM GMT


**Adobe Acrobat Sign**

**From:**        Andrew Etter (DHL Group, Legal) <andrew.etter@dhl.com>
**Sent:**        Friday, August 26, 2022 7:23 AM
**To:**          'whitehurstlawfirm@yahoo.com'
**Subject:**     Walters. v. DHL, 3:22-cv-01840-C (N.D. Tx)
**Attachments:** 123021_Walters, Jason.pdf; Jason Walters - COBRA Qualifying Event Notice.pdf

Mr. Whitehurst—

Thank you for your time this morning. Per our discussion, please see the attached evidencing Mr. Walters' status as an exempt, salaried employee making $55K+ per year as well as the COBRA notice he received subsequent to his employment. If any questions, please let me know.

In light of this information, please let me know if Mr. Walters intends to further pursue the above-referenced litigation when you get a chance.

Best regards,
-Andrew


**Andrew Etter**
Associate General Counsel
Global Business Services

**DHL Supply Chain**
360 Westar Blvd.
Westerville, Ohio 43082 USA

Office: 614.865.5978
Fax: 614.865.8879
Mobile: 740.953.9270

andrew.etter@dhl.com

www.dhl-usa.com/supplychain

DHL Supply Chain – Excellence. Simply delivered.

1


**EXHIBIT A**
**APP 229**

| CO. | FILE | DIV | DEPT. | VCHR NO | |
|---|---|---|---|---|---|
| 7LU | 109314 | 3517 | 003060 | 0000522981 | 1 |
| | | | HRID | 015448 | |

# Earnings Statement

**ADP®**

*EXEL, INC.*
*DBA DHL SUPPLY CHAIN*
*360 WESTAR BVLD.*
*WESTERVILLE, OH 43082*

Period Beginning:     12/20/2021
Period Ending:        01/02/2022
Pay Date:             12/30/2021

Taxable Marital Status:   Married
Exemptions/Allowances:
Federal:          0,$25 Additional Tax
TX:               No State Income Tax

**JASON R WALTERS**
**142 COUNTY ROAD 2437**
**MINEOLA TX 75773**

| Earnings | rate | units | this period | year to date |
|---|---|---|---|---|
| Regular | 26.44 | 80.00 | 2,115.38 | 54,618.45 |
| Refer Bonus | | | | 600.00 |
| **Gross Pay** | | | **$2,115.38** | 55,559.12 |

| Deductions | Statutory | this period | year to date |
|---|---|---|---|
| | Federal Income Tax | -172.94 | 4,651.57 |
| | Social Security Tax | -122.63 | 3,223.14 |
| | Medicare Tax | -28.68 | 753.80 |
| | **Other** | | |
| | Dependent Life | -1.89 | 49.14 |
| | Pretax Dental | -17.10* | 444.60 |
| | Pretax Medical | -102.92* | 2,675.92 |
| | Pretax Vision | -17.68* | 459.68 |
| | 401K Sav Pretax | -148.08* | 3,865.35 |
| | **Net Pay** | **$1,503.46** | |
| | Checking | -1,503.46 | |
| | **Net Check** | **$0.00** | |

**\* Excluded from federal taxable wages**

Your federal taxable wages this period are
$1,829.60

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Group Term Life | 0.28 | 7.28 |
| Totl Hrs Worked | 80.00 | |

**Important Notes**
YOUR COMPANY PHONE NUMBER IS 866-504-6943

VERIFY YOUR ADDRESS ON YOUR EARNINGS STATEMENT
CONTACT YOUR HR MANAGER ASAP IF A CHANGE IS
NEEDED

For customer service assistance, contact askPAYROLL via
Email at askPAYROLL@dhl.com   or telephone  1-866-504-6943

For easy access to your pay information, logon to MyADP at
**https://My.ADP.com**

| Kronos PTO | YTD Taken | Balance |
|---|---|---|
| General Purpose | 0.00 | 0.00 |
| Personal | 0.00 | 0.00 |
| Sick | 0.00 | 0.00 |
| Vacation | 0.00 | 0.00 |

**Employee Info**

| Vantage ID | 18026700 |
|---|---|

© 2000 ADP, LLC

DHL SUPPLY CHAIN
360 WESTAR BLVD.
WESTERVILLE, OH 43082

Advice number:     **00000522981**
Pay date:          12/30/2021

| Deposited to the account of | account number | transit ABA | amount |
|---|---|---|---|
| **JASON R WALTERS** | xxx | xxxx xxxx | $1,503.46 |

THIS IS NOT A CHECK

**NON-NEGOTIABLE**

**APP 230**

**Be Secure (c/o Businessolver, Inc.)**
1025 Ashworth Road
West Des Moines, IA 50265



Jason Walters and Family                                   **Notice Date: March 22, 2022**
142 COUNTY ROAD 2437
MINEOLA, TX 75773

---

**IMPORTANT – COBRA CONTINUATION COVERAGE & OTHER HEALTH COVERAGE ALTERNATIVES**
You're getting this notice because you recently lost coverage under Be Secure group health plan ("the Plan"). This notice has important information about your right to COBRA continuation coverage, which is a temporary extension of coverage under the Plan. Please read the information in this notice very carefully before you make your decision.

---

This notice has important information about your right to continue your health care coverage under the Plan, as well as other health coverage options that may be available to you, including coverage through Medicaid or the Health Insurance Marketplace. To sign up for Marketplace coverage, visit **www.HealthCare.gov** or call 1-800-318-2596 (TTY: 1-855-889-4325). People in most states use **www.HealthCare.gov** to apply for and enroll in health coverage; if your state has its own Marketplace platform, you can find contact information here: **www.HealthCare.gov/marketplace-in-your-state/**.

Please read the information in this notice very carefully before you make your decision. If you choose to elect COBRA continuation coverage, you should enroll online at **www.YourBenefitLink.com** or use the Election Form provided later in this notice.

---

**IT TAKES JUST THREE EASY STEPS TO REVIEW AND ENROLL IN YOUR COBRA COVERAGE OPTIONS ONLINE:**

1. **Go to www.YourBenefitLink.com** and log in with your username and password. If you don't know them, select **Register** then provide your company key (**besecure**), your Social Security Number and your Date of Birth.

2. **Review and make your COBRA elections**. The online enrollment process makes it easy to select the coverage you're eligible for.

3. **Choose the payment method you want.**
   a. **Pay Online** – Provide your preferred payment method and account information. You can set up automatic monthly payments and avoid the usual $2.00 monthly convenience fee.
   b. **Pay by Check** – Make your check payable to **Be Secure**.

*Please note, if you are electing COBRA as a dependent of a former employee who is not also electing COBRA or due to dependent qualifying event (such as a divorce or child reaching maximum age), you cannot enroll online. You will need to return the paper election form found in this package. Once enrolled, you will be able to login to www.YourBenefitLink.com and create your online account.*

---

Coverage provided by Be Secure to you and/or your covered dependent(s) ends on 03/16/2022 due to the qualifying event marked below:

| QUALIFYING EVENT | COBRA EFFECTIVE DATE | DURATION OF COVERAGE |
|---|---|---|
| Employment Termination | 03/17/2022 | 18 months |

Only members covered at the time of Qualifying Event are eligible for continuation. The following Qualified Beneficiaries are eligible to continue coverage under COBRA:



JASON WALTERS
       WALTERS
       WALTERS
       WALTERS

**Para ver el texto de este aviso en español, visite:**
**https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/cobra/model-election-notice-spanish.docx**.
Si tiene preguntas sobre esta información por favor contacte Businessolver, Inc. at 877-411-4455. Los representantes están disponibles de lunes a viernes durante el horario comercial normal.

**GENERAL COBRA INFORMATION**
Federal Law requires that most group health plans (including this Plan) give employees and their families the opportunity to continue

221338116

**APP 231**

their health care coverage through COBRA continuation coverage when there is a "qualifying event" that would result in a loss of coverage under the Plan. Depending on the type of qualifying event, "qualified beneficiaries" can include the employee covered under the group health plan, the covered employee's spouse, and/or dependent children of the covered employee. COBRA continuation coverage is the same coverage the Plan gives to active employees. Each qualified beneficiary who elects continuation coverage will have the same rights under the Plan as other participants or beneficiaries covered under the Plan.

**WHAT'S COBRA CONTINUATION COVERAGE?**
COBRA continuation coverage is the same coverage that the Plan gives to other participants or beneficiaries who aren't getting continuation coverage. Each "qualified beneficiary" (described below) who elects COBRA continuation coverage will have the same rights under the Plan as other participants or beneficiaries covered under the Plan.

**WHO ARE THE QUALIFIED BENEFICIARIES?**
Each person ("qualified beneficiary") listed on the Election Form below can independently elect COBRA continuation coverage. COBRA continuation coverage is available to all qualified beneficiaries from 03/17/2022 to 09/16/2023 (the end of the maximum period). Dependents not covered at the time of the qualifying event may be added only during Open Enrollment, if HIPAA special enrollment applies, or a status change event occurs to establish a right to enroll.

Only one of you needs to elect COBRA continuation coverage for your spouse and dependent child(ren), if any, who wish to continue coverage. (Please note, a parent or legal guardian (regardless of whether they are a qualified beneficiary) may elect COBRA continuation coverage on behalf of a minor child, as applicable.) Furthermore, because COBRA gives you the right to elect coverage independently, you, your spouse or dependent child(ren), if any, may elect single coverage and not include those individuals who do not wish to continue coverage. However, you may not decline coverage on behalf of your spouse or non-minor child.

Continuation coverage for a qualified beneficiary will be terminated before the end of the maximum period, if:

1. the required premium is not paid in full, on time;
2. after electing continuation coverage, the qualifying beneficiary becomes covered under another group health plan;
3. after electing continuation coverage, the qualified beneficiary becomes entitled to Medicare (under Plan A, Plan B, or both); or
4. the employer ceases to provide any group health plan for its employees.

Continuation coverage may also be terminated for any reason the Plan would terminate coverage of a participant or beneficiary not receiving continuation coverage (such as fraud).

**ARE THERE OTHER COVERAGE OPTIONS BESIDES COBRA CONTINUATION COVERAGE?**
Yes. Instead of enrolling in COBRA continuation coverage, there may be other coverage options for you and your family through the Health Insurance Marketplace, Medicare, or other group health plan coverage options (such as a spouse's plan) through what is called a "special enrollment period." Additionally, you may apply for and, if eligible, enroll in Medicaid at any time. Some of these options may cost less than COBRA continuation coverage.

You should compare your other coverage options with COBRA continuation coverage and choose the coverage that is best for you. For example, if you move to other coverage you may pay more out of pocket than you would under COBRA because the new coverage may impose a new deductible.

When you lose job-based health coverage, it's important that you choose carefully between COBRA continuation coverage and other coverage options, because once you've made your choice, it can be difficult or impossible to switch to another coverage option until the next available open enrollment period.

**IF I ELECT COBRA CONTINUATION COVERAGE, WHEN WILL MY COVERAGE BEGIN AND HOW LONG WILL COVERAGE LAST?**
If elected, COBRA continuation coverage will begin on 03/17/2022 and can last until 09/16/2023. You may elect any of the options for COBRA continuation coverage listed within the Election Form below.

Continuation coverage may end before the date noted above in certain circumstances, like failure to pay premiums, fraud, or if you become covered under another group health plan or entitled to Medicare.



Note, due to the COVID-19 National Emergency, the Department of Labor, the Department of the Treasury, and the Internal Revenue Service issued a Notice of Extension of Certain Timeframes for Employee Benefit Plans, Participants, and Beneficiaries Affected by the COVID–19 Outbreak ("Joint Notice"). This notice provided relief for certain actions related to employee benefit plans required or permitted under Title I of ERISA and the Code, including the 60-day initial election period for COBRA continuation coverage. The Department of Labor's Employee Benefits Security Administration (EBSA) provided further guidance on this relief in EBSA Disaster Relief Notice 2021-01.

**CAN I EXTEND THE LENGTH OF COBRA CONTINUATION COVERAGE?**
If you elect continuation coverage, you may be able to extend the length of continuation coverage if a qualified beneficiary is disabled, or if a second qualifying event occurs. You must notify Businessolver, Inc. of a disability or a second qualifying event within a certain time period to extend the period of continuation coverage. If you don't provide notice of a disability or second qualifying event within the required time period, you will lose your right to extend the period of continuation coverage.

For more information about extending the length of COBRA Continuation coverage visit
**https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/an-employees-guide-to-**

221338116

**APP 232**

**health-benefits-under-cobra.pdf**.

*Disability*
An 11-month extension of coverage may be available if any of the qualifying beneficiaries are determined by the Social Security Administration (SSA) to be disabled. The disability has to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of continuation coverage.

This notice must be mailed to the COBRA Administrator at the address provided in this notice. The notice must be received within 60 days after the latest of:

1. the date of the SSA disability determination;
2. the date on which the qualifying event occurred;
3. the date on which the qualified beneficiary loses (or would lose) coverage under the terms of the Plan as a result of the covered employee's termination or reduction of work hours; or
4. the date on which the qualified beneficiary is informed of the obligation to provide the disability notice.

Regardless of the 60-day deadline described above, your notice must be provided no later than 18 months after your COBRA coverage began or you will not be eligible for a disability extension.

Each qualified beneficiary who has elected continuation coverage will be entitled to the 11-month disability extension. If the qualified beneficiary is determined by SSA to no longer be disabled, you must notify Businessolver, Inc. of that fact at the address below within 30 days after SSA's determination. COBRA coverage will terminate (retroactively, if applicable) on the first day of the first month that begins at least 30 days after the date of the SSA determination that the qualified beneficiary is no longer disabled or the end of the maximum coverage period that applies to the qualified beneficiary without regard to the disability extension.

*Second Qualifying Event*
An 18-month extension of coverage may be available to spouses and dependent children who maintain continuation coverage if a second qualifying event occurs within the first 18-months of continuation coverage. The maximum amount of continuation coverage available when a second qualifying event occurs is 36 months. Second qualifying events may include the death of a covered employee, divorce or separation from the covered employee, the covered employee's becoming entitled to Medicare benefits under Part A, Part B, or both, or a dependent child's ceasing to be eligible for coverage as a dependent under the Plan. These events *may* be second qualifying events *only* if they would have caused the qualified beneficiary to lose coverage under the Plan if the first qualifying event had not occurred. If you want to extend your continuation coverage you must notify Businessolver, Inc. at the address below of the event within 60 days starting from the latest of: (1) the date on which the qualifying event occurs; (2) the date on which the qualified beneficiary loses (or would lose) coverage under the Plan as a result of the second qualifying event; or (3) the date on which the qualified beneficiary is informed, through the furnishing of the SPD or the COBRA general notice, of the responsibility to notify the Plan of the second qualifying event and the procedures for doing so.

Second Qualifying Event documentation must be mailed to the Businessolver, Inc. at the address provided in this notice.

**HOW MUCH DOES COBRA CONTINUATION COVERAGE COST?**
**Please review the Election Form for details of COBRA continuation cost.**

Other coverage options may cost less. If you choose to elect continuation coverage, you don't have to send any payment with the Election Form. Additional information about payment will be provided to you after the Election Form is received by the Plan. Important information about paying your premium can be found in this notice. Please note, premiums are subject to change.

You may be able to get coverage through Medicaid or the Health Insurance Marketplace®. You can learn more about the Marketplace below.

**WHAT IS THE HEALTH INSURANCE MARKETPLACE?**
The Marketplace offers "one-stop shopping" to find and compare private individual health insurance options. In the Marketplace, you could be eligible for a subsidy that lowers your monthly premiums and for cost-sharing reductions (that lower your out-of-pocket costs for deductibles, coinsurance, and copayments) right away, and you can see what your subsidized premium, deductibles, and out-of-pocket costs will be before you make a decision to enroll. Through the Marketplace you'll also learn if you qualify for free or low-cost coverage from Medicaid or the Children's Health Insurance Program (CHIP). People in most states use HealthCare.gov to apply for and enroll in Marketplace coverage; if your state has its own Marketplace platform you can find contact information for your State Marketplace at the web address below.



|  |  |
|---|---|
| Health Insurance Marketplace: | **https://www.healthcare.gov** |
| State-based Marketplace: | **https://www.healthcare.gov/marketplace-in-your-state/** |
| Medicaid: | **https://www.healthcare.gov/do-i-qualify-for-medicaid** |
| Children's Health Insurance Program (CHIP): | **https://www.healthcare.gov/are-my-children-eligible-for-chip** |

Being offered COBRA continuation coverage won't limit your eligibility for Medicaid. It also won't limit your eligibility for Marketplace coverage or for a subsidy through the Marketplace, if you are a former employee of the employer offering the coverage. But you won't be eligible for a subsidy or a tax credit during any month that you're enrolled in COBRA continuation coverage. Therefore, if you want to use a special enrollment period to enroll in Marketplace coverage with a subsidy or a tax credit, you must end your COBRA continuation coverage before your Marketplace coverage starts. Coverage through the Health Insurance Marketplace may cost less than COBRA continuation coverage.

**APP 233**

If you are currently employed by the employer offering the COBRA continuation coverage with premium assistance, you may enroll in Marketplace coverage but you may be ineligible for a subsidy or a premium tax credit for the Marketplace coverage for the period you are offered the COBRA continuation coverage with premium assistance.

**WHEN CAN I ENROLL IN MARKETPLACE COVERAGE?**
Marketplace-eligible consumers can enroll in Marketplace coverage if they qualify for a special enrollment period. For example, Marketplace-eligible consumers always have 60 days from the time they lose your job-based coverage to enroll in the Marketplace, or they can apply up to 60 days beforehand if they know they'll lose coverage ahead of time. **After 60 days your special enrollment period will end and you may not be able to enroll unless you qualify for another special enrollment period, so you should take action right away if you want to enroll in Marketplace coverage.** In addition, during what is called an "open enrollment" period, Marketplace-eligible consumers can enroll from November 1 – December 15 in Marketplace coverage that starts on January 1. Finally, they may apply for and, if eligible, enroll in Medicaid coverage at any time.

To find out more about enrolling in the Marketplace, such as when the next open enrollment period will be and what you need to know about qualifying events and special enrollment periods, visit **www.HealthCare.gov/coverage-outside-open-enrollment/special-enrollment-period/**. If your state has its own Marketplace platform, you can find contact information for your State Marketplace here: **https://www.HealthCare.gov/marketplace-in-your-state**. Note, you may apply for and, if eligible, enroll in Medicaid coverage at any time.

**IF I SIGN UP FOR COBRA CONTINUATION COVERAGE, CAN I SWITCH TO COVERAGE IN THE MARKETPLACE? WHAT ABOUT IF I CHOOSE MARKETPLACE COVERAGE AND WANT TO SWITCH BACK TO COBRA CONTINUATION COVERAGE?**
If you sign up for COBRA continuation coverage, you can switch to a Marketplace plan during the annual Marketplace open enrollment period. You can also choose to end your COBRA continuation coverage early and switch to a Marketplace plan if you have another qualifying event such as marriage or birth of a child through something called a "special enrollment period." But be careful though - if you terminate your COBRA continuation coverage early without another event that qualifies you for special enrollment, you may have to wait to enroll in Marketplace coverage until the next available open enrollment period, and could end up without any health coverage in the interim.

Alternatively, once you've exhausted your COBRA continuation coverage and the coverage expires, you may be eligible for a special enrollment period to enroll in Marketplace coverage, even if Marketplace open enrollment has endedand no other qualifying events apply. For more information on COBRA continuation coverage and the Marketplace, see **www.HealthCare.gov/unemployed/cobra-coverage/**.

If you sign up for Marketplace coverage instead of COBRA continuation coverage, you cannot switch to COBRA continuation coverage under any circumstances once your COBRA election period ends.

**CAN I ENROLL IN ANOTHER GROUP HEALTH PLAN?**
You may be eligible to enroll in coverage under another group health plan (like a spouse's plan), if you request enrollment within 30 days of the loss of coverage.

If you or your dependent chooses to elect COBRA continuation coverage instead of enrolling in another group health plan for which you're eligible, you'll have another opportunity to enroll in the other group health plan within 30 days of losing your COBRA continuation coverage.

**CAN I ENROLL IN MEDICARE INSTEAD OF COBRA CONTINUATION COVERAGE AFTER MY GROUP HEALTH PLAN COVERAGE ENDS?**
In general, if you don't enroll in Medicare Part A or B when you are first eligible because you are still employed, after the Medicare initial enrollment period, you have an 8-month special enrollment period to sign up for Medicare Part A or B, beginning on the earlier of:

1. The month after your employment ends; or
2. The month after group health plan coverage based on current employment ends.



These rules are different for people with End Stage Renal Disease (ESRD). See **https://www.medicare.gov/sign-up-change-plans/how-do-i-get-parts-a-b/part-a-part-b-sign-up-periods** for more information.

If you don't enroll in Medicare Part B and elect COBRA continuation coverage instead, you may have to pay a Part B lifetime late enrollment penalty and you may have a gap in coverage if you decide you want Part B later. If you elect COBRA continuation coverage and later enroll in Medicare Part A or B before the COBRA continuation coverage ends, the Plan may terminate your continuation coverage. However, if Medicare Part A or B is effective on or before the date of the COBRA election, COBRA coverage may not be discontinued on account of Medicare entitlement, even if you enroll in the other part of Medicare after the date of the election of COBRA coverage.

You must notify Businessolver, Inc. in writing within 30 days if, after electing COBRA, a qualified beneficiary becomes entitled to Medicare (Part A, Part B, or both) or becomes covered under other group health plan coverage. Correspondence can be mailed to your COBRA Administrator at the address noted in this notice.

COBRA coverage is subject to termination retroactive to the date (after your COBRA election date) when the qualified beneficiary becomes entitled to Medicare or becomes covered under other group health coverage, regardless of when notice of other coverage is provided.

221338116

**APP 234**

If you are enrolled in both COBRA continuation coverage and Medicare, Medicare will generally pay first (primary payer) and COBRA continuation coverage will pay second. Certain plans may pay as if secondary to Medicare, even if you are not enrolled in Medicare. For more information visit **https://www.medicare.gov/medicare-and-you**, or, for more specific information regarding the Plan, contact your Plan Administrator.

**WHAT FACTORS SHOULD I CONSIDER WHEN CHOOSING COVERAGE OPTIONS?**
When considering your options for health coverage, you may want to think about:

- Premiums: Your previous plan can charge up to 102% of total plan premiums for COBRA coverage (or up to 150% of total plan premiums after 18 months if you choose to extend the COBRA continuation coverage period beyond 18 months due to the disability of a qualified beneficiary) Other options, like coverage on a spouse's plan, Medicaid, or through the Marketplace, may be less expensive at that point.
- Provider Networks: If you're currently getting care or treatment for a condition, a change in your health coverage may affect your access to a particular health care provider. You may want to check to see if your current health care providers participate in a network and whether you will have access to that network through any other option as you consider options for health coverage.
- Drug Formularies: If you're currently taking medication, a change in your health coverage may affect your costs for medication – and in some cases, your medication may not be covered by another plan. You may want to check to see if your current medications are listed in drug formularies for other health coverage.
- Severance payments: If you lost your job and got a severance package from your former employer, your former employer may have offered to pay some or all of your COBRA payments for a period of time. In this scenario, you may want to contact the Department of Labor at 1-866-444-3272 to discuss your options.
- Service Areas: Some plans limit their benefits to specific service or coverage areas – so if you move to another area of the country, you may not be able to use your benefits. You may want to see if your plan has a service or coverage area, or other similar limitations.
- Other Cost-Sharing: In addition to premiums or contributions for health coverage, you probably pay copayments, deductibles, coinsurance, or other amounts as you use your benefits. You may want to check to see what the cost-sharing requirements are for other health coverage options. For example, one option may have much lower monthly premiums, but a much higher deductible and higher copayments. You may also want to consider whether you have met your deductible or maximum out-of-pocket limit under your COBRA continuation coverage.

**FOR MORE INFORMATION**
This notice does not fully describe continuation coverage or other rights under the Plan. More information about continuation coverage and your rights under the Plan is available in the summary plan description or from Benefits Committee c/o DHL Supply Chain (the "Plan Administrator").

If you have any questions about the information in this notice or your rights to COBRA continuation coverage, you should contact the COBRA Administrator:

Be Secure (c/o Businessolver, Inc.)
PO BOX 850512
MINNEAPOLIS, MN 55485-0512
877-411-4455

If you have questions about the Plan or would like to request a copy of the Plan's summary plan description, you should contact your Plan Administrator:

Benefits Committee c/o DHL Supply Chain
360 Westar Blvd
Westerville, Ohio 43082
614-865-8500

For more information about your rights under the Employee Retirement Income Security Act (ERISA), including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), the Patient Protection and Affordable Care Act, and other laws affecting group health plans, visit the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) website at **https://www.dol.gov/agencies/ebsa**, contact them electronically at **askebsa.dol.gov**, or call their toll-free number at 1-866-444-3272 For more information about health insurance options available through the Health Insurance Marketplace, and to locate an assistor in your area who you can talk to about the different options, visit **www.healthcare.gov**.

**KEEP YOUR PLAN INFORMED OF ADDRESS CHANGES**
In order to protect you and your family's rights, you should keep the COBRA Administrator informed of any changes in your address and the addresses of family members. You should also keep a copy, for your records, of any notices you send to the COBRA Administrator or Plan Administrator.

**IMPORTANT INFORMATION ABOUT PAYMENT**

***First Payment for Continuation Coverage***
If you elect COBRA you should pay the total premium due at the time you send in the Election Form in order to complete your enrollment and continue your coverage. Although you are not required to send any payment with the Election Form, you must make your first payment for continuation coverage no later than 45 days after the date of your election (this is the date the Election Notice is postmarked if sent by mail or the date you complete your online enrollment). **If you do not make your first payment in full within 45**



221338116

**APP 235**

days after the date of your election, **you will lose all continuation coverage rights under the Plan.** You're responsible for making sure that the amount of your first payment is correct. You may contact the COBRA Administrator to confirm the correct amount of your first payment using the contact information provided within this notice.

**IMPORTANT: Your first payment must cover the cost of COBRA coverage from the time your coverage under the Plan would have otherwise terminated up through the end of the month before the month in which you make your first payment.**

*For example, Employee A's employment terminates on September 30th, and they lose coverage on September 30th. Employee A then elects COBRA coverage on November 15th. The initial premium payment Employee A sends in must include the premium amount for October and November and is due on or before December 30th, (the 45th day after the postmarked date on the COBRA Election Form.) Also, please note that Employee A's December premium is due December 1st and that premium must be postmarked by December 31st for it to be considered timely.*

Due to the COVID-19 National Emergency, the Department of Labor, the Department of the Treasury, and the Internal Revenue Service issued guidance extending timeframes for certain actions related to health coverage under group health plans sponsored by private employers. This guidance may give you more time to make COBRA premium payments.  For additional information about this guidance visit: **https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/disaster-relief**.

*Periodic Payments for Continuation Coverage*
After your first payment for COBRA continuation coverage, subsequent payments for continuation coverage are due on the first day of each month of coverage. The date your payment is made is determined by the postmark on the envelope (e.g. May premiums must be postmarked on or before May 31, *see grace period described below*). The amount due is listed on the enclosed Election Form. Please make a copy of this for your records. The COBRA administrator provides billing periodic notices of payments due, but, **as a COBRA participant, it is your responsibility to remit payments on a timely basis.** If you make a periodic payment on or before the first day of the coverage period to which it applies, your coverage under the Plan will continue for that coverage period without any break.

**Checks returned for insufficient funds or checks that otherwise cannot be cashed are considered non-payment of premium and a replacement premium payment must be received by the end of the 30-day grace period (see the next paragraph) or coverage will terminate back to the end of the last fully paid period** and you will lose all rights to COBRA coverage under the Plan. You may not be notified that a payment was returned due to insufficient funds until after the end of your grace period and after your COBRA coverage terminates. Once your COBRA coverage terminates, it will not be reinstated. Therefore, it is your responsibility to ensure funds are available to cover the required premium and, if a check is returned by the bank, to ensure a replacement check is submitted within the appropriate timeframe.

*Grace Periods for Periodic Payments*
Although periodic payments are due on the first of the month, you will be given a grace period of 30 days from the payment due date, except as previously described regarding your initial payment. You'll get continuation coverage for each coverage period as long as payment for that coverage period is made before the end of the grace period. **If you pay a period payment later than the first day of the coverage period to which it applies, but before the end of the grace period for the coverage period, your coverage will be suspended as of the first day of the coverage period and then retroactively reinstated (going back to the first day of the coverage period) when the periodic payment is received. This means that any claim you submit for benefits while your coverage is suspended may be denied and may have to be resubmitted once your coverage is reinstated.**

If you fail to make a periodic payment before the end of the grace period for the coverage period, you will lose all rights to continuation coverage under the Plan.

Your first payment and all periodic payments for continuation coverage should be made payable to **Be Secure.**

Please mail payments to:

Be Secure (c/o Businessolver, Inc.)
ATTN: COBRA Administration
PO BOX 850512
MINNEAPOLIS, MN 55485-0512

**TO CHECK ON PAYMENT AND ACCOUNT STATUS**
Go to **www.YourBenefitLink.com** using your previous log in information. If you previously used a company intranet to log in; please register using the company key of: besecure. If you have questions, please contact your COBRA Administrator at 877-411-4455.

221338116

**APP 236**

## COBRA CONTINUATION COVERAGE ELECTION INSTRUCTIONS

Under federal law, you have 60 days from the date of original notice or the coverage termination date, whichever is later, to elect COBRA continuation coverage under the Plan, unless you are entitled to additional time under a federal policy or program. For example, you may be entitled to more time because of a national emergency.

---

**IT TAKES JUST THREE EASY STEPS TO REVIEW AND ENROLL IN YOUR COBRA COVERAGE OPTIONS ONLINE:**

1. **Go to www.YourBenefitLink.com** and log in with your username and password. If you don't know them, select **Register** then provide your company key (**besecure**), your Social Security Number and your Date of Birth.

2. **Review and make your COBRA elections**. The online enrollment process makes it easy to select the coverage you're eligible for.

3. **Choose the payment method you want.**
   a. **Pay Online** – Provide your preferred payment method and account information. You can set up automatic monthly payments and avoid the usual $2.00 monthly convenience fee.
   b. **Pay by Check** – Make your check payable to **Be Secure**.

*Please note, if you are electing COBRA as a dependent of a former employee who is not also electing COBRA or due to dependent qualifying event (such as a divorce or child reaching maximum age), you cannot enroll online. You will need to return the paper election form found in this package. Once enrolled, you will be able to login to www.YourBenefitLink.com and create your online account.*

---

If you choose to submit your completed Election Form by mail, it must be postmarked no later than **05/22/2022**.

Completing your enrollment online at **www.YourBenefitLink.com** is the fastest and most secure way to ensure continuation coverage for you and your family. **Requests received by mail can take up to 7-10 days from receipt to complete processing.**For elections submitted by mail, send the completed form to:

> Be Secure (c/o Businessolver, Inc.)
> ATTN: COBRA Administration
> PO BOX 850512
> MINNEAPOLIS, MN 55485-0512

If you do not submit a completed Election Form or complete **your online enrollment** by the due date shown above, you will lose your right to elect COBRA continuation coverage. If you reject/waive COBRA continuation coverage before the due date, you may change your mind and revoke your rejection/waiver as long as you complete your enrollment online at **www.YourBenefitLink.com** or submit a completed Election Form before the due date. However, if you change your mind after first rejecting COBRA continuation coverage, your COBRA continuation coverage will begin on the date you submit the completed Election Form.

Your decision whether to elect COBRA continuation coverage will affect your future right to portability of group health coverage, guaranteed access to individual health coverage and special enrollment. Additional information about such rights is included in your Plan's summary plan description.

If you elect to continue coverage, and if you meet all other requirements explained on the enclosed document, your COBRA continuation coverage will begin on**03/17/2022.**

You must make your first payment for COBRA coverage no later than 45 days after the postmark date of your election (this is the date your Election Form is mailed) or completion of **your online enrollment**. If you do not make your first payment for COBRA coverage in full within 45 days after the date of your election, you will lose all COBRA rights under the Plan.



**IMPORTANT: Your first payment must cover the cost of COBRA coverage from the time your coverage under the Plan would have otherwise terminated up through the end of the month before the month in which you make your first payment.**

Subsequent payments are due on the 1st of the month. If you do not remit the full premium on a timely basis, your coverage may be terminated. Refer to the PREMIUM PAYMENT INFORMATION section for more information.

**APP 237**

## COBRA CONTINUATION COVERAGE ELECTION FORM
*(FOR BSC USE ONLY: Be Secure – mm_num:27031376)*

Read the important information about your rights included in this packet before completing your Election Form below.

**Your COBRA Continuation elections must be completed and/or postmarked no later than <u>05/22/2022</u>.**

Completing your enrollment online at **www.YourBenefitLink.com** is the fastest and most secure way to ensure continuation coverage for you and your family. **Elections received by mail can take up to 7-10 days from receipt to complete processing.** To enroll by mail, complete this form and return to the COBRA Administrator at the address provided in the COBRA Continuation Coverage Election Instructions.

Please note, if you are electing COBRA as a dependent of a former employee who is not also electing COBRA or due to dependent qualifying event (such as a divorce or child reaching maximum age), you cannot enroll online. You will need to return the paper election form found in this package. Once enrolled, you will be able to login to **www.YourBenefitLink.com** and create your online account.

Only members covered at the time of Qualifying Event are eligible for continuation. The following Qualified Beneficiaries are eligible to continue coverage under COBRA:

| PLACE AN "X" BY QUALIFIED BENEFICIARY TO BE COVERED: | QUALIFIED BENEFICIARY | SOCIAL SECURITY NUMBER |
|---|---|---|
| [ ] | JASON WALTERS | XXX-XX- |
| [ ] | WALTERS | XXX-XX- |
| [ ] | WALTERS | XXX-XX- |
| [ ] | WALTERS | XXX-XX- |

I/We elect COBRA continuation coverage as indicated below:

**PLACE AN "X" BY COVERAGE SELECTION:**          **MONTHLY COST**

Anthem Basic
[ ] Employee Only                                  $ 544.40 /Monthly
[ ] Employee and One Child plus Spouse             $ 1,677.78 /Monthly
[ ] Employee and Two Children plus Spouse          $ 1,677.78 /Monthly
[ ] Employee and Three Children plus Spouse        $ 1,677.78 /Monthly
[ ] Employee and Four Children plus Spouse         $ 1,677.78 /Monthly
[ ] Employee and Spouse                            $ 1,224.89 /Monthly
[ ] Employee and Children                          $ 1,007.14 /Monthly
[ ] Family                                         $ 2,014.28 /Monthly
Standard Dental
[ ] Employee Only                                  $ 27.45 /Monthly
[ ] Employee and One Child plus Spouse             $ 96.09 /Monthly
[ ] Employee and Two Children plus Spouse          $ 96.09 /Monthly
[ ] Employee and Three Children plus Spouse        $ 96.09 /Monthly
[ ] Employee and Four Children plus Spouse         $ 96.09 /Monthly
[ ] Employee and Spouse                            $ 57.65 /Monthly
[ ] Employee and Children                          $ 68.62 /Monthly
[ ] Family                                         $ 96.09 /Monthly
VSP-Vision
[ ] Employee Only                                  $ 11.42 /Monthly
[ ] Employee and One Child plus Spouse             $ 39.07 /Monthly
[ ] Employee and Two Children plus Spouse          $ 39.07 /Monthly
[ ] Employee and Three Children plus Spouse        $ 39.07 /Monthly
[ ] Employee and Four Children plus Spouse         $ 39.07 /Monthly
[ ] Employee and Spouse                            $ 22.85 /Monthly
[ ] Employee and Children                          $ 24.46 /Monthly
[ ] Family                                         $ 39.07 /Monthly



NOTE:  If you were enrolled in a Health Care Flexible Spending Account benefit on the day prior to your COBRA Qualifying Event and you do not see the FSA plan election option above, you may still be eligible to continue your Health Care Flexible Spending Account through COBRA.  This continuation will last through the end of the plan year in which your COBRA Qualifying Event occurred, and your monthly premium for Health Care FSA continuation will be equal to your annual election minus your year-to-date contributions, divided over the remaining months of the plan year.

To enroll in Health Care FSA, please contact your COBRA Administrator at 877-411-4455 .



221338116

**APP 238**

As a COBRA Qualified Beneficiary you are being given the opportunity to continue the EAP program through COBRA. If you elect to take this coverage, your coverage will extend to your COBRA end date or until you explicitly terminate the coverage, whichever is earlier. The cost for this coverage will be the employer contribution, plus the employee contribution amount of the benefit, multiplied by 102%

[ ] Yes, I wish to elect the EAP program.

[ ] No, I do not wish to elect this plan.

**COBRA PREMIUMS ARE SUBJECT TO CHANGE.**

_____          _____
**Signature**                                                                      **Date**

_____          _____
**Print Name**                                                                   **Email Address**
                                                                                         *(Recommended to receive future reminders and notifications*
                                                                                         *regarding your account and payments due)*

_____          _____
**Telephone Number**                                                     **Mailing Address**

**Questions?** For faster service, we recommend first reviewing the information provided within your account via **www.YourBenefitLink.com**. This information is available at your convenience, with no wait times.



221338116

**APP 239**

**From:**        Bob Whitehurst <whitehurstlawfirm@yahoo.com>
**Sent:**        Tuesday, August 30, 2022 4:07 PM
**To:**          Andrew Etter (DHL Group, Legal)
**Subject:**     Re: Walters. v. DHL, 3:22-cv-01840-C (N.D. Tx)


Yes he does intend to pursue his claims, since we have yet to receive the documents that were requested.

thanks

On Tuesday, August 30, 2022 at 02:02:58 PM CDT, Andrew Etter (DHL US) <andrew.etter@dhl.com> wrote:



Mr. Whitehurst—

I have provided you with documentation relevant to Mr. Walters' alleged claims, which DHL believes are without merit. If you have any questions in that regard, please do not hesitate to let me know. However, and as I am sure you can appreciate given that this is filed litigation, any additional discovery would need to be coordinated through DHL's external litigation counsel as per the applicable civil rules.

Having had a chance to review the documentation provided, please advise if Mr. Walters intends to pursue these claims.

Best regards,

-Andrew

Andrew Etter

Associate General Counsel

Global Business Services

Office: 614.865.5978

Fax: 614.865.8879

Mobile: 740.953.9270

andrew.etter@dhl.com

---

**From:** Bob Whitehurst <whitehurstlawfirm@yahoo.com>
**Sent:** Friday, August 26, 2022 10:41 AM
**To:** Andrew Etter (DHL US) <andrew.etter@dhl.com>
**Subject:** Re: Walters. v. DHL, 3:22-cv-01840-C (N.D. Tx)


appreciate the information, could you also send me his personnel file

thanks



**EXHIBIT B**
**APP 240**

On Friday, August 26, 2022 at 09:22:42 AM CDT, Andrew Etter (DHL US) <andrew.etter@dhl.com> wrote:

Mr. Whitehurst—

Thank you for your time this morning. Per our discussion, please see the attached evidencing Mr. Walters' status as an exempt, salaried employee making $55K+ per year as well as the COBRA notice he received subsequent to his employment. If any questions, please let me know.

In light of this information, please let me know if Mr. Walters intends to further pursue the above-referenced litigation when you get a chance.

Best regards,

-Andrew

**Andrew Etter**

Associate General Counsel

Global Business Services

**DHL Supply Chain**

360 Westar Blvd.

Westerville, Ohio 43082 USA

Office: 614.865.5978

Fax: 614.865.8879

Mobile: 740.953.9270

andrew.etter@dhl.com

www.dhl-usa.com/supplychain

DHL Supply Chain – Excellence. Simply delivered.

**APP 241**