## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

**JASON WALTERS**
**Plaintiff**

**vs.**                                    **CIVIL ACTION 3:22-cv-01840-C**
                                           **JURY REQUESTED**

**EXEL, INC. D/B/A**
**DHL SUPPLY CHAIN**
**Defendant**

### Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Plaintiff Jason Walters ("Walters" or "Plaintiff"), and files this his Brief in Opposition to Defendants' Motion for Summary Judgment and for same would show the Court as follows:

I.

### DEFENDANT MUST PROVE ADMINISTRATIVE EXEMPTION APPLIES

To establish that the FLSA administrative exemption applies, defendants must prove three requirements by a preponderance of the evidence: (1) the employee must be "[c]ompensated on a salary or fee basis . . . at a rate of not less than $684 per week," (2) the employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) the employee's "primary duty" must "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a);   *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)). A preponderance of the evidence means such evidence as, when

considered and compared with that opposed to it, has more convincing force and produces in the mind of the trier of fact a belief that what is sought to be proved is more likely true than not true. To establish an affirmative defense by a "preponderance of the evidence" means to prove that the defense is more likely so than not so. Defendants have the burden of proving each of the three required elements of their affirmative defense by a preponderance of the evidence

II.

## DEFENDANT MUST ESTABLISH PRIMARY DUTY

The second element of the administrative exemption affirmative defense requires the employer to establish that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). The regulations define an employee's "primary duty" as the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "The `directly related' test is met by the employee's `assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.'" *Dewan*, 858 F.3d at 335 (quoting 29 C.F.R. § 541.201(a)). For the "directly related" inquiry, "it is `the type of work performed by the employee' on which [the court] must focus." Id. (quoting 29 C.F.R. § 541.201(a)). "As a general rule, an employee's `primary duty' involves over 50% of the employee's work time. And yet, flexibility is appropriate when applying this rule, depending on the importance of the managerial duties as compared with other duties, frequency of exercise of discretionary power, freedom from supervision, and comparative wages." *Smith v. City of Jackson*, 954 F.2d 296, 299 (5th Cir.1992)).

III.

**MUST PROVE THE USE OF EXERCISE OF DISCRETION AND JUDGMENT**

The third element requires that the employer establish that the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3)

In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.    29 C.F.R. § 541.202(a);    *Hobbs v. EVO Inc.*, 7 F.4th 241, 250 (5th Cir. 2021). The exercise of discretion must involve more "than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Jones v. New Orleans Reg'l Physician Hosp. Org.*, 981 F.3d 428, 435 (5th Cir. 2020)

> Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.  29 C.F.R. § 541.202(b)

IV.

**DEFENDANT MUST ESTABLISH BEYOND PERADVENTURE**

When summary judgment is sought on an affirmative defense, as here, the movant `must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor.'" *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017).   Movant has failed to establish such facts.     The Fair Labor Standards Act generally requires employers to pay workers one-and-a-half times their normal pay rate for hours worked in excess of forty in a week. 29 U.S.C. § 207(a)(1). The FLSA enables an employee to sue his employer for unpaid overtime. 29 U.S.C. § 216(b). The overtime requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity ... (as such terms are defined and delimited from time to time by regulations)." 29 U.S.C. § 213(a)(1). Under the Department of Labor's regulations, the administrative exemption includes "any employee (1) Compensated on a salary or fee basis ... at a rate of not less than $684 per week ... (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a) (emphasis added). Work is "directly related to [a business's] management or general business operations" if it is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Examples include "tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory

compliance; and similar activities." Id. § 541.201(b) (emphasis added)

V.

**JOB DESCRIPTION NOT GUARANTEED**

Defendant refers to APP 189-191 for its job description; however, the document also states "Management maintains the right to assign or reassign duties and responsibilities to this job at any time".

VI

**PLAINTIFF' ACTUAL JOB**

Plaintiff worked on the warehouse floor with the employees and the equipment, such as the forklifts and tires.   (See APP 0001-APP 0010). (APP 111, l. 10(5)

Eartis Shaw was in charge of the employees, and made the decision as to whether run and extra shift or not.  (See APP   0011-0025). (APP 111, No. 8, l. 13)

Plaintiff's job was a repetitive job where he met with employees each morning, where he went over the day's activities and reminders, such as clean as you go, be mindful of restroom and break room, do not push racks on or over the painted yellow line and make sure your forks or lifted 2 inches from the floor, drink plenty of water, don't leave anything on top of the battery chargers, HU label need to be placed on tires not racks.   (See APP 0026- 0036) (APP. 112, l. 5-11)

On March 4, 2022, Adam Elliott , general manager, sent an email out to management level employees.  Plaintiff's name was not on the document.  Said document went out to Jose Gonzalez, Eartis Shaw, and Jason Smith.  This directive says "Below is the HR policy on clocking in.  There is not a grace period that I am aware of.  Mickey is also not aware of grace

period.  If someone has a repeat pattern of coming in late.  Please let your manager know so we

can address it appropriately.  (See APP 0037, l. 3-4).  That document would mean that despite the

fact Defendant claims that Plaintiff was a salary worker, he was not even given a copy or

informed of said policy, when he met with the employees to go over the clean as you go each

morning.

Plaintiff indeed was not aware of any such policy in that on March 11, 2022 at 11:25 am.

an email is sent to Eartis Shaw stating in part "Last week, I asked about if there was a grace

period for coming in to pre-shift late, I was told there was no such grace period.  (See APP 0038,

l. 7,8).   This document also states in part "I try my best to keep them from getting themselves

into attendance issue or nay other trouble.   (l. 11-12).

Mr. Shaw forwarded that email at 11:27 a.m., that same day to Mickey Moza, without any

reference to the fact that there was indeed a grace period.  (APP 38, L. 2)

From the deposition of John Dobbins:  (See APP0039-044) (l. 12-19)

Q. He didn't work -- Mr. Walters, he didn't work in an air-conditioned office, did he?
13 A. There would have been times he would have
14 been in the office, but about 70 percent of his day
15 would have been out on the floor.
16 Q. Okay. And part of Mr. Walters' job was to
17 make sure the employees show up, correct?
18 A. Not necessarily to make sure they showed up,
19 but to monitor for attendance

That was indeed a great part of the job of Plaintiff to monitor attendance based on both

statements by Plaintiff and Mr. Dobbins.  Hardly management level work.

How was Plaintiff going to monitor for attendance when management did not have the

forethought to even send him a copy of the current policy?

The problem is that John Dobbins had made an agreement with Ms. Hooper that she

could be late.

Q. Did you ever had a discussion with Ms. Hooper about an agreement that she could be, potentially, a few minutes late due to child care issues.
A. Yes.   (See APP0045, l. 17-21)

If there was an agreement between
11 Ms. Hooper and yourself, would it have gone -- to show
12 up late, would that have been in her file?
13 MS. BEZNEY: Object to form.
14 A. No. It would -- it would have been
15 reflected on the timekeeping side, so the admin and
16 Eartis would have been aware of it. I'm unaware if it
17 made it down -- like I said, I do not know if it made
18 it down to Jason.
19 Q. (BY MR. WHITEHURST) Well, I mean, my
20 understanding, he was her supervisor, was he not?
21 A. He was.
22 Q. So why in the world wouldn't you tell him?
23 A. I -- I am -- I cannot -- I cannot remember
24 if I told him specifically, is -- I may have; I -- I
25 may not have. I do not know.  (See APP0046, l. 10-25)


Q. Did you make the agreement with Ms. Hooper,
2 or did Mr. Shaw make the agreement?
3 A. We would have both made the agreement with
4 Ms. Hooper,   (See APP0047, l. 1-4)

        That would mean when Mr. Shaw forwarded the email from Mr. Walters to Mickey

Moza, he knew for a fact that Ms. Hooper could be late, and failed to inform Mr. Moza of that

fact.   The failure to inform can constitute a material false representation in the same way as an

affirmative misstatement, especially in the context of a fiduciary relationship.   *Diduck v.*

*Kaszyci v. Sons Contractors, Inc.* 974 F. 2d 270, 276 (1992).   True there may or may not be any

fiduciary relationship in this case, but no doubt should raise an issue for the trier of fact, as to

why Mr. Shaw and Mr. Dobbins, knew for a fact that Ms. Hooper could be late, and failed to

inform Mr. Walters of said fact, despite the claims of Defendant that he was in charge.   In order

to determine whether Plaintiff qualified as an exempt employee, the Court must conduct "a

thorough, fact-intensive analysis of the employee's employment duties and responsibilities."

*Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012),

Plaintiff did not set his schedule as to when he was supposed to show up for work.

From the deposition of Adam Elliott, pg.  19, ln. 21-24  (See APP 0050, l. 21-24)

21 Do you set the schedule?
22 A. Their operations manager sets the schedule.
23 Q. And who is that?
24 A. Eartis Shaw

From the deposition of Adam Elliott, pg. 21, ln. 2-15 (See APP-0051, l. 2-17)

Q. Okay. Is that his attire, usually? Is that
3 what operations supervisors wear? He's got a hardhat
4 and a radio and some other stuff.
5 A. No.
6 Q. What do they wear?
7 A. Normally just a safety vest and a radio.
8 Q. Okay.
9 A. And steel-toed shoes.
10 Q. Now, the operations supervisors all work in
11 the warehouse. Is that correct?
12 A. Yes.
13 Q. Okay. Do they work somewhere else?
14 A. Just the warehouse and, then, possibly out
15 on the yard, where the trucks are

From the deposition of Eartis Shaw, pg. 139, l. 10-15 (See APP 0054, l. 10-18)

10 Okay. So had Mr. Walters corrected
11 anyone else prior to that day, about not having the
12 correct safety gear on, anything of that nature?
13 A. I'm sure he did.
14 Q. Okay. That would be his job.
15 A. Yes, sir
16 Q. Because that's what DHL told him to do,
17 right?
18 It's a requirement of the job, yes.

From the deposition of Deneill Hooper, pg. 28, (See APP 0055- 59) (APP 0057, l. 1-9)

Q. (BY MR. WHITEHURST) Was he supposed to do
2 what the office -- or general manager and everybody
3 else told him to do?
4 A. Supposed to.
5 Q. Okay. And if he didn't do that, he wouldn't
6 be doing his job. Is that right?
7 A. Right.
8 Q. Is that right, yes or no?
9 A. Yes.

From the deposition of Deneill Hooper, pg. 51, l. 7–12 (See APP 0058, l. 7-12)

7 All right. If Mr. Walters had believed
8 that you were wearing the wrong uniform, would it have
9 been his job to correct you?
10 A. If I was in the wrong uniform --
11 Q. Right.
12 A. -- yes, it was his job to correct me.

From the deposition of Deneill Hooper, pg. 53, (See APP 0059, l. 2-7)

Q. Okay. And that was part of Mr. Walters'
3 job, is to make sure everybody's safe.
4 A. Right.
5 Q. Okay. And if he didn't do that, he wouldn't
6 be doing his job.
7 A. Right

From the deposition of Tammy Williams, pg. 41, l. 2-23. (See APP 0060-0062)(APP 0062, l. 2-23)

Q. What is that? What am I talking about?
3 A. High-vis is a color; and you need to be able
4 to see someone out on the floor, so they require
5 high-vis coloring to wear: bright yellow, bright
6 green, bright orange, reflective gray.
7 Q. Right.
8 A. Just high-visibility colors.
9 Q. Does this lady have that on?
10 A. I don't know that the site accounts for that
11 jacket being high-vis or not.

12 Q. I'm sorry, what? Yes, she does --
13 A. The site gave out those jackets. Whether or
14 not they claim that that yellow on that jacket is
15 high-vis, I don't know.
16 Q. Okay. So maybe yes and maybe no.
17 A. Correct.
18 Q. Okay. So if it was not, would it be the job
19 of Mr. Walters to tell her?
20 A. Yes, sir.
21 Q. Okay. And if he doesn't, he wouldn't be
22 doing his job.
23 A. Correct.

From the deposition of Mickey Moza , (See APP 0063-0067) (APP 0067, (l. 8-20).

Q. Okay. Did you keep any records regarding
9 Jason Walters when you left DHL?
10 A. No.
11 Q. Okay. Did you look at any tapes or
12 videotapes prior to your deposition here today?
13 A. Not since I left DHL, no.
14 Q. Okay.
15 You were going to school while you were
16 working for DHL, correct?
17 A. Yes.
18 Q. Okay. What school was that?
19 A. That was the University of Texas at
20 Arlington.

From the deposition of Mickey Moza , (See APP 0068) (l. 4-23).

Q. Okay. You were at -- were you at the
5 location while all this was going on?
6 A. I had many other locations, so I don't think
7 I was ever physically present during this
8 investigation, at that location.
9 Q. So all you got was by phone or fax?
10 A. I don't remember -- by phone and by email,
11 yes.
12 Q. Email and fax, okay.
13 A. Email and phone.
14 Q. Email and phone.
15 And you were talking to Eartis Shaw?
16 A. Yes.

17 Q. You were talking to who else?
18 A. I would say, as well as Eartis Shaw, it
19 would be the general manager of the facility.
20 Q. Adam Elliott?
21 A. Yes. As well as the director for that
22 location, the operations director for that location,
23 which would be John Dobbins.
   ,
      That would also mean that if John Dobbins was talking with Mr. Moza, that he failed to

inform Mr. Moza of the agreement with Ms. Hooper along with Mr. Shaw that she could be late.

From the deposition of Mickey Moza , (See APP 0069) (l. 22-25)

Q. (BY MR. WHITEHURST) I'm going to show you
23 what's been marked Exhibit F, hopefully.
24 Do you know Tammy Williams?
25 A. I did know her, yes.

      From the deposition of Mickey Moza (See App 0070) (l. 1-24).

Q. Okay. And if you see this, is Exhibit F,
2 this is from Tammy Williams; it says, "I will
3 definitely send Mickey an email today when I get to
4 Kentucky. I am so sorry your going through this. She
5 is one of the biggest racists I've ever worked with."
6 Did you ever get this email or text?
7 A. Not that I --
8 MS. BEZNEY: Object to form.
9 A. -- recall.
10 Q. (BY MR. WHITEHURST) I'm sorry, sir, go
11 ahead.
12 A. Not that I can recall.
13 Q. This is a pretty blatant email. You're
14 saying you never got it?
15 MS. BEZNEY: Object to form.
16 A. Not that I can recall.
17 Q. (BY MR. WHITEHURST) Is there something that
18 would affect your memory here today?
19 A. I don't recall getting any email that's
20 referring to whatever that is there, on your phone.
21 Q. Okay. Are you on any kind of drugs or
22 medication that would affect your memory here today,
23 Mr. Moza, Mickey?

24 A. No.

From the deposition of Mickey Moza (See App 0071) (l. 4-12).

Q. So -- but you did the investigation. Is
5 that correct?
6 A. I'm involved in the investigations. I
7 don't, necessarily, do them. The investigations are
8 typically an effort between the -- you know, someone
9 at that location that I was responsible for and
10 myself. So yeah.
11 Q. Okay. You just gather the facts, right?
12 A. Sure. Yeah, you could say that.

It is evident that Mr. Moza did not have all the facts.

From the deposition of Mickey Moza (See App 0072) (l. 7-15).


Q. (BY MR. WHITEHURST) Are you aware that
8 Mr. Walters was complaining about Ms. Hooper
9 interrupting during the pre-shift meeting?
10 A. I don't recall.
11 Q. You don't recall that?
12 A. No, I don't recall that specific part of
13 this.
14 Q. Okay.
15 A. I don't know

From the deposition of Mickey Moza (See App 0073) (l. 5-14)

Q. Okay. And you did that at your home,
6 correct?
7 A. No, not necessarily at my home. As I
8 mentioned before, I was, every day, at different
9 locations. So probably at another DHL location is
10 likely where I typed this up.
Q. So you possibly could have been at the
12 location when this was going on.
13 I don't believe I was at that location when
this was going on, no.

From the deposition of Mickey Moza (See App 0074) (l. 8-25).

Q. (BY MR. WHITEHURST) Okay. Mr. Moza, I just
9 want to make sure I'm clear in my mind. You only
10 spoke to Eartis Shaw and John Dobbins.
11 A. And Adam Elliott.
12 Q. And Adam Elliott. You didn't talk --
13 A. Regarding this matter.
14 Q. All the information you're getting is in a
15 written statement. Is that right?
16 MS. BEZNEY: Object to form.
17 A. Other than the conversation with those three
18 individuals, yes. As far as these three, Jason
19 Walters, as well as the other two individual -- or
20 other three individuals, on this form that we looked
21 at just a minute ago, at the top of the form, I didn't
22 speak to any of those individuals directly. I think I
23 spoke to Jason Walters maybe near the end of this
24 matter, but I don't believe I spoke to any of the
25 other individuals directly.

From the deposition of Mickey Moza (See App 0075, 0076) (l. 3-25, l. 1-3)

Q. (BY MR. WHITEHURST) Okay. But, Mr. Moza,
4 my understanding is -- do you know who Tammy Williams
5 is or not?
6 A. I knew her when I was at DHL.
7 Q. Okay.
8 MR. WHITEHURST: All right. If we can
9 kind of go through the document, please, ma'am.
10 Q. (BY MR. WHITEHURST) Apparently, this is on
11 Friday, March 18th, 2022. It says, "Did you call
12 Mickey?" But as we sit here today, you don't remember
13 getting any phone calls from Ms. Williams or anyone
14 else.
15 A. From who?
16 Q. Tammy Williams.
17 A. I don't recall getting a phone call from
18 Tammy Williams. No, I don't believe so.
19 Q. Do you even know who I'm talking about?
20 Tammy Williams?
21 A. Yes, I do -- I do recall Ms. Williams from
22 when I worked there, yes.
23 Q. Okay. Did you ever have any conversations
24 with her?

25 A. Regarding this matter or just in general
Q. Well, first of all, in general, yeah.
2 A. Yes. We had conversations when I worked at
3 DHL, but not regarding this matter.

## From the deposition of Mickey Moza (See App 0076-0077) (l. 24-25), (l. 1-14).

Q. Okay. Did you ever tell Mr. Walters why he
25 was terminated
A. I don't recall.
2 Q. You don't recall? Did he ever ask why he
3 was terminated?
4 A. I don't recall if he asked me directly. I
5 do recall one of these calls. I think it's near the
6 top one on this list.
7 THE WITNESS: If you could scroll up a
8 little bit. Yep.
9 A. I think that call, I recall it happening;
10 but I don't recall the specifics of the call, you
11 know, what we -- what we discussed specifically. So.
12 Q. (BY MR. WHITEHURST) Okay. Did he ever ask
13 you why he was terminated?
14 A. Again, I don't recall.

## From the deposition of Mickey Moza (See App 0078) (l. 4-16).

Is it the policy of DHL not to take
5 statements from all the people that were there?
6 MS. BEZNEY: Object to form.
7 A. I don't believe -- I don't know if there is
8 a policy that specifically states when and when not to
9 take statements and who and who not to take statements
10 from. So I don't know if there's a specific policy
11 that states that, what -- you know, exactly what to do
12 with which statements -- sorry, which witnesses to
13 collect statements from, which ones to not. So I
14 guess I can't answer that definitively. I don't
15 recall the policy verbatim, so can't answer that
16 definitively, I guess

## From the deposition of Mickey Moza (See App 0079) (l. 8-19).

8 Q. Mr. Moza, you're the human resource person.
9 You're trained on this. Correct?
10 A. I don't believe, at DHL, I was trained on
11 this -- I don't recall if I was trained or not on the
12 investigations at DHL. But what I do recall is that
13 HR--and I believe it's a policy, in DHL's policy -- I
14 don't recall if this was the policy name--that both HR
15 and management worked together to collect statements
16 and to conduct an investigation. So it's not
17 something that just HR does by themselves.
18 Q. But you take the lead, do you not?
19 A. Yes. HR has to guide it, certainly.

It is evident from the above that Mr. Moza failed to investigate  anything.  Mr. Moza

failed to speak with Mr. Walters or any of the witnesses.  It is also evident that Plaintiff has no

idea as why he was being terminated in that he never received a copy of the corrective action

form which was completed by  Eartis Shaw and Adam Elliott.  (See App 0091).

From the deposition of Mickey Moza (See App 0080, 81, 82  (l. 7-25, l. 2-25, l. 1-13)

Q. (BY MR. WHITEHURST) Okay. My understanding
8 from your previous testimony, you talked to Mr. Jason
9 Walters one time. Is that right?
10 A. I believe so, yes.
11 Q. Okay. He tried to call you several times,
12 but you talked to him one time.
13 A. I don't know --
14 Q. Right?
15 A. -- I don't know if that's true, that he
16 tried to call me several times. And if he did -- you
17 know, I don't know how many calls were exchanged back
18 and forth. What I do know is that we did speak one
19 time; yes, that's true.
20 Q. Okay.
21 Then he says, "They said they did not
22 [sic]...when I asked Daisy...she said they haven't
23 asked her anything." You see where I'm reading from?
24 A. I can see it, yes.
25 Q. Okay. But you didn't talk to Daisy. Is
that right?

2 A. I don't believe so. I don't recall that
3 individual, the name.
page, please, ma'am.
6 Q. (BY MR. WHITEHURST) Then it says, "When I
7 asked to see the accusations/statements...I was
8 denied...."
9 Did Mr. Walters ask you to see the
10 accusation statements?
11 A. I don't recall.
12 Q. Well, if he had, would you have given them
13 to him?
14 MS. BEZNEY: Object to form.
15 A. I don't know if I would or wouldn't have.
16 Q. (BY MR. WHITEHURST) Why not?
17 A. Because that's not what happened -- or, at
18 least, I don't recall that happening, I should say.
19 Q. Now, wait a minute. There was accusation
20 statements from Ms. Hooper and the other two ladies.
21 Is that correct?
22 A. Yes.
23 Q. Okay. Did you allow Mr. Walters to see
24 those statements?
25 A. He -- I don't believe
he even asked me for them, so I can't answer that
2 question. I don't know if I would have given --
3 Q. This says, "When I asked to see the
4 accusations/statements...I was denied...."
5 A. Okay.
6 Q. Do you have any --
7 A. I don't know if that happened or not, if he
8 asked -- I don't recall him asking me or not, one way
9 or the other, so.
10 Q. Well, he could have; you just don't
11 remember.
12 MS. BEZNEY: Object to form.
13 A. I suppose that's possible


From the deposition of Mickey Moza (See App 00083) (l. 6-14)

Q. (BY MR. WHITEHURST) So you don't know if
6 DHL has a policy or no policy on it?
7 A. Yeah, I don't recall. I don't recall
8 actually providing statements other people have

9 written, to employees, while I was at DHL. So I don't
10 know if -- if you're asking me about a
11 hypothetical--it sounds like you are--whether I would
12 have provided or not, because I don't recall that
13 happening, and so I don't recall some policy where I
14 would have typically done that or not.


From the deposition of Mickey Moza (See App 0084-0085) (l. 24-25, l. 1-19).

Q. (BY MR. WHITEHURST) Okay. Now, this is
25 dated March 21st, 2022. It says, "Mickey I'm trying
o figure out when my health and dental insurance
2 expire on my family...I called the benefits number,
3 they referred me back to HR." HR is you, is that not?
4 A. Not necessarily. I don't know who -- who
5 is -- who they're referring to when -- or who he's --
6 who they told him, you know, that HR is.
7 Q. Okay. "I need this information for the
8 state...due to my special needs child."
9 Do you remember this?
10 A. I don't recall this specifically, no.
11 Q. You don't recall this, either?
12 A. I -- I recall something about him needing to
13 get the COBRA information, I believe it was. This
14 specific message, with all this information, no, I
15 don't recall all this information, no. I just -- but
16 I do remember something about him needing to get the
17 COBRA information.
18 Q. For his child.
19 A. That, I don't know. I don't recall that.


From the deposition of Mickey Moza (See App 0086) (l. 4-23).

. Do you think that the investigation that you
5 did with Mr. Walters and Ms. Hooper was the same as
6 you responded to in this email about his COBRA
7 benefits?
8 MS. BEZNEY: Object to form.
9 A. I don't understand the question. I'm sorry.
10 Q. (BY MR. WHITEHURST) Okay. My
11 understanding, from looking at these texts and emails,
12 Mr. Walters did not understand his COBRA benefits.
13 Would you agree with that?

14 A. I don't know what -- I don't -- again, I
15 don't understand -- I don't know what he did or didn't
16 understand. I believe I communicated there the
17 information that I am capable of providing, with my
18 role there, and that's all that I could communicate.
19 So as far as him not understanding his COBRA
20 information, I don't know the answer to that question
21 because I don't -- I'm not involved in the COBRA
22 process at DHL.
23 Q. Right.

From the deposition of Mickey Moza (See App 00087-0088) (l. 2-25, l. 1-13).

Q. (BY MR. WHITEHURST) All right. And that's
3 his comments. Would you agree with me Mr. Walters did
4 not understand what was going on here?
5 MS. BEZNEY: Object to form.
6 A. I don't know -- I don't know what -- I don't
7 know -- I don't know what you mean. He didn't
8 understand what was going on here with regard to what,
9 exactly?
10 Q. (BY MR. WHITEHURST) Mr. Moza, could you
11 read that statement that's on the screen right now,
12 please?
13 A. "I really am taken by surprisectgst my
14 direct questions could not be answered when I clearly
15 asked when my benefits would end being that I have a
16 special needs child that has 24/7 nursing and medicine
17 needed so that he does not have a stroke and die...I
18 am more than aggravated at this point with how." Then
19 it ends after the letter "t."
20 Q. Would you agree with me, Mr. Moza, that
21 Mr. Walters is pretty upset about this procedure?
22 MS. BEZNEY: Object to form.
23 A. I would agree that he's communicating that,
24 you know, he does not -- that he's trying to get
25 information so his child doesn't have a stroke and die
and that he's aggravated. That's what I would agree
2 with because that's what he's written there.
3 Q. (BY MR. WHITEHURST) Was the same thorough
4 response given in this text, from yourself to
5 Mr. Walters, about his COBRA benefits, the same clear
6 understanding of why he was terminated, to
7 Mr. Walters?

8 MS. BEZNEY: Object to form.
9 A. I don't recall -- I guess I don't know the
10 answer to that question because I don't recall what
11 was communicated to him when he was notified of his
 termination, nor do I recall the details of our call
13 that we had, that we talked about earlier.

From the deposition of Mickey Moaz (See App 089-090) (l. 9-23, l. 4-10).

Q. And during that time, did you receive any
10 written documentation, either in person or online,
11 from DHL?
12 A. Yes, probably both. Probably in person and
13 online, yes.
14 Q. Okay. And do you still have those
15 documents?
16 A. I don't think so, no.
17 Q. So did you delete them?
18 A. I don't believe I deleted them. I believe
19 that if I saved them on my computer or if they are in
20 the emails somewhere on the computer that I used, that
21 I don't believe I deleted them. And I'm quite certain
22 that I gave all -- my computer back -- I know I gave
23 my computer back to DHL.

Q. Okay. So you had a computer that DHL issued
5 you.
6 A. Correct.
7 Q. And that computer, when you left in
8 September of 2022, went back to DHL.
9 A. Yes, that's correct. I gave it back to
10 them, yes.

VII.

**PLAINTIFF RECEIVED UNEMPLOYMENT COMPENSATION**

Plaintiff received unemployment after he was wrongfully terminated by the Defendant.

App 092.  (l. 4-5)  The decision from the Texas Workforce Commission stated in part "Our

investigation found that your employer fired you for a reason that was not misconduct connected

with the work."   Plaintiff would request this Honorable Court to take judicial notice of said

document.   Quoting from *Domain Vault LLC v. McNair*,   Civil Action No. 3:14-cv-1126-L,

United States District Court, N.D. Texas, Dallas Division, (2015)  Under Rule 201, a court "may

judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

Evid. 201(b)(2). Filings with government agencies, public records, and government documents

available from an official government website or other reliable source on the Internet have been

held not to be subject to reasonable dispute.  *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir.

2003) (holding that a district court may take judicial notice of information on an official

government website); *Graham v. Dyncorp Int'l, Inc.*, 973 F. Supp. 2d 698, 706 n.4 (S.D. Tex.

2013) (citing *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 415 (S.D.N.Y. 2009), for the

proposition that a court may "take judicial notice of filings with government agencies that are a

matter of public record")); *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968,

972 (W.D. Mich. 2003) ("Public records and government documents are generally considered not

to be subject to reasonable dispute. This includes public records and government documents

available from reliable sources on the Internet.")

## VIII.

## DEFENDANT RECEIVES NOTICE

Based on the testimony of Mr. Moza he left his computer with the Defendant in

September of 2022.   Based on the U.S. Postal Service and what is on file with this Honorable

Court, Defendant received a letter, and a release of records signed by Mr. Walters on July 22,

2022 at 11:36 a.m.   (093-098, l. 2).   Well before the time that Mr. Moza turned his computer

back to the defendant.     Now with the declaration of Mr. Etter (APP 226-227) in Defendant's documents, Mr. Etter knew of the pending litigation in August of 2022 at the very latest.

The American Bar Association's Civil Discovery Standards  also provide some guidance, rule No.10 states, "When a lawyer who has been retained to handle a matter learns that litigation is probable or has been commenced, the lawyer should inform the client of its duty to preserve potentially relevant documents.   A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence might be relevant."  *Rimkus Consulting Group, Inc. v. Cammarata,* 688 F.Supp.2d 598, 615-16 (S.D.Tex.2010).     The testimony of Mr. Moza indicated that he gave his computer back to the defendant in September of 2022.   His computer contained the details of whom he talked to, any notes that he have made, any correspondence that he may have gathered, and any evidence that he may have gathered during his investigation regarding Plaintiff and other persons.   Defendant was aware of potential litigation in July of 2022, but apparently made no effort, intentionally or recklessly,  to secure the evidence at that time.     FED. R. CIV. P. 37(e) ("If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, (that is assumed based on the responses from the defendant for said computer information) the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the

information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.")

This certainly raises a question of fact for the trier of fact.

IX.

**RECORDS GONE MISSING**

It is also relevant at this point in time that the issue of the calendar of Mr. Shaw and the computer records of Mr. Moza has occurred previously as reflected in correspondence dated July 31, 2023. (APP 099-110.). (L. 1-25).

X

**OBJECTION WITNESSES**

Plaintiff objects to the declaration of Antonio Juarez, declaration of Bruce Gillis, and declaration of Andrew Etter in that it does not appear they have been disclosed in proper discovery requests.

XI.

**AGE DISCRIMINATION**

The ADEA states that "it shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). In the Fifth Circuit, age discrimination claims are analyzed under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). See *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of age discrimination. To establish a prima facie case of age discrimination, a plaintiff must show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i)

replaced by someone outside of the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." Id.

XII.

## RECORDS SHOW PLANTIFF  REPLACED BY YOUNGER MAN

Based on APP 135 (Excel 00246, L. 14)), was terminated on March 16, 2022.   In addition that document reflects John Ilegwu Oloh, age 24,  replaced Jason Walters on that date with an adjusted service date of March 16, 2022.   (APP 135, l. 3)   Both employee were supervised by Eartis Shaw.

Eartis Shaw would call Plaintiff papa bear  and old man (App 123, l. 2-3).   This is also supported by declaration of Bennielee Shelby (App 129, L. 8))

XIII.

## RECORDS SHOW PATTERN OF AGE DISCRIMINATION

Plaintiff objects to the declaration of Antonio Jurarez, in that does not indicate that he ever worked on the floor with Jason Walters or Eartis Shaw.  Said declaration does not  indicate that if he did or did not he not hear Eartis Shaw call Plaintiff "old man" or "paw paw", as stated in the declarations of Plaintiff and Mr. Shelby.    Said declaration (APP 186 for Defendant) does raise an issue of fact in of itself.   It is uncertain as to whom employee JA, employee No. 185446 is, since it does not appear to be an employee that worked at the same facility as Plaintiff as reflected in document.  (APP 135).    Mr. Jurarez fails to state that (1) employee no. 011589 was age 63, and been at the facility for many years and was terminated   (2) that employee No. 004736 was age 65, had been at the facility for many years and was terminated (3) employee 201789 was age 46, had been at the facility for many years, and was terminated (4) Mr Juararez

stated that Mr. Walters was 49; however, document bate stamped excel 00246 (APP 135)  states

he was 50 years of age when he was terminated.   The actual age was 49 years, 11 months, and 23

days. certainly raising an issue of fact for the trier of fact, when it appears that the older workers

were being terminated.    It is evident from the above that Defendant does indeed terminate its

older workers.  A question of fact for the trier of fact.

XIV.

**COBRA NOTICE NOT MAILED**

Plaintiff objects to the declaration of   Bruce Gillis does not state the actual Cobra notice

was mailed to Mr. Walters.    This court has typically required evidence that a letter was actually

mailed to meet the good faith standard.  (finding good faith when the defendant mailed a

COBRA notice via certified mail, "a special type of first class mail whose primary purpose is to

provide evidence of an individual's receipt of delivery"); cf. *Custer v. Murphy Oil USA, Inc*., 503

F.3d 415, 421 (5th Cir. 2007) (genuine dispute of material fact remained on issue of mailing,

despite testimony that the defendant business typically used first-class mailing procedures).

*Hager v. DBG Partners, Inc.* 903 F. 3d 460, 468 (5th Cir. 2018).

XV.

**DECLARATION OF PLAINTIFF PROVES ACTS OF DEFENDANT**

The declaration of Jason Walters provides the following: (App. 120-128)

1.  I am a former employee of Exel, Inc. d/b/a DHL Supply Chain.  (that is not disputed)

3.  I started working for the Defendant on or about June 9, 2011.  (that is not disputed)

4.  I was terminated from the Defendant on or about March 16, 2022. (that is not disputed)

5.  I worked on the floor in the warehouse with the forklifts and the tires. (App 1-10 supports

this)

6.    Eartis  Shaw, my manager,  instructed me to arrive at work at 5:00 a.m. for my shift. (App 050, l. 21-24,  supports this).

7.    I would often work more than 12 hours a day. (App. 26-36, l. 2,  support this).

8.   Eartis Shaw, my manager, made the decision as to whether extra shifts were needed or not. (App 25, l. 1-3,  supports this).

9.   All the work that I performed while working for the Defendant was a the instruction of Eartis Shaw or some other manager. (App 11-25), (App 26-36) (App 37-38, l. 4, l. 1) (App 44, l. 11-19, 47, l. 1-4, 50, l. 21-24, l. 1, 54, l. 10-18,  57, l. 1-9,  support this).

10.  I worked a four day schedule, Wednesday through Saturday, and I was  sometimes assigned to  work on Sunday. (App 26-36 support this).

11.   After working the schedule I then had to prepare data entry and productivity reports. (App-26, l. 2, support this).

12.  I was assigned that schedule by Eartis Shaw.  (App 50, l. 21-24, support this).

13.   My job entailed a great deal of repetition work, that is reminders to other employees, such as clean as you go, drink plenty of water, do not push racks on or over the yellow lines,   don't leave anything sitting on top of the battery chargers, all tires labeled properly,  The majority of my time was spent doing the same thing over and over to make sure the other employees were being safe. Those tasks were assigned to me by Eartis Shaw and upper management with the defendant. There was little to no independent judgment on my part.  My job to a great deal was making sure the tires got out, as reflected in the end of shift reports. (App 26-36),  support this).

14. I walked and drove around the outside of the building, picking up debris, boxes and trash.

15.  When Fedex would deliver certain items, I would load the delivery truck off the dock staging area.   I did this because I was a certified forklift operator and that was part of my job.

16.  The environment in which I worked was very loud with the forklifts firing up, and the reverse alarms going off, making it very difficult to hear at times.  (App 1-10 supports this)/.

17.   In my job as operation supervisor, I was not allowed to hire or fire personnel, and anything that had to do with discipline had to go through the operations manager, Eartis Shaw.

18.  The shared desk that was used on the operations supervisors was on the warehouse floor, which was shared by the operations supervisors, in an open area.

19.  Eartis Shaw, the operations manager, had the power to fire and hire employees.

20.. I did not use independent judgment, but did what the operations manager, Eartis Shaw, and others told me what to do.

21.  I was not involved in planning long or short term business ideas, that was the job of upper management.

22.   My understanding was there was no excuses and/or a grace period for being late to work. This was supported by an email text from Adam Elliott the plant manager to Jose Gonzalez, Eartis Shaw, and Jason Smith dated March 4, 2022, that stated in part "There is no grace period that I am aware of Mickey is also not aware of a grace period.    Each associate is expected to clock in and be at their assigned work area by the scheduled start time."    I  was not included in the email/text as a Forney supervisor.  (App 37, l. 7-8,  support this).

23.   I have seen the video that was produced by the Defendant in this case, and is labeled APP 212 by the Defendant.

24.  The reason I touched Ms. Hooper's coat was that I told her she was  not wearing high

visibility colors, and the jacket that she had on did not meet the proper requirements.   High

visibility  colors are yellow, orange, and green.  That was required by the company.   Ms. Hooper

had on a company jacket which was not approved.  This  also visible in the video with a

gentlemen with a orange shirt on and a guy with a green shirt on.   There is also a gentlemen

walking in the background with a green shirt on.  .   I was doing what I was instructed to do by

my managers.   (App 1-10, the video of Plaintiff,, App 58, l 7-13,  59, l. 2-7, and 62, l. 2-23

support this).

25.    My job entailed in great part making sure employees had on the proper safety clothing and

gear.  (App 1-10, the video of Plaintiff,,  App 58, l 7-13,  59, l. 2-7, and 62, l. 2-23 support this)..

26. On March 11, 2022 at 11:25 a.m.   I forwarded an email/text to Eartis Shaw that stated in

part "Last week, I asked if there was a grace period for coming in to pre-shift late, I was told

there was no such grace period."   I was not aware that Ms. Hooper and made an agreement with

John Dobbinis and Eartis Shaw that she could come in late work.  John Dobbins nor Eartis Shaw

ever informed me of that fact.   (App 38, l. 7-8,  support this).

27.    Eartis Shaw would often call me Paw Paw in reference to my age and gray hair. (App 129, l.

4 support this).

28. Eartis Shaw would call me Paw Paw daily.   Mr. Shaw would also call me old man.   (App

129, l. 4 support this). (l, 1-14) _

29.    This is supported by the declaration of Mr. Bennielee Shelby.  (App 129 and 130 supports

this) (l. 1-14, l. 1`-9).

30.    I was not told on March 16, 2022, why I was being terminated by Eartis Shaw. (App 91

support this, l. 13.)

31. .  Document bated stamped EXEL -00246 shows my termination date as March 16, 2022. (App 135 , l. 14,  support this).

32.   Document bated stamped EXEL-00246 shows that John Ifegwu Oloh replaced me on March 16, 2022, which is also reflected in bated stamped EXEL-00246   (App 135, l. 4, support this).

33.   John Ifegwu Oloh has an  adjusted service date of March 16, 2022, being the same day as my termination.  (App 135, l.4  supports this).

34.  The date of birth of John Ifegwu is October 10, 1998.

35.  My date of birth is December 22, 1972.

36.   Mickey Moza never talked to me about my termination.

37.  After I was terminated, I applied for and received unemployment compensation.   (App 92 support this)

38.  I had insurance for myself and my son Gunner Walters, while I was employed by the Defendant.

39.   Our son, Gunner Walters, is a special needs person that needs a lot of care, which caused a great deal of concern when the insurance was discontinued by the Defendant.

40.    After I was terminated I and my son were no longer insured.

41. As a result of that I had uninsured medical expenses.

42. After I was terminated by the Defendant I needed a letter from the company about when my benefits ended so that my son and I could be put on my wife's insurance.   I did not get that letter.

43.  On March 21, 2022, I sent Mickey Moza a email/text regarding my health and dental insurance that was needed for my special needs child.   (See Exhibit "A" attached hereto) (App 116, l. 1-8, support this)

45.  On March 28, 2022, I sent Mikey Moza another email that about when my benefits would end so that my son would not have a stroke and die.   (See Exhibit "B" attached hereto)/ (App 117, l. 4-15, support this).

46.  I did not see document dated March 16, 2022, as to the reason I was being terminated; therefore, had no reason to know why I was being terminated.    (See Exhibit "C" attached hereto) (App 118, l. 13,  support this.)

47. After I was terminated, I corresponded with Tammy Williams, who is/was a manager at the facility.   One of the email/text from Ms. Williams staated in part "I will definitely send Mickey an email today when I get to Kentucky..   She is one of the biggest racists I have ever worked with."   (See Exhibit "D" attached hereto.  (App 119, l. 1-9 support this).

48.  I worked about 20 hours a week that I was not paid for at Excel, Inc.. (App. 26-36, l. 2, support this).

## CONCLUSION

Based on the above there are issues of fact to be decided by the trier of fact to whether was or was not an exempt employee under the Fair Labor Standards Act, whether Plaintiff was terminated because of his age, and whether the required COBRA requirements were completed by the Defendant.

WHEREFORE PREMISES CONSIDERED, Plaintiff Jason Walters prays that, the Court deny Defendants' Motion for Summary Judgment in its entirety, and that Plaintiff have such other and further relief to which he may show himself justly entitled, whether at law or in equity

.

Respectfully submitted

_/S/_____
Bob Whitehurst
State Bar No. 21358100
Bob Whitehurst
5380 Old Bullard Road
Suite 600, #363
Tyler, Texas 75703
(903)593-5588
(214)853-9382


CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served upon the attorney's of record in accordance with the applicable Rules of Civil Procedure on this 5th day of March, 2024

*Bob Whitehurst*

Bob Whitehurst

Annie Lau
Texas Bar No. 24057723
FISHER & PHILLIPS LLP
500 N. Akard Street, Suite 3550
Dallas, Texas 75201
Telephone: (214) 220-9100
Facsimile: (214) 220-9122
*alau@fisherphillips.com*

Theanna Bezney
Texas Bar No. 24089243
*tbezney@fisherphillips.com*
FISHER & PHILLIPS LLP
500 North Akard Street, Suite 3550
Dallas, Texas 75201
Telephone: (214) 220-9100
Facsimile: (214) 220-9122